# Exhibit H

## Fw: Requested Contracts and Billing Codes

Dan Creger <dan.creger@tennesseederm.com>
Sun 5/3/2020 3:45 PM

**To:** Dan Creger <dancreger@hotmail.com>

4 attachments (314 KB)

SkinCure Program Services Agreement - John Q. Binhlam, M.D., P.C.., - Brentwood, TN 11092017.pdf; SkinCure Leased RTT Agreement - John Q. Binhlam, M.D., P.C. (Brentwood, TN) - 11092017.pdf; SkinCure Business Associate Agreement - John Q. Binhlam, M.D., P.C.. (Brentwood, TN) 11092017.pdf; Billing Allowables (2017).pdf;

---

**From:** Kerwin Brandt <kbrandt@skincureoncology.com>
**Sent:** Thursday, November 9, 2017 2:05 PM
**To:** jbinhlam@advancedskinlaser.com <jbinhlam@advancedskinlaser.com>; Dan Creger <dan.creger@tennesseederm.com>
**Cc:** Aredden2@gmail.com <Aredden2@gmail.com>
**Subject:** Requested Contracts and Billing Codes

Dr. Binhlam and Dan,

It was a pleasure to meet you both last evening. I much enjoyed our conversation. As expressed last night, I look forward to the prospect of working with you both. As also discussed last evening, attached please find the promised contracts for SkinCure Oncology along with the Billing Allowables for Medicare for 2017. Please let me know if you have any further question. Thank you again for your interest in SkinCure Oncology.

Sincerely,

Kerwin

SkinCure
ONCOLOGY

KERWIN J BRANDT
Chief Executive Officer

[illegible] McClintock Drive, Suite [illegible]
Burr Ridge, Illinois [illegible]
[illegible]
kbrandt@skincureoncology.com

# PROGRAM SERVICES AGREEMENT

THIS PROGRAM SERVICES AGREEMENT ("*Agreement*") is made as of the 9 day of November, 2017 (the "*Effective Date*"), by and between SkinCure Oncology, LLC, a Delaware limited liability company ("*SkinCure*"), and John Q. Binhlam, M.D., P.C., a Professional Corporation (the "*Practice*").

## RECITALS

A. Sensus Healthcare Inc. has been leading recent innovations in superficial radiation therapy and electronic brachytherapy technology in part through the SRT-100 Vision™ that utilizes a high-frequency ultra-sound guidance system that allows precise targeting during treatment ("*Sensus Technology*"). Moreover, the Sensus Technology offers certain qualified patients many benefits including the following: (i) provides excellent cure rates for non-melanoma skin cancers that clinically compare favorably to surgical procedures; (ii) minimizes or avoids the painful and lengthy healing process (including risk of infection) associated with the surgical excision of cancerous tissue; (iii) minimizes or avoids the need for reconstructive plastic surgery following surgical excision of cancerous tissue; (iv) allows patients to receive a full course of fractionated radiation treatment within a dermatology office setting; and (v) permits each course of fractionated radiation treatment to be delivered in short office visits scheduled over the course of several weeks at the patient's convenience.

B. SkinCure is a national company aligned with Sensus Healthcare to develop turn-key management relationships with dermatology practices so that they can utilize the Sensus Technology and offer the above benefits to their patients. In particular, SkinCure's services include: (i) financing the acquisition and funding of ongoing maintenance of Sensus Technology; (ii) on a turn-key basis, assisting certain dermatology practices in developing, implementing and operating a clinical program to utilize the Sensus Technology in treating their patients ("*Program*"); (iii) providing comprehensive management and non-medical services to certain dermatology practices to enable them to utilize the Sensus Technology in providing superficial radiation therapy and electronic brachytherapy services to their patients ("*Radiotherapy Services*"); and (iv) recruiting, training and placing licensed radiation therapists (each a "*Radiation Therapy Technologist*" or "*RTT*") at those dermatology practices that have entered into a leased employee agreement with SkinCure ("*Leased RTT Agreement*").

C. The Practice is a professional Corporation duly organized under the laws of the State of Georgiaand operated as a medical practice specializing in the provision of dermatological services including related services to Practice patients.

D. The Practice desires to engage SkinCure to develop a Program to provide Radiotherapy Services to patients at its Practice locations.

E. The Practice desires to devote all of its time to providing quality medical services to patients, and in connection therewith desires to obtain the assistance of SkinCure in managing the business and technical aspects of the Radiotherapy Services to be provided by the Practice.

F. SkinCure desires to provide the Practice with the necessary support to manage the business and technical aspects of the Program and support the Practice in the provision of Radiotherapy Services to its patients, including developing, expanding and improving the Program, installing, calibrating and maintaining Sensus Technology, and providing supplies, clerical and billing services,

claims pursuit and collection, and general management and administrative services (collectively, "*Program Services*").

G. Further, Practice desires to secure the professional services of Radiation Therapy Technologists and will separately enter into a Leased RTT Agreement.

NOW, THEREFORE, in consideration of the foregoing and of the respective covenants and undertakings hereunder and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, intending to be legally bound, the parties hereto do hereby agree as follows:

## PRINCIPAL TERMS

1. Obligations of SkinCure.

(a) SkinCure will shall assist the Practice in developing, implementing and operating a Program to utilize the Sensus Technology in treating its patients, and shall provide to the Practice the Program Services, including without limitation providing appropriate supplies, furniture, fixtures, equipment, personnel, and operational support, all as more specifically provided in the Terms and Conditions attached as Exhibit B hereto (the "*Terms and Conditions*"), which are incorporated into this Agreement and are binding on the parties as if fully set forth herein.

(b) In providing Program Services hereunder, SkinCure shall be a business associate of the Practice under the Administrative Simplification Provisions of the Health Insurance Portability and Accountability Act, as amended, and shall enter into a Business Associate Agreement with Practice in the form set forth as Exhibit C hereto.

(c) SkinCure agrees to acquire and install the Sensus Technology at each of the Practice locations set forth in Exhibit A hereto (each a "*Practice Location*") and further will provide those supplies and items of furniture, fixtures, and other equipment necessary and/or appropriate for the provision of Radiotherapy Services at the Practice during the term of this Agreement. Unless otherwise modified in writing, at each Practice Location SkinCure will specifically provide the following:

- 1 – Shielding installation for Radiotherapy Treatment room
- 1 – Sensus Healthcare SRT-100 Vision System
- 1 – Treatment table
- 1 – Supply Kit

(all such items of furniture, fixtures, equipment and supplies are collectively referred to hereinafter as the "*FF&E*").

2. Obligations of Practice. The Practice will provide the professional services associated with the Program and certain other support services, including without limitation providing qualified Physicians and Mid-Level Providers (as defined in Section 1.1 of the Terms and Conditions) to supervise the provision of Radiotherapy services, provide billing information to enable SkinCure to bill, in the Practice's name and on its behalf, for Radiotherapy Services provided by the Practice, participate in quality and utilization management programs relating to the provision of Radiotherapy Services, provide suitable space in the Practice's offices for the provision of Radiotherapy Services, and promote the Program (using educational materials provided by SkinCure), all as more specifically provided in the Terms and Conditions.

SkinCure is entitled to seek injunctive relief to enforce it. The terms of this Section 7(b) of these Principal Terms shall survive the termination of this Agreement.

(c) Nonsolicitation of Personnel. During the term of this Agreement and for a period of two (2) years thereafter, the Practice shall not directly or indirectly employ, hire or contract for services with (a) any employees or former employees of SkinCure, (b) any current or former independent contractors of SkinCure who provided services under this Agreement on behalf of SkinCure, or (c) any Radiation Therapy Technologists who provided services under or related to this Agreement. The terms of this Section 7(c) of these Principal Terms shall survive the termination of this Agreement.

8. Nonsolicitation of Personnel by SkinCure. SkinCure covenants and agrees that during the term of this Agreement and for a period of two (2) years thereafter, SkinCure shall not, directly or indirectly, employ, hire or contract for services with (a) any employees or former employees of the Practice or (b) any current or former independent contractors of the Practice who provided services under this Agreement on behalf of the Practice; provided that this Section 8 of these Principal Terms shall not preclude SkinCure from continuing existing arrangements or entering into new arrangements with Radiation Therapy Technologists who were leased employees or independent contractors of the Practice. The terms of this Section 8 of these Principal Terms shall survive the termination of this Agreement.

INTENDING TO BE LEGALLY BOUND, the authorized representatives of the parties have executed this Agreement on the date set forth below, effective as of the Effective Date.

| SKINCURE ONCOLOGY, LLC | JOHN Q. BINHLAM, M.D., P.C. |
| --- | --- |
| By: ______________________ | By: ______________________ |
| Name: ______________________ | Name: ______________________ |
| Title: ______________________ | Title: ______________________ |
| Date: ______________________ | Date: ______________________ |

SkinCure

EXHIBIT A

PRACTICE LOCATIONS

1.) 16419 Westgate Circle, Suite 100, Brentwood, TN 37027

SkinCure

# EXHIBIT B
# TERMS AND CONDITIONS

## ARTICLE I
## OBLIGATIONS OF SKINCURE

SECTION 1.1 Program Services. SkinCure shall assist the Practice in developing, implementing and operating a Program to utilize the Sensus Technology in treating its patients and shall provide to the Practice the Program Services. However, the Practice and (a) the physicians who are duly licensed to practice medicine in the state(s) in which the Practice operates and who are either employees or independent contractors of the Practice (the "*Physicians*") and (b) those mid-level providers employed by the Practice who are licensed as physician assistants or advanced registered nurse practitioners (or equivalent) in the state(s) in which the Practice operates and who are qualified (in light of their education and experience) and authorized (within their respective scopes of practice and applicable law) to perform or supervise the performance medical functions of the type contemplated by this Agreement, including without limitation the performance or supervision of Radiotherapy Services (the "*Mid-Level Providers*" and, collectively with the Physicians, the "*Qualified Providers*") will perform all of the medical functions associated with the provision of medical services. SkinCure will have no authority, directly or indirectly, to perform, and will not perform, any medical functions. SkinCure may, however, advise the Practice as to the relationship (if any) between its performance of medical functions and the overall administrative and business functioning of the Program. To the extent that any SkinCure personnel assist the Practice and the Qualified Providers in performing medical functions, such SkinCure personnel shall be subject to the professional direction and supervision of the Practice and, in the performance of such medical functions, shall not be subject to any direction or control by, or create any liability on behalf of SkinCure.

SECTION 1.2 Furniture, Fixtures, Equipment and Supplies; Facility Improvements.

(a) Title to the existing, additional and replacement FF&E provided by SkinCure pursuant to Section 1(c) of the Principal Terms shall be in the name of SkinCure, any affiliate of SkinCure, or any of their respective nominees or a leasing company. SkinCure shall, at its sole expense, maintain and arrange for any needed repairs to the FF&E.

(b) SkinCure represents and warrants that the FF&E provided by SkinCure to the Practice to the Practice pursuant to Section 1.2(a) of these Terms and Conditions shall be of a quality and quantity suitable for the operation of the Program. Apart from the warranty provided in the preceding sentence and the maintenance and repair obligations of SkinCure pursuant to Section 1.2(a) of these Terms and Conditions, SkinCure, not being the manufacturer of any FF&E, makes no warranty or representation, either express or implied, as to the merchantability, fitness for a particular purpose, design, condition, durability, capacity, material or workmanship of the FF&E. Fulfillment of obligations under any warranties provided by a manufacturer or suppliers of the FF&E or of any third party shall be the sole responsibility of the manufacturer, supplier, or third party providing such warranty, and SkinCure shall have no obligation hereunder other than to use reasonable efforts to enforce the terms of such warranties. The Practice shall cooperate with SkinCure as SkinCure reasonably requests in order to enforce the terms of such warranties.

(c) SkinCure, at its expense, will provide or arrange for the provision of such improvements as are needed to render the space provided by the Practice suitable for the provision of Radiotherapy Services.

SECTION 1.3 Day to Day Operations. Subject to the terms and provisions of this Agreement, SkinCure shall provide management and operations oversight of the day to day operation of the Program, subject to Practice's requirements and the ultimate authority of the Practice and its Qualified Providers to direct the delivery of patient care at the Practice. SkinCure hereby is expressly authorized to perform management and operations services in whatever manner it reasonably deems appropriate to meet the day-to-day requirements of the non-medical business functions of the Practice relating to the Program. Without limiting the foregoing, SkinCure shall perform the following functions: (a) accounting, bookkeeping, billing processing and accounts payable processing; (b) materials management, including purchase and stocking of office and medical supplies at levels reasonably necessary for the provision of Radiotherapy Services to patients receiving such services at the Practice; (c) in accordance with the limitations of Section 1.4 of these Terms and Conditions, human resources management, including recruitment of any necessary additional personnel that are approved by the parties; (d) provide financial auditing services reasonably necessary for billing purposes and for compliance with Medicare and Medicaid, managed care contracts, and other federal, state, or private payor reimbursement programs or plans; (e) assist the Practice in the evaluation, negotiation and administration of all managed care contracts and other third-party payor contracts relating to Radiotherapy Services; (f) provide ongoing assessment of business activity of the Program, including outcomes monitoring and patient satisfaction; (g) order and purchase all medical and office supplies required in the day-to-day operation of the Program at the Practice; and (h) provide such other services as are deemed reasonably necessary by SkinCure to assure the efficient delivery of Radiotherapy Services to patients of the Practice. Although Practice will be responsible for the ultimate decisions regarding coding and billing procedures, the Practice hereby irrevocably appoints SkinCure its lawful attorney-in-fact, with full authority in the place and stead of the Practice and in the name of the Practice, SkinCure or otherwise, and with full power of substitution in the premises (which power

of attorney, being coupled with an interest, is irrevocable for so long as this Agreement shall be in effect), for the purposes of billing patients for Radiotherapy Services on the Practice's behalf.

SECTION 1.4 Personnel.

(a) After consultation with the Practice, SkinCure shall provide to the Practice the services of a radiation safety officer and the services of one or more physicists as required for the Program. In addition, SkinCure shall provide the services of appropriate revenue collection personnel as are necessary for the collection of accounts receivable and other amounts owing to the Practice for Radiotherapy Services provided by the Practice ("*Receivables*") and maintenance of the financial records of the Practice to the extent directly related to the Radiotherapy Services. SkinCure shall determine the compensation and fringe benefits of all personnel employed by SkinCure, and at all times during the term of this Agreement such personnel shall be employees or independent contractors of SkinCure and not of the Practice. SkinCure shall be responsible for the assignment of all such personnel to perform services hereunder; provided, however, that SkinCure shall, at the Practice's reasonable request, reassign or replace any non-physician medical support personnel who are not, in the Practice's judgment, adequately performing the required services. Neither the Practice nor SkinCure shall discriminate against such personnel on the basis of race, religion, age, sex, disability or national origin, or otherwise in violation of any applicable Law.

(b) SkinCure shall assist the Practice in employing (as leased employees) or contracting with Radiation Therapy Technologists to provide technical support for Radiotherapy Services delivered at the Practice pursuant to the Leased RTT Agreement. All radiation therapists who support the delivery of Radiotherapy Services at the Practice shall act in the capacity of employees or independent contractors of the Practice and not SkinCure, but SkinCure shall assist the Practice in recruiting such personnel, negotiating the terms of the Practice's contracts with such personnel, and administering such contracts on behalf of the Practice. The Practice, and not SkinCure, shall be responsible for the professional direction and supervision of such Radiation Therapy Technologists. SkinCure shall reimburse the Practice for the fees and expenses incurred by the Practice under the Leased Therapist Agreement as provided in Section 4 of the Principal Terms.

SECTION 1.5 Files and Records.

(a) The Practice shall supervise the preparation of, and direct the contents of, patient medical records, all of which shall be and remain confidential and the property of the Practice. The Practice shall establish and enforce procedures to ensure that the Practice's professional staff properly prepare and complete medical records for all patients who receive Radiotherapy Services as required by applicable Law, the requirements of the Practice, the recommendations of SkinCure, and the rules and regulations of any third-party payors with which the Practice may contract or affiliate from time to time. All such patient records shall be maintained for the periods required by, and subject to the other requirements of, applicable Law. SkinCure shall have reasonable access to such records.

(b) Subject to paragraph (a) above, SkinCure shall maintain all files and records relating to the operation of the Program, including customary financial records and patient files relating to the Receivables. SkinCure shall use its best efforts to manage all files and records in compliance with all applicable Laws, and all files and records shall be located so that they are readily accessible for patient care, consistent with ordinary records management practices.

## ARTICLE II
## OBLIGATIONS OF THE PRACTICE

SECTION 2.1 Services and Service Hours. Unless otherwise agreed to by each of the parties, at all times during the term of this Agreement, the Practice agrees to ensure that: (a) a sufficient number of Qualified Providers and Radiation Therapy Technologists are available to provide or supervise the provision, as appropriate, of Radiotherapy Services at the Practice; (b) each patient seeking Radiotherapy Services is treated within a reasonable time of such patient's request for treatment; and (c) a Qualified Provider shall be available at the applicable office, at all times, when a patient is being treated. The Practice's obligations under this Section 2.1 are contingent upon SkinCure's performance of its obligations under the Leased RTT Agreement.

SECTION 2.2 Professional Standards.

(a) The Radiotherapy Services provided by the Practice and its personnel shall be performed solely by or under the supervision of a Qualified Provider licensed to practice medicine (or licensed to practice as a physician assistant, advanced registered nurse practitioner, or equivalent) in the applicable states and shall at all times be provided in accordance with applicable ethical standards and Laws applying to the medical profession (or with any standards to which by contract it has agreed to abide). The Practice shall, with the assistance of SkinCure if so requested, resolve any utilization management or quality improvement issues (as described more fully in Section 2.6 of these Terms and Conditions) which may arise in connection with the provision of Radiotherapy Services.

(b) If any disciplinary actions or professional liability actions are initiated against the Practice or any of its personnel, the Practice shall immediately inform SkinCure of such action and the underlying facts and circumstances and provide SkinCure, promptly upon receipt thereof but in any event within five business days, with copies of all documents received by SkinCure with respect to any such action. SkinCure shall similarly inform the Practice of any such disciplinary actions or professional liability actions initiated against the Practice or any of the Practice's personnel of which SkinCure first becomes aware and provide the Practice, promptly upon receipt thereof but in any event within five Business Days, with copies of all documents received by SkinCure with respect to any such action.

(c) The Practice shall establish and maintain procedures to assure the consistency and quality of all professional Radiotherapy Services provided by the Practice, and SkinCure shall render administrative assistance to the Practice as requested in furtherance thereof. The Practice shall in good faith cooperate with inspections and on-site surveys of the Radiotherapy Services as may be conducted by any Governmental Authority, accrediting organization or other third-party payor.

SECTION 2.3 Powers of Attorney. The Practice shall require all Qualified Providers to execute and deliver to the Practice powers of attorney, satisfactory in form and substance to SkinCure, appointing the Practice as attorney-in-fact for each such Qualified Provider to permit the Practice to execute documents relating to this Agreement and/or the Program on behalf of such Qualified Providers.

SECTION 2.4 Cooperation. The Practice shall, and shall request the Qualified Providers to, cooperate with and assist SkinCure to control all costs and expenses relating to the operation of the Radiotherapy Services without sacrificing professional standards or patient care. The Practice shall, and shall require Qualified Providers to, exercise due care to ensure that, when being used by the Qualified Providers, medical equipment utilized by the Practice is being used in a safe and efficient manner, and shall timely report any unsafe or unsatisfactory equipment of which the Practice, or any of the Qualified Providers, is aware. The parties acknowledge that the Practice retains full authority and responsibility for patient care and that SkinCure's policies and procedures referenced herein are not to interfere with the Practice's authority with respect to patient care issues. The Practice also agrees to cooperate with, and participate in, any patient satisfaction surveys and/or outcomes management surveys or programs instituted or implemented by SkinCure, subject to approval by the Practice (such approval not to be unreasonably withheld or delayed).

SECTION 2.5 Billing Information and Collection Policy.

(a) The Practice shall promptly provide SkinCure with all billing information requested by SkinCure (including appropriate provider numbers, the name of the patient, the date of service, and the nature and extent of services provided) and any supporting medical information necessary to enable SkinCure to bill and collect the Practice's charges for Radiotherapy Services pursuant hereto. The Practice shall cause each Qualified Provider to provide SkinCure with billing codes and complete descriptions supporting all Radiotherapy Services performed by such Qualified Provider, and shall comply with all reasonable requests by SkinCure to supplement such coding or descriptions for billing purposes.

(b) All professional fee schedules for Radiotherapy Services shall be approved by the Practice. SkinCure shall review all proposed professional fee schedules and provide recommendations to the Practice with respect thereto. No discount, fee reduction, writeoff, or other waiver of the agreed fees shall be made by SkinCure without express authorization of the Practice, which authorization shall not be unreasonably withheld.

SECTION 2.6 Quality and Utilization Management. The Practice acknowledges and agrees that a quality and utilization management program for determining the medical necessity and appropriateness of Radiotherapy Services provided by the Practice provides controls and protections that assist to prevent potential overutilization with any fee-for-service arrangement including, but not limited to, those reimbursable under federal health insurance programs and also provides essential data to the Practice and SkinCure for the purposes of managing the Radiotherapy Services and negotiating, administering and maintaining third-party payor contracts. The Practice and SkinCure agree to develop and implement a quality and utilization management program in accordance with recommendations made by SkinCure or the Practice or as required under third-party payor contracts. The Practice shall cause the Qualified Providers to participate in the development of such programs and to comply with the standards, protocols or practice guidelines established thereby, and the Practice will ensure that such individuals are required by their employment agreements or other contracts to do so. SkinCure is authorized by the Practice to prepare and distribute reports of such program activities to employees of, and consultants to the Practice and SkinCure, to third-party payors, and to such other Persons as SkinCure deems necessary in order for SkinCure to carry out its obligations hereunder.

SECTION 2.7 Space. The Practice shall provide suitable space in the Practice's offices for the provision of Radiotherapy Services consistent with applicable laws and regulations, radiation therapy equipment manufacturers' requirements, and as otherwise mutually agreed by the parties. The parties anticipate that approximately 100 square feet of office space will be required for the provision of Radiotherapy Services at each Practice location.

SECTION 2.8 Permits. The Practice shall be responsible for obtaining any and all Permits (as defined in Section 5.1(d)(ii) of these Terms and Conditions) that are required for the Practice to provide Radiotherapy Services. SkinCure shall assist the Practice in obtaining such Permits and will pay or reimburse any reasonable out of pocket expenses incurred in securing or maintaining such Permits.

SECTION 2.9 Promotion of Radiotherapy Services. The Practice shall be solely responsible for all advertising and promotional efforts (and all of the costs and expenses associated therewith) relating to the Radiotherapy Services. SkinCure may provide the Practice with certain community and patient educational materials that the Practice may use, in its discretion, for the education of the Practice's community and patients regarding Radiotherapy Services. By providing SkinCure-branded community and patient educational materials for the Practice's use hereunder, SkinCure authorizes Practice to use SkinCure's name, as incorporated in such materials, for the purpose of educating the Practice's community and patients regarding Radiotherapy Services during the Term. Practice's license to use such materials and SkinCure's name shall expire upon the expiration or termination of this Agreement. In no manner shall the Practice's license to use such SkinCure materials imply that SkinCure is exercising any control over the Practice's marketing or related activities or that otherwise that Practice is operating as a francise of SkinCure.

## ARTICLE III
## FINANCIAL ARRANGEMENT

SECTION 3.1 Collateral Security.

(a) Grant of Security Interest. To the extent permitted by applicable Law, as collateral security for the prompt and complete payment when due of all Management Fees and other obligations arising under this Agreement including the return of FF&E under Section 4.4 of these Terms and Conditions ("***Secured Obligations***"), the Practice hereby sells, assigns, mortgages, hypothecates, conveys and transfers to SkinCure, and hereby grants to SkinCure a continuing security interest (subordinate only to any security interest of third party payors in Receivables owed by such payor) in all of the Practice's rights, title and interest in, to and under the Receivables (other than the Governmental Receivables) which may be created or arise during the term of this Agreement, together with any and all proceeds (as defined in the Uniform Commercial Code) and products thereof, accessions thereto and substitutions and additions therefor, regardless of the manner in which the entitlement to payment for such Receivables shall exist, whether as accounts, accounts receivable, notes receivable or other evidence of entitlement to the Receivables, and all of the Practice's rights, title and interest (including its right to control the same), if any, in, to and under the Practice Lockbox Account and the sums on deposit therein (referred to collectively as the "***Collateral***"). "***Government Receivables***" shall mean all accounts receivable generated from Radiotherapy Services rendered to beneficiaries under the Medicare, Medicaid and other state and federal programs, which services are reimbursable under any of such programs.

(b) Remedies. If an Event of Default shall have occurred and be continuing, SkinCure shall be entitled to exercise in respect of the Collateral all of its rights, powers and remedies provided for herein or otherwise available to it by Law, in equity or otherwise, including all rights and remedies of a secured party under the Uniform Commercial Code, and shall be entitled in particular, but without limitation of the foregoing, to exercise the following rights, which the Practice agrees to be commercially reasonable: to sell, resell, assign and deliver, in its sole discretion, all or any of the Collateral, in one or more parcels, at public or private sale, at SkinCure's main office or elsewhere, for cash, upon credit or for future delivery, at such time or times and at such price or prices and upon such other terms as SkinCure may deem satisfactory. If any of the Collateral is sold by SkinCure upon credit or for future delivery, SkinCure shall not be liable for the failure of the purchaser to purchase or pay for the same and, in the event of any such failure, SkinCure may resell such Collateral. In no event shall the Practice be credited with any part of the proceeds of sale of any Collateral until and to the extent cash payment in respect thereof has actually been received by SkinCure. Each purchaser at any such sale shall hold the property sold absolutely, free from any claim or right of whatsoever kind, including any equity or right of redemption of the Practice, and the Practice hereby expressly waives all rights of redemption, stay or appraisal, and all rights to require SkinCure to marshal any assets in favor of the Practice or any other party or against or in payment of any or all of the Secured Obligations, that it has or may have under any rule of Law now existing or hereafter adopted. No demand, presentment, protest, advertisement or notice of any kind (except any notice required by Law, as referred to below), all of which are hereby expressly waived by the Practice, shall be required in connection with any sale or other disposition of any part of the Collateral. If any notice of a proposed sale or other disposition of any part of the Collateral shall be required under applicable Law, SkinCure shall give the Practice at least 10 days' prior notice of the time and place of any public sale and of the time after which any private sale or other disposition is to be made. SkinCure shall not be obligated to make any sale of Collateral if it shall determine not to do so, regardless of the fact that notice of sale may have been given. SkinCure may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. Upon each public sale and, to the extent permitted by applicable Law, upon each private sale, SkinCure may purchase all or any of the Collateral being sold, free from any equity, right of redemption or other claim or demand, and may make payment therefor by endorsement and application (without recourse) of the Secured Obligations in lieu of cash as a credit on account of the purchase price for such Collateral.

SECTION 3.2 Deposit of Receivables. The Practice shall provide SkinCure with an accurate and complete list of all third-party payors and will provide SkinCure's designees access to the Practice's billing system. The Practice and SkinCure will add new physician designators to the Practice's billing system for use in billing for a Physician's provision of Radiotherapy Services. All amounts received from third-party payors, including the Medicare program, Medicaid program, and other government health care programs, will be deposited into an existing bank account in the Practice's name (the "Practice Account") over which the Practice will have sole and exclusive authority and control. SkinCure and the Practice shall periodically reconcile amounts received in the Practice Account from billing under Radiotherapy Services physician designators against the Management fees and other amounts due to SkinCure, and the Practice shall pay such amounts to SkinCure periodically, but no less frequently than twice monthly.

## ARTICLE IV
## TERMINATION

SECTION 4.1 Termination by SkinCure. Upon written notice to the Practice, SkinCure may terminate this Agreement and have no further liability or obligation hereunder (except as expressly provided herein) upon the occurrence of any of the following events (each an "*Event of Default*"):

(a) The Practice is involuntarily suspended, excluded or terminated from participation in the Medicare or Medicaid programs.

(b) The Practice withdraws from participation in the Medicare or Medicaid programs as a result of regulatory investigation or the Practice is excluded from entering into healthcare provider agreements with any material portion of the managed care or healthcare insurance industry.

(c) If the Practice shall apply for or consent to the appointment of a receiver, trustee or liquidator of it or all or a substantial part of its assets, file a voluntary petition in bankruptcy or admit in writing its inability to pay its debts as they come due, make a general assignment for creditors or take advantage of any insolvency Law, or if any order, judgment or decree shall be entered by any court of competent jurisdiction, on the application of a creditor, adjudicating it as bankrupt or insolvent or approving a petition seeking its reorganization or appointment of a receiver, trustee, or liquidator of it or all or a substantial part of its assets.

(d) The Practice ceases to perform its duties and responsibilities hereunder or breaches any material term or condition of this Agreement and, in the reasonable opinion of SkinCure, such cessation or breach remains uncured for a period of sixty (60) days after the Practice's receipt of a written notice specifying such breach.

(e) The Practice revokes any instructions to a third-party payor related to the Payor Instruction Letter or revokes or modifies any instructions to the Depository Bank in connection with the Practice Lockbox Agreement as set forth in Section 3.2 of these Terms and Conditions.

(f) The Leased RTT Agreement terminates for any reason and Practice fails to enter into a new Leased RTT Agreement, on terms acceptable to SkinCure, within thirty (30) days following such termination.

(g) Any representations and warranties made by the Practice in this Agreement prove to be untrue or incorrect in any material respect as of the date of this Agreement or any representations or warranties of a continuing nature made by the Practice cease to be true and correct at any future date in any material respect and, in each case, SkinCure has notified the Practice of the breach, and the breach has continued without cure for a period of thirty (30) days after such notice.

SECTION 4.2 Termination by the Practice. Upon written notice to SkinCure, the Practice may terminate this Agreement and have no further liability or obligation hereunder (except as expressly provided herein) upon the occurrence of any of the following events:

(a) If SkinCure shall apply for or consent to the appointment of a receiver, trustee or liquidator of it or all or a substantial part of its assets, file a voluntary petition in bankruptcy or admit in writing its inability to pay its debts as they come due, make a general assignment for creditors or take advantage of any insolvency Law, or if any order, judgment or decree shall be entered by any court of competent jurisdiction, on the application of a creditor, adjudicating it as bankrupt or insolvent or approving a petition seeking its reorganization or appointment of a receiver, trustee, or liquidator of it or all or a substantial part of its assets.

(b) SkinCure ceases to perform its duties and responsibilities hereunder or breaches any material term or condition of this Agreement and, in the reasonable opinion of the Practice, such cessation or breach remains uncured for a period of sixty (60) days after SkinCure's receipt of a written notice specifying such breach.

(c) Any representation and warranties made by SkinCure in this Agreement prove to be untrue or incorrect in any material respect as of the date of this Agreement or any representations or warranties of a continuing nature made by SkinCure cease to be true and correct at any future date in any material respect and, in each case, the Practice has notified SkinCure of the breach, and the breach has continued without cure for a period of thirty (30) days after such notice.

SECTION 4.3 Limitation On Termination Rights. Notwithstanding anything to the contrary contained herein, the Practice shall not be permitted to terminate this Agreement pursuant to Section 4.2(b) of these Terms and Conditions if SkinCure's actions or inactions are a result of any written directions or instructions of the Practice.

SECTION 4.4 Duties And Remedies Upon Expiration Or Termination. Except as necessary to provide care to any patient undergoing treatment at any Practice at the time of the expiration or earlier termination of this Agreement, upon the expiration or earlier termination of this Agreement, the Practice and SkinCure hereby agree to perform, in addition to their obligations provided for elsewhere in this Agreement and continuing after such expiration or termination of this Agreement, such steps as are otherwise customarily required to wind up their relationship under this Agreement in as orderly a manner as possible. Without limiting the generality of the foregoing, the parties agree that once all courses of treatment in process as of the date of expiration or termination of this Agreement are completed, SkinCure may remove all of its property from the Practice's locations, including without limitation all FF&E and policies and procedures manuals, and Practice shall cooperate fully with and shall take no action to impede such removal. SkinCure shall use its reasonable efforts to mitigate any damage to the Practice's locations as a result of such removal of property. Except as specifically set forth herein, upon the expiration or earlier termination of this Agreement, neither party shall have any further obligation hereunder with the exception of obligations accruing prior to the date of such expiration or earlier termination and obligations, promises and covenants contained herein which extend beyond the terms hereof including any indemnities, restrictive covenants and access to books and records. From and after any expiration or earlier termination, each party shall provide the other with reasonable access to books and records then owned by it to permit such requesting party to satisfy legal reporting and contractual obligations which may be required of it.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE PRACTICE

SECTION 5.1 The Practice hereby represents and warrants to SkinCure as follows:

(a) Organization and Qualification. The Practice is a professional association duly organized, validly existing and in good standing under the Laws of the State of Texas and has all power and authority to own, lease and operate its properties and assets and to carry on its business as currently being conducted and as proposed to be conducted.

(b) Authority. The Practice has the requisite power and authority to execute and deliver this Agreement and all other instruments or agreements to be executed in connection herewith, and to consummate the transactions contemplated hereby. The execution, delivery and performance of this Agreement, and the consummation of the transactions contemplated hereby, have been duly authorized by all necessary action on the part of the Practice, and no other proceedings on the part of the Practice are necessary to authorize this Agreement or to consummate the transactions contemplated hereby. This Agreement has been duly executed and delivered by the Practice and, assuming this Agreement constitutes a valid and binding obligation of SkinCure, constitutes a valid and binding obligation of the Practice enforceable against it in accordance with its terms.

(c) Consents and Approvals; No Violations. Neither the execution, delivery or performance of this Agreement by the Practice, nor the consummation by the Practice of the transactions contemplated hereby nor compliance by the Practice with any of the provisions hereof (including the Practice's grant of a security interest hereunder) will (a) conflict with or result in any breach of any provision of the Articles of Association or other governing documents of the Practice, (b) require any filing with, or consent of a Governmental Authority, agency or court or other Person or entity by the Practice, (c) (with or without the giving or receipt of notice or passage of time or both) result in a violation or breach of, or constitute a default or give rise to any right of termination, amendment, cancellation or acceleration under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, lease, license, contract, agreement or other instrument or obligation to which the Practice is a party (or becomes a party) or by which any of its properties or assets may be bound or subject or (d) violate any writ, injunction or decree applicable to the Practice or any of its properties or assets.

(d) Compliance With Laws; Licenses.

(i) The conduct of the operations of the Practice (including the conduct of any Qualified Provider or any other practice employee) has not violated, and as presently conducted does not violate, any Laws or any other promulgations, interpretative advice or guidance of any court or Governmental Authority or agency, including the Occupational Safety and Health Administration, the Department of Transportation, the Centers for Medicare and Medicaid Services and the Food and Drug Administration or any medical industry standards, nor has the Practice received any notice of any such violation which remains outstanding. Without limiting the generality of the foregoing, neither the Practice nor any Practice personnel has

ever been suspended, excluded, debarred, or sanctioned by Medicare, Medicaid, TRICARE, or any other state or federal healthcare program, nor has any of them been convicted of a criminal offense related to healthcare.

(ii) The Practice has all licenses, certificates, permits, approvals, franchises, notices and authorizations ("*Permits*") required for the conduct of its operations as currently conducted and as proposed to be conducted (including accreditations and certifications as a provider of healthcare services eligible to receive payment and compensation and to participate under Medicare and Medicaid). To the Practice's knowledge, all of such Permits are in full force and effect, and the Practice has not engaged in any activity which would cause or permit revocation, modification, cancellation or suspension of any such Permit, and no action or proceeding looking to or contemplating the revocation, modification, cancellation or suspension of any such Permit is pending or threatened. The Practice has no knowledge of any default or claimed or purported or alleged default or state of facts which, with or without the giving or receipt of notice or the passage of time or both, would constitute a default by the Practice under, or give rise to a right of revocation, modification, cancellation or suspension of, any such Permit.

(iii) The Practice qualifies as (and will continue to qualify during the term of this Agreement as) a "group practice" as defined in the federal physician self-referral law at 42 USC § 1395nn, the applicable regulations and any similar state laws.

(e) Litigation; Investigations. There are no suits, claims, proceedings, investigations or reviews which are pending or, to the knowledge of the Practice, threatened against or affecting the Practice, any Qualified Provider, any director or officer (in their capacity as such) of the Practice or any properties or assets used by the Practice in conducting its businesses. To the knowledge of the Practice, no investigation or review by any Governmental Authority, agency or court or other regulatory body (including trade associations) with respect to either the Practice or any Qualified Provider or other practice employee is pending or threatened or probable of initiation, nor has any Governmental Authority, agency or court or other regulatory body (including trade associations) indicated to the Practice an intention to conduct the same, and there is no action, suit or proceeding pending or, to the knowledge of the Practice, threatened against or affecting the Practice or any Qualified Provider or other practice employee, at Law or in equity, or before any Governmental Authority or other regulatory body (including trade associations).

(f) Professional Liability. No Qualified Provider or other employee of the Practice has ever (a) had his or her license to practice medicine or other profession in any state or his or her Drug Enforcement Agency Number suspended, relinquished, terminated, restricted or revoked; (b) been reprimanded, sanctioned or disciplined by any licensing board, or any federal, state or local society or agency, Governmental Authority or specialty board; (c) had entered against him or her final judgment in, or settled without judgment, a malpractice or similar action for an aggregate award or amount to the plaintiff in excess of $25,000; or (d) had his or her medical staff privileges at any hospital or medical facility suspended, involuntarily terminated, restricted or revoked.

(g) Collateral. The Collateral pledged by the Practice hereunder is and shall be free and clear of any Liens except for the Liens granted to SkinCure pursuant to this Agreement. No security agreement, financing statement or other public notice with respect to all or any part of the Collateral is on file or of record in any government or public office, and the Practice has not filed or consented to the fling of any such statement or notice, except Uniform Commercial Code financing statements naming SkinCure as secured party.

(h) Security Interests; Filings. This Agreement, together with the filing of duly completed and executed Uniform Commercial Code financing statements naming the Practice as debtor, SkinCure as secured party, and describing the Collateral, in the State of Texas, which have been duly executed and delivered by the Practice and delivered to SkinCure for filing, creates, and at all times shall constitute, a valid and perfected security interest in and Lien upon the Collateral in favor of SkinCure to the extent a security interest therein can be perfected by such filings or possession, as applicable, superior and prior to the rights of all other Persons therein, and no other or additional filings, registrations, recordings or actions are or shall be necessary or appropriate in order to maintain the perfection and priority of such Lien and security interest, other than actions required with respect to Collateral of the types excluded from Article 9 of the Uniform Commercial Code or from the filing requirements under such Article 9 by reason of Section 9-104 or 9-302 of the Uniform Commercial Code and other than continuation statements required under the Uniform Commercial Code.

(i) Limited Use of FF&E. The Practice acknowledges that no right, title, or interest in any FF&E shall pass to Practice other than the right to possess and use the FF&E during the Term. The Practice shall reasonably facilitate SkinCure (or its designated interested parties) in perfecting and maintaining title in and to the FF&E. Practice agrees not to sell, assign, sublet, pledge, or otherwise encumber any interest in the FF&E and agrees to keep the same free from any lien, encumbrance, right of restraint, or any other claim that may be asserted by any third party. Upon actual knowledge thereof, Practice shall immediately notify SkinCure in writing of any tax or other liens attaching to any part of the FF&E. Practice hereby confirms its intent that the FF&E always remain and be deemed personal property of SkinCure (or its designated interested parties) even though FF&E may become attached or affixed to realty. Practice shall obtain all such waivers as SkinCure may reasonably require acknowledging SkinCure's (or its designated interested parties, if applicable) interest in, and assuring SkinCure's rights in and to the FF&E, including any landlord and mortgage waivers, if applicable.

(j) Receivables. The Practice shall take such actions as are required of the Practice to ensure that each Receivable is, or at the time it arises will be, a bona fide, valid and legally enforceable indebtedness of the account debtor according to its terms, arising out of or in connection with the sale, lease or performance of goods or services by the Practice, including, without limitation, ensuring that such Receivable results from the performance of medically necessary services provided by the Practice and that the patient's chart notes contain all documentation necessary to support the submission of a valid claim for payment for such services.

(k) Disclosure. No representation, warranty or statement made by the Practice in this Agreement contains any untrue statement of a material fact, or omits to state a material fact required to be stated herein or necessary to make the statements contained herein, in light of the circumstances under which they were made, not misleading.

SECTION 5.2 SkinCure hereby represents and warrants to the Practice as follows:

(a) Organization and Qualification. SkinCure is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and qualified to do business in the State of Texas. SkinCure has all power and authority to own, lease and operate its properties and assets and to carry on its business as currently being conducted and as proposed to be conducted.

(b) Authority. SkinCure has the requisite power and authority to execute and deliver this Agreement and all other instruments or agreements to be executed in connection herewith, and to consummate the transactions contemplated hereby. The execution, delivery and performance of this Agreement, and the consummation of the transactions contemplated hereby, have been duly authorized by all necessary action on the part of SkinCure, and no other proceedings on the part of SkinCure are necessary to authorize this Agreement or to consummate the transactions contemplated hereby. This Agreement has been duly executed and delivered by SkinCure and, assuming this Agreement constitutes a valid and binding obligation of the Practice, constitutes a valid and binding obligation of SkinCure enforceable against it in accordance with its terms.

(c) Consents and Approvals; No Violations. Neither the execution, delivery or performance of this Agreement by SkinCure, nor the consummation by SkinCure of the transactions contemplated hereby nor compliance by SkinCure with any of the provisions hereof, will (a) conflict with or result in any breach of any provision of the charter or limited liability company operating agreement of SkinCure, (b) require any filing with, or consent of a Governmental Authority, agency or court or other Person or entity by SkinCure, (c) (with or without the giving or receipt of notice or passage of time or both) result in a violation or breach of, or constitute a default or give rise to any right of termination, amendment, cancellation or acceleration under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, lease, license, contract, agreement or other instrument or obligation to which SkinCure is a party (or becomes a party) or by which any of its properties or assets may be bound or subject or (d) violate any writ, injunction or decree applicable to SkinCure or any of its properties or assets.

(d) Compliance With Laws; Licenses.

(i) The conduct of the operations of SkinCure (including the conduct of any SkinCure employee) has not violated, and as presently conducted does not violate, any Laws or any other promulgations, interpretative advice or guidance of any court or Governmental Authority or agency, including the Occupational Safety and Health Administration, the Department of Transportation, the Centers for Medicare and Medicaid Services and the Food and Drug Administration or any medical industry standards, nor has SkinCure received any notice of any such violation which remains outstanding. Without limiting the generality of the foregoing, neither SkinCure nor any of its affiliates or any SkinCure personnel has ever been suspended, excluded, debarred, or sanctioned by Medicare, Medicaid, TRICARE, or any other state or federal healthcare program, nor has any of them been convicted of a criminal offense related to healthcare.

(ii) SkinCure has all Permits required for the conduct of its operations as currently conducted and as proposed to be conducted. To SkinCure's knowledge, all of such Permits are in full force and effect, and SkinCure has not engaged in any activity which would cause or permit revocation, modification, cancellation or suspension of any such Permit, and no action or proceeding looking to or contemplating the revocation, modification, cancellation or suspension of any such Permit is pending or threatened. SkinCure has no knowledge of any default or claimed or purported or alleged default or state of facts which, with or without the giving or receipt of notice or the passage of time or both, would constitute a default by SkinCure under, or give rise to a right of revocation, modification, cancellation or suspension of, any such Permit.

(e) Litigation; Investigations. There are no suits, claims, proceedings, investigations or reviews which are pending or, to the knowledge of the Practice, threatened against or affecting SkinCure, any member or manager (in their capacity as such) of SkinCure or any properties or assets used by SkinCure in conducting its businesses. To the knowledge of SkinCure, no investigation or review by any Governmental Authority, agency or court or other regulatory body (including trade associations) with respect to either SkinCure or any SkinCure employee is pending or threatened or probable of initiation, nor has any Governmental Authority, agency or court or other regulatory body (including trade associations) indicated to SkinCure an

intention to conduct the same, and there is no action, suit or proceeding pending or, to the knowledge of SkinCure, threatened against or affecting SkinCure or any SkinCure employee, at Law or in equity, or before any Governmental Authority or other regulatory body (including trade associations).

(f) Ownership of FF&E. SkinCure, an affiliate of SkinCure, or a nominee of SkinCure or any such affiliate shall be the owner of and shall have good and valid title to the FF&E provided hereunder or, in the case of leased FF&E, shall have a valid leasehold interest in such FF&E.

(g) Disclosure. No representation, warranty or statement made by SkinCure in this Agreement contains any untrue statement of a material fact, or omits to state a material fact required to be stated herein or necessary to make the statements contained herein, in light of the circumstances under which they were made, not misleading.

## ARTICLE VI
## OTHER OBLIGATIONS OF THE PARTIES

SECTION 6.1 Covenants of the Practice. The Practice covenants and agrees that for so long as this Agreement is in effect (and thereafter to the extent specifically provided below):

(a) The following additional provisions shall apply with respect to the covenant not to compete set forth in Section 7(b) of the Principal Terms:

(i) Section 7(b) of the Principal Terms shall not apply following a termination of this Agreement by the Practice pursuant to Section 4.2 of these Terms and Conditions.

(ii) Nothing in this Agreement shall be construed to deny any Physician access to a list of the patients such Physician had seen or treated within one year of the termination of such Physician's employment or independent contractor agreement with the Practice.

(iii) Any Physician may have access to medical records of such Physician's patients upon authorization of the patient and copies of medical records for a reasonable fee (which fee, in the case of patients located in the State of Texas, shall be as established by the Texas Medical Board under Section 159.008 of the Texas Occupations Code).

(iv) Any access to a list of patients or to patients' medical records pursuant to clause (ii) or (iii) above shall not require such list or records to be provided in a format different from that by which such records are maintained by the Practice.

(b) Non-Disparagement. During the term of this Agreement and following the expiration or termination thereof, the Practice will not publicly disparage or criticize SkinCure or SkinCure's members, managers, shareholders, directors, officers, employees, independent contractors, and agents, nor will the Practice encourage any other individuals or entities to engage in such disparagement or criticism. The terms of this Section 6.1(b) shall survive the termination of this Agreement and shall not apply to statements made by the Practice in the course of a litigation proceeding between the parties.

(c) Certificates. The Practice will provide, and will use its best efforts to cause each Qualified Provider to provide, notice to SkinCure if any representation or warranty contained herein becomes untrue as of a date after the date hereof because of subsequent events and to provide from time-to-time, at the reasonable request of SkinCure, a certificate stating that the representations and warranties contained herein are true, or, if they are not true, specifying in reasonable detail the extent to which they are not true.

(d) Collateral. The Practice shall not grant any other Lien on or in, or otherwise encumber, any of the Collateral.

(e) Records; Inspection. At the request of SkinCure, the Practice will legend, in form and manner satisfactory to SkinCure, the books, records and materials evidencing or relating to the Collateral with an appropriate reference to the fact that the Collateral has been assigned to SkinCure and that SkinCure has a security interest therein. SkinCure shall have the right to make test verifications of the Receivables in any reasonable manner and through any reasonable medium, and the Practice agrees to furnish all such reasonable assistance and information as SkinCure may require in connection therewith.

(f) Compliance with Law. The Practice will comply, in all material respects, with all Laws applicable to its businesses and its operations.

(g) Standard of Care. The Practice will consistently provide medical services in a manner that meets or exceeds the prevailing community standard of care.

(h) Physicians and Mid-Level Providers. Each Physician will: (i) be duly licensed to practice medicine in the states in which he/she practices and shall maintain such licenses in good standing, (ii) have, and will maintain in good standing, unrestricted federal and state registrations authorizing them to prescribe controlled substances in the states in which he/she practices. Each Mid-Level Provider will be duly licensed as a physician assistant, advanced registered nurse practitioner, or equivalent in the states in which he/she practices and shall maintain such licenses in good standing.

(i) Other Notice. In addition to the other notice obligations of the Practice provided for elsewhere in this Agreement, the Practice will provide, and will use its best efforts to cause each Qualified Provider to provide, notice to SkinCure of any (i) physical or mental illness or condition that impairs or may impair a Qualified Provider's ability to provide the services required by this Agreement, and (ii) Qualified Provider's dependency on, habitual use or episodic abuse of, alcohol or any controlled substances.

SECTION 6.2 Covenants of SkinCure. SkinCure covenants and agrees that for so long as this Agreement is in effect (and thereafter to the extent specifically provided below):

(a) Non-Disparagement. During the term of this Agreement and following the expiration or termination thereof, SkinCure will not publicly disparage or criticize the Practice or the Practice's members, managers, shareholders, directors, officers, employees, independent contractors, and agents, nor will SkinCure encourage any other individuals or entities to engage in such disparagement or criticism. The terms of this Section 6.2(a) shall survive the termination of this Agreement and shall not apply to statements made by SkinCure in the course of a litigation proceeding between the parties.

(b) Certificates. SkinCure will provide notice to the Practice if any representation or warranty contained herein becomes untrue as of a date after the date hereof because of subsequent events and to provide from time-to-time, at the reasonable request of the Practice, a certificate stating that the representations and warranties contained herein are true, or, if they are not true, specifying in reasonable detail the extent to which they are not true.

(c) Compliance with Law. SkinCure will comply, in all material respects, with all Laws applicable to its businesses and its operations.

(d) Standard of Care. SkinCure will consistently provide Program Services in a manner that meets or exceeds the prevailing standards of quality and professionalism for providers of such services.

SECTION 6.3 Taxes.

(a) SkinCure shall pay (i) all taxes (if any) assessed and levied against SkinCure's property and assets located within or associated with the Practice and (ii) all lawful claims that, if unpaid, might become a Lien upon any of its properties located within or associated with the Practice; provided, however, that SkinCure shall not be required to pay any such unsecured (or secured, only if secured by operation of Law) tax, assessment, charge, levy or claim that is being contested in good faith and by proper proceedings and as to which SkinCure has maintained adequate reserves with respect thereto in accordance with GAAP. SkinCure shall be solely responsible for the payment of all such taxes and claims (referred to as "***Company Taxes***") that may be imposed on SkinCure with respect to this Agreement.

(b) The Practice shall pay (i) all taxes (if any) assessed and levied against the Practice's property and assets and (ii) all lawful claims that, if unpaid, might become a Lien upon any of its properties; provided, however, that the Practice shall not be required to pay any such unsecured (or secured, only if secured by operation of Law) tax, assessment, charge, levy or claim that is being contested in good faith and by proper proceedings and as to which the Practice has maintained adequate reserves with respect thereto in accordance with GAAP. The Practice shall be solely responsible for the payment of all such taxes and claims (referred to as "***Practice Taxes***") that may be imposed on the Practice with respect to this Agreement.

## ARTICLE VII
## INSURANCE AND INDEMNIFICATION

SECTION 7.1 Insurance Maintained by the Practice. During the term of this Agreement, the Practice shall provide, or shall arrange for the provision of, and maintain: (a) comprehensive professional liability insurance on the Practice and each Qualified Provider in such reasonable amounts (and with such insurance companies) as are agreed upon by the parties, however, not less than a minimum coverage of $1 million per occurrence and $3 million in the aggregate annually and (b) comprehensive general liability and property insurance covering the Practice premises and operations in the minimum amount of $1 million per occurrence and $3 million in the aggregate annually. Each such insurance policy shall name SkinCure and each of

its affiliates as an additional insured (on a non-contributory basis) -and by its terms provide that it shall be primary for all covered losses hereunder and shall not be amended or modified without the prior written consent of SkinCure and shall not be canceled or terminated unless 10 days' prior notice thereof is given by the insurer to SkinCure.

SECTION 7.2 Insurance Maintained by SkinCure. During the term of this Agreement, SkinCure shall provide, or shall arrange for the provision of, and maintain comprehensive commercial and professional liability insurance covering all risks and exposures arising out of the performance of Program Services pursuant to this Agreement in such reasonable amounts (and with such insurance companies) as are agreed upon by the parties, however, not less than a minimum coverage of $1 million per occurrence and $3 million in the aggregate annually.

SECTION 7.3 Requirements as to Insurance. At all times during this Agreement, each party shall require its insurance carrier(s) to provide the other party with a current certificate of insurance evidencing the coverage required by Sections 7.1 and 7.2 of these Terms and Conditions. The obligations of each party to be insured for acts and occurrences during the term of this Agreement shall be binding on the parties and shall survive the termination or expiration of this Agreement. In the event any such insurance is written on a "claims-made" rather than an "occurrence" basis, any necessary reporting endorsements ("tail insurance") shall be procured by the responsible party.

SECTION 7.4 Waiver of Subrogation. SkinCure and the Practice release each other, and their respective authorized agents, employees, and representatives, from any claims for loss or damage that are caused by or result from risks insured against under any insurance policies carried by SkinCure or the Practice and in force at the time of any such damage or loss. SkinCure and the Practice shall cause each insurance policy obtained by them to provide that the insurance company waives all rights of recovery by way of subrogation against the other party in connection with any loss or damage covered by such insurance policy. Any insurance policies obtained by a party hereunder shall include a waiver by the insurer of any right of subrogation against the other party and the other party's agents, employees and representatives, which arises or might arise by reason of any payment under such policy or by reason of any act or omission of s, its agents, employees or representatives.

SECTION 7.5 Indemnification. Each party shall indemnify and hold harmless the other parties (and their affiliates, shareholders, officers, directors, employees and agents) from any and all claims, actions, liabilities, damages, costs and expenses (including settlements, reasonable attorneys' fees and court costs, whether incurred to enforce this Section 7.5 or otherwise), regardless of the outcome of such claim or action, that are caused by or result from the grossly negligent or intentionally wrongful acts or grossly negligent or intentionally wrongful omissions of such indemnifying party (or its affiliates, agents or employees acting in such capacity) or the breach of this Agreement by such indemnifying party (or its affiliates, agents or employees acting in such capacity). The obligation to provide indemnification shall not be effective unless the party seeking such indemnification provides prompt written notice to the party against whom such indemnification is sought of a matter under this Section 7.5.

## ARTICLE VIII
## CONFIDENTIAL INFORMATION; ACCESS TO RECORDS

SECTION 8.1 SkinCure Confidential Information and Trade Secrets. All SkinCure Confidential Information and Trade Secrets (as defined in Section 8.2 of these Terms and Conditions) belong to and shall remain the property of SkinCure. The Practice recognizes and acknowledges that the SkinCure Confidential Information and Trade Secrets are proprietary to SkinCure and are a valuable, special and unique asset of SkinCure's business. The Practice therefore covenants and agrees that it will not (and it will ensure that each Qualified Provider will not), during or after the term of this Agreement, disclose any of the SkinCure Confidential Information or Trade Secrets to any Person or entity for any reason or purpose whatsoever, without the written consent of SkinCure, except (a) as necessary in the proper performance of its obligations hereunder, (b) for any such SkinCure Confidential Information or Trade Secrets that the Practice can show is generally available to and known by the public through no fault of the Practice or the Qualified Providers or is lawfully acquired by the Practice or a Qualified Provider from sources which are not prohibited from disclosing such information by a legal, contractual, or fiduciary obligation, or (c) as may be required by Law (in which case the Practice shall promptly notify SkinCure in writing and shall disclose only that portion of such information that the Practice is advised by its counsel in writing is legally required to be disclosed, *provided that* the Practice shall use best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information). The Practice hereby acknowledges that if it or any of its employees or agents engage in activities within the limitations of this Section 8.1, money damages shall be an inadequate remedy, and the Practice agrees that SkinCure shall be entitled to obtain, in addition to any other remedy provided by Law or equity, an injunction against the violation of the Practice's obligation to SkinCure hereunder.

SECTION 8.2 Definition of SkinCure Confidential Information and Trade Secrets. For purposes of this Agreement, the term "*SkinCure Confidential Information and Trade Secrets*" shall mean (a) the material terms of this Agreement or any other written agreement between the parties, (b) any confidential or secret information concerning (i) any trade secrets, new product developments, special or unique processes or methods of SkinCure or any of its affiliates (or of the Practice to the extent related to the Program), as the case may be, or (ii) any sales, advertising or other concepts or plans of SkinCure or any of its affiliates (or of the Practice, to the extent related to the Program), as the case may be, (c) records (other than patient

medical records and patient lists), reports and other documents pertaining to the Program Services, (d) the systems, protocols, policies, procedures, manuals, reports, data bases, documents, instruments and other materials used by SkinCure or any of its affiliates (or by the Practice, to the extent related to the Program), as the case may be, (e) all other professional or business information developed by or on behalf of SkinCure or any of its affiliates (or by the Practice, to the extent related to the Program), as the case may be, including Program-related items produced by the Qualified Providers, and (f) all financial statements and reports produced by SkinCure or any of its affiliates or by the Practice in connection with this Agreement.

SECTION 8.3 Practice Confidential Information and Trade Secrets. All Practice Confidential Information and Trade Secrets (as defined in Section 8.4 of these Terms and Conditions) belong to and shall remain the property of the Practice. SkinCure recognizes and acknowledges that the Practice Confidential Information and Trade Secrets are proprietary to the Practice and are a valuable, special and unique asset of the Practice's business. SkinCure therefore covenants and agrees that it will not, during or after the term of this Agreement, disclose any of the Practice Confidential Information or Trade Secrets to any Person or entity for any reason or purpose whatsoever, without the written consent of the Practice, except (a) as necessary in the proper performance of its obligations hereunder, (b) for any such Practice Confidential Information or Trade Secrets that SkinCure can show is generally available to and known by the public through no fault of SkinCure or is lawfully acquired by SkinCure from sources which are not prohibited from disclosing such information by a legal, contractual, or fiduciary obligation, or (c) as may be required by Law (in which case SkinCure shall promptly notify the Practice in writing and shall disclose only that portion of such information that SkinCure is advised by its counsel in writing is legally required to be disclosed, *provided that* SkinCure shall use best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information). SkinCure hereby acknowledges that if it or any of its employees or agents engage in activities within the limitations of this Section 8.3, money damages shall be an inadequate remedy, and SkinCure agrees that the Practice shall be entitled to obtain, in addition to any other remedy provided by Law or equity, an injunction against the violation of SkinCure's obligation to the Practice hereunder.

SECTION 8.4 Definition of Practice Confidential Information and Trade Secrets. For purposes of this Agreement, the term "***Practice Confidential Information and Trade Secrets***" shall mean (a) any confidential or secret information concerning (i) any trade secrets, new product developments, special or unique processes or methods of the Practice (to the extent unrelated to the Program), or (ii any sales, advertising or other concepts or plans of the Practice (to the extent unrelated to the Program), (b) all patient medical records, (c) records of the Practice unrelated to the Program, (d) the systems, protocols, policies, procedures, manuals, reports, data bases, documents, instruments and other materials used by the Practice (to the extent unrelated to the Program), and (e) all other professional or business information developed by the Practice (to the extent unrelated to the Program).

SECTION 8.5 Books and Records. Each party shall maintain and make available to the other party accurate books, records, and accounts relating to the services provided by such party pursuant to this Agreement. Such books and records shall be available at their place of keeping for inspection by the other party or its representative for the purpose of determining whether the correct amounts have been retained and/or paid in accordance with the terms of this Agreement and for any other valid purpose. Each party shall have the right to conduct an audit (at such party's expense) upon fifteen (15) days advance written notice, but not more frequently than twice each calendar year.

## ARTICLE IX
## GENERAL PROVISIONS

SECTION 9.1 Changes in the Law. This Agreement shall be subject to all applicable Laws and all changes and amendments thereto. Any provision of Law that invalidates, or is otherwise inconsistent with, the terms of this Agreement, or which would cause one of the parties to be in violation of Law, shall automatically supersede the terms of this Agreement; provided, however, the parties shall exercise their best efforts to negotiate an appropriate modification to the terms and conditions of this Agreement to accommodate such provisions of Law and to effectuate the existing terms and intent of this Agreement to the greatest possible extent consistent with the requirements of such Law. In the event that there shall be a change in the Medicare or Medicaid (or the general instructions relating thereto), or in other Laws (or the application thereof), or the adoption of new legislation, or a change in any third-party payor reimbursement system applicable to the provision of services, any of which materially and adversely affects the compensation that SkinCure may receive for the services furnished to the Practice or if there is any other material change in the facts, circumstances or assumptions of the parties that substantially alters the allocation of risks and rewards intended to be accomplished herein, the party so affected may by notice propose to the other party a new basis for compensation hereunder or other modification of this Agreement and the parties shall negotiate in good faith an equitable amendment to this Agreement. If such notice is given and if the parties are unable within 60 days to agree upon such amendment, the parties shall submit such matter to the dispute resolution process in accordance with Section 9.12 of these Terms and Conditions.

SECTION 9.2 Independent Contractors. The relationship between SkinCure and the Practice is that of independent contractors, and none of the provisions of this Agreement is intended to create, nor shall be construed to create a partnership, joint venture or employment relationship between the parties. Neither party, nor any of its respective officers,

members, employees or independent contractors, shall, except as otherwise expressly permitted in this Agreement, be deemed to be the employee or representative of the other party by virtue of this Agreement.

SECTION 9.3 Force Majeure. Neither party shall be liable to the other for failure to perform any of the services, duties or obligations required of such party herein in the event of strikes, lockouts, calamities, acts of God, unavailability of supplies or other events over which such party has no control for so long as such event continues and for a reasonable period of time thereafter; provided, however, that each party agrees to use reasonably diligent efforts to perform such services, duties and obligations required of such party herein notwithstanding such events and shall be liable to the other for the failure to use such reasonable diligent efforts.

SECTION 9.4 Notices and Addresses. Any notice, demand, request, waiver, or other communication under this Agreement shall be in writing and shall be deemed to have been duly given on the date of service, if personally served or sent by facsimile; on the Business Day after notice is delivered to a courier or mailed by express mail, if sent by courier delivery service or express mail for next day delivery; and on the third day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered, return receipt requested, postage prepaid.

SECTION 9.5 Entire Agreement. This Agreement, including the exhibits and schedules hereto, sets forth the entire understanding and agreement and supersedes any and all other understandings, negotiations or agreements between the parties.

SECTION 9.6 Governing Law; Waiver of Jury Trial. This Agreement and any dispute, controversy or claim related to, arising directly or indirectly, out of, cause by or resulting from this Agreement shall be governed by and construed and enforced in accordance with the laws of the State under which the Practice is Organized without regard to its conflict of laws provisions, and, subject to the mandatory arbitration provisions in Section 9.12 of these Terms and Conditions, all parties hereby submit to the jurisdiction of the courts of said state with respect to any and all disputes or other matters arising out of or in any way relating to this Agreement and hereby waive any right to a jury trial.

SECTION 9.7 Captions. The captions or headings in this Agreement are made for convenience and general reference only and shall not be construed to describe, define or limit the scope or intent of the provisions of this Agreement.

SECTION 9.8 Severability. The provisions of this Agreement shall be deemed severable and if any portion shall be held invalid, illegal or unenforceable for any reason, the remainder of this Agreement shall be effective and binding upon the parties.

SECTION 9.9 Waiver. Any term or condition of this Agreement may be waived at any time by the party that is entitled to the benefit thereof, but no such waiver shall be effective unless set forth in a written instrument duly executed by or on behalf of the party waiving such term or condition. No waiver by any party of any term or condition of this Agreement, in any one or more instances, shall be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement on any future occasion. All remedies, either under this Agreement or by Law or otherwise afforded, will be cumulative and not alternative.

SECTION 9.10 Counterparts. This Agreement may be executed via facsimile or email in .PDF and in any number of counterparts, each of which shall be deemed to be an original instrument and all of which together shall constitute one and the same instrument.

SECTION 9.11 Amendment and Modification. This Agreement may be amended or modified only by written agreement executed by all of the parties hereto.

SECTION 9.12 Arbitration. Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration in Chicago, Illinois in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The costs of arbitration shall be allocated among the parties as directed by the arbitrator(s). .

SECTION 9.13 Assignment and Delegation. SkinCure shall have the right to assign its rights hereunder to any affiliate of SkinCure, any acquirer of all or substantially all of the assets or equity interests of SkinCure, or any lending institution, for security purposes or as collateral, from which SkinCure or such affiliate obtains financing. Notwithstanding any other provision of this Agreement, neither this Agreement nor the rights and duties of this Agreement may be assigned or delegated by the Practice without the written consent of SkinCure, which consent shall not be unreasonably withheld. Subject to this Section 9.13, this Agreement shall be binding on and shall inure to the benefit of the parties, and their successors and permitted assigns.

SECTION 9.14 Rules of Construction. Unless the context otherwise requires:

(a) an accounting term defined by GAAP that is not otherwise defined herein shall have the meaning assigned to it in accordance with GAAP;

(b) "or" is not exclusive;

(c) words in the singular include the plural, and words in the plural include the singular;

(d) the words "include" and "including" shall be deemed to mean "include, without limitation," and "including, without limitation";

(e) "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular article, section, paragraph or clause where such terms may appear;

(f) references to sections mean references to such section in this Agreement, unless stated otherwise; and

(g) the use of any gender shall be applicable to all genders.

SECTION 9.15 Further Actions. Each of the parties agrees (and the Practice agrees to cause the Qualified Providers) to execute and deliver such further instruments, and do such further acts and things, as may be reasonably required or useful to carry out the intent and purpose of this Agreement and as are not inconsistent with the terms hereof. In addition, the parties agree to cooperate with one another in the fulfillment of their respective obligations under this Agreement. Furthermore, the Practice agrees (and agrees to cause the Qualified Providers) to cooperate with SkinCure and to assist it in obtaining all necessary licenses, certificates of need, and other approvals from regulatory agencies and accrediting bodies.

SECTION 9.16 No Prejudice. This Agreement has been jointly prepared by the parties hereto and the terms hereof shall not be construed in favor of or against any party on account of its participation in such preparation.



Case 3:20-cv-00592 Document 1-9 Filed 07/09/20 Page 20 of 21 PageID #: 217

EXHIBIT C

BUSINESS ASSOCIATE AGREEMENT

[Attach separate Business Associate Agreement]

SkinCure