## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA; STATES | * | |
| OF CALIFORNIA; FLORIDA, GEORGIA; | * | |
| ILLINOIS; INDIANA; LOUISIANA; | * | |
| MICHIGAN; MINNESOTA; NEW YORK; | * | |
| NORTH CAROLINA; TENNESSEE; | * | |
| and, TEXAS, ex rel DANIEL W. CREGER, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | CIVIL CASE NO.:3:20-CV-00592 |
| | * | |
| PINNACLE DERMATOLOGY; SKINCURE | * | JUDGE: W. L. Campbell, Jr. |
| ONCOLOGY, LLC; CHAD A. ECKES; | * | MAGISTRATE JUDGE: |
| CHICAGO PACIFIC FOUNDERS; MARY | * | |
| TOLAN; DR. JOSE RIOS; DR. PAULA | * | **JURY TRIAL DEMANDED** |
| LAPINSKI; KERWIN J. BRANDT; | * | |
| DR. DANIEL LADD; KRISTA HATCHER; | * | **TO BE FILED IN CAMERA** |
| VANCE VARNIER, STEVEN B. BONNER; | * | **AND UNDER SEAL** |
| STEVEN L. SCOTT; L. PETER SMITH; | * | DO NOT PUT IN PRESS BOX |
| CAPX PARTNERS; JEFFREY S. PREFFER; | * | DO NOT ENTER ON PACER |
| FOUNTAIN PARTNERS, D/B/A SEACOAST | * | DO NOT MAKE PUBLIC |
| CAPITAL; TOM CARTER, ET AL; | * | |

Comes the plaintiff, Daniel W. Creger, *ex rel.*, and amends his complaint pursuant

to Federal Rule of Civil Procedure, Rule 15(a)(1)(B), as a matter of right. In support of

such amendment, plaintiff states the following:(1) the complaint has not previously been

amended; (2) the original complaint alleged a complaint under the False Claims Act and

was filed UNDER SEAL; (3) the United States has not yet made its intervention decision;

(4) pursuant to the False Claims Act, the original complaint has not been served on the

defendants; (5) once service is made, defendants will be required to file a responsive

-1-

pleading. Wherefore, the premises considered, plaintiff is entitled, as a matter of

right, to amend his original complaint and does so as follows:

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA; STATES | * | |
| OF CALIFORNIA; FLORIDA, GEORGIA; | * | |
| ILLINOIS; INDIANA; LOUISIANA; | * | |
| MICHIGAN; MINNESOTA; NEW YORK; | * | |
| NORTH CAROLINA; TENNESSEE; | * | |
| and, TEXAS, ex rel DANIEL W. CREGER, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | CIVIL CASE NO.: 3:20-cv-00592 |
| | * | |
| PINNACLE DERMATOLOGY; SKINCURE | * | JUDGE: W. L. Campbell, Jr. |
| ONCOLOGY, LLC;  CHAD A. ECKES; | * | MAGISTRATE JUDGE: |
| CHICAGO PACIFIC FOUNDERS; MARY | * | |
| TOLAN; DR. JOSE RIOS; DR. PAULA | * | **JURY TRIAL DEMANDED** |
| LAPINSKI; KERWIN J. BRANDT; | * | |
| DR. DANIEL LADD; KRISTA HATCHER; | * | **TO BE FILED IN CAMERA** |
| VANCE VARNIER, STEVEN B. BONNER; | * | **AND UNDER SEAL** |
| STEVEN L. SCOTT; L. PETER SMITH; | * | DO NOT PUT IN PRESS BOX |
| CAPX PARTNERS; JEFFREY S. PREFFER; | * | DO NOT ENTER ON PACER |
| FOUNTAIN PARTNERS, D/B/A SEACOAST | * | DO NOT MAKE PUBLIC |
| CAPITAL; TOM CARTER, JOHN VAN | * | |
| HOOSER; BAYPINE LP; JOEL HACKNEY; | * | |
| ANJAN MUKHERJEE; WAN LING | * | |
| MARTELLO; ANDREW GOLDFARB; | * | |
| **[ALABAMA DEFENDANTS]:** | * | |
| DERMATOLOGY CARE OF ALABAMA; | * | |
| DR. ROBERT BENTLEY; ADVANCED | * | |
| DERMATOLOGY & SKIN CARE CENTRE, | * | |
| d/b/a FOREFRONT DERMATOLOGY, d/b/a | * | |
| PARTNERS GROUP (FOREFRONT | * | |

-2-

DERMATOLOGY); DR. THOMAS BENDER;          *
DR. RONALD JOHNSON; DR. ALAN               *
STANFORD; DR. CARY L. DUNN;                *
DR. VIRGINIA REEDER; DR. NORA              *
KACHATUROFF; DERMATOLOGY                   *
SPECIALISTS OF ALABAMA; DR. JOHN R.        *
WARD; DR. JEFFREY STRICKER;                *
DR. STEPHANIE LAI; DR. BART D.             *
WILKISON; DR. ERIC W. BAUM; DR. JOYA*
SAHU; SOUTHERN DERMATOLOGY                 *
CENTER, P.C.; DR. ANGELO MANCUSO           *
TOTAL SKIN & BEAUTY DERMATOLOGY;*
DR. GARY D. MONHEIT; DR. JAMES M.          *
KRELL; DR. MELANIE L. APPELL; DR. A.       *
MICHELLE KILL; DR. RAJINI K. MURTHY; *
RENEW FAMILY DERMATOLOGY;                  *
DR. MICHAEL DIGBY; **[ARIZONA**            *
**DEFENDANTS]:** DR. NANCY H. KIM;         *
DR. TIMOTHY SALMON; **[ARKANSAS**          *
**DEFENDEANTS]:** THE DERMATOLOGY          *
CENTER; DR. G. LUKE LEWIS; DR. P.          *
CRAIG STITES; WILLIAM J. HELMS             *
DERMATOLOGY; DR. WILLIAM J. HELMS *
DR. CHRISTIE RAINEY; **[CALIFORNIA**       *
**DEFENDANTS]:**MILLIGAN                   *
DERMATOLOGY; DR. MICHAEL P.                *
MILLIGAN; DR. REUVEN F. SISON; DR.         *
ANTHONY T. NASER; ADVANCE                  *
DERMATOLOGY & LASER MEDICAL                *
CENTER, INC.; DR. NITA PATEL;              *
WEST HILLS DERMATOLOGY GROUP;              *
DR. FARNAZ GAMINCHI; RAO                   *
DERMATOLOGY; DR. BABAR K. RAO;             *
DR. LANA KASHLAN; ADVANCED                 *
DERMATOLOGY & SKIN CARE                    *
SPECIALISTS; DR. JESSE D. MITCHELL;        *
DR. M. SEYFZADEH; **[COLORADO**            *
**DEFENDANTS]:**ACCENT DERMATOLOGY*
& LASER INSTITUTE; DR. TYLER O.            *
VUKMER; **[CONNECTICUT**                   *

-3-

**DEFENDANTS]:** SEAPORT                    *
DERMATOLOGY; DR. JOHN WEST;                  *
MIDDLESEX DERMATOLOGY; DR. ERIC              *
J. THOMAS; **[FLORIDA DEFENDANTS]:**         *
DERMATOLOGY SPECIALISTS OF                   *
FLORIDA, d/b/a DERMATOLOGY                   *
SOLUTIONS GROUP, LLC; DR. JOHN R.            *
PHILLIPS, III; DR. HALEY LEWIS;              *
HOLLYWOOD DERMATOLOGY &;                     *
COSMETIC SPECIALISTS d/b/a DERMCARE*
MANAGEMENT; DR. EDUARDO WEISS;               *
DR. RONALD D. SMITH; DR. JULIAN O.           *
MOORE; DR. SHOLOMO J. LANES;                 *
RENDON CENTER FOR DERMATOLOGY                *
 & AESTHETIC MEDICINE d/b/a                  *
DERMCARE MANAGEMENT; DR. MARTA *
K. RENDON ; DR. CHERE LUCAS ANTONY;*
DR. TODD R. COVEN; DR. ANN MAZOR             *
REED; DR. BERTHA BAUM; BREVARD               *
SKIN CANCER CENTER; DR. RICHARD C.           *
KIRKPATRICK; DR. MARIO J. SEQUEIRA;          *
DR. ANDREW MINER; SKIN & CANCER              *
ASSOCIATES; DR. MARK S. NESTOR;              *
DR. DAVID J. GOLDBERG; DR. BRIAN             *
BERMAN; ASSOCIATED                           *
DERMATOLOGISTS; DR. JOHN C.                  *
LONG, JR.; PORTER PREMIER                    *
DERMATOLOGY; DR. ANTHONY PORTER;*
CABAN SKIN INSTITUTE DERMATOLOGY;*
DR. FRANCIS CABAN; PARK AVENUE               *
DERMATOLOGY; DR. GEORGE                      *
SCHMIEDER; DR. MARY SCHMIEDER;               *
AESTHETIC DERMATOLOGY; DR. IGOR              *
CHAPLIK; **[GEORGIA DEFENDANTS]:**           *
DERMATOLOGY SPECIALISTS OF                   *
GEORGIA d/b/a DERMATOLOGY                    *
SOLUTIONS GROUP, LLC; DR. ALAN               *
GARDNER; DR. JOSH A. HAMMEL;                 *
CLARKSVILLE DERMATOLOGY AND                  *
MEDICAL ASSOCIATES; DDR. SHRI                *

-4-

NADIG; DERMATOLOGY ASSOCIATES OF *
SAVANNAH, GEORGIA; DR. LEWIS *
COLLINS: AGHA ADVANCED *
DERMATOLOGY; DR. AMR AGHA; *
ATLANTA DERMATOLOGY; DR. JERRY L. *
COOPER; DR. RAVEN ELOISE WALKER; *
GAUGHF DERMATOLOGY; DR. CLAUDIA *
N. GAUGHF; **[ILLINOIS DEFENDANTS]:** *
PINNACLE DERMATOLOGY, LLC; *
DR. FRANK A. TOBIN; DR. TODD T. *
DAVIS; DR. RENATO GORESHI; MUSICK *
DERMATOLOGY, LLC, d/b/a, MUSICK *
DERMATOLOGY & ADVANCED SPA; *
DR. STEVEN MUSICK; ILLINOIS *
DERMATOLOGY INSTITUTE; DR. *
MATTHEW HARRIS; DR. REGINA O'BRIEN *
DR. JOHN KALIS; DR. SREYA TALASILA; *
DR. RUSHIK DESAI; DR. EMILY M. *
GARRITSON; SUMMIT DERMATOLOGY; *
DR. RANIA AGHA; DERMATOLOGY *
SPECIALISTS OF ILLINOIS; DR. VIKRAM *
KHANNA; SHABERG DERMATOLOGY; *
DR. SUSAN SHABERG; FOREFRONT *
DERMATOLOGY d/b/a PARTNERS GROUP; *
DR. SCOTT CARRIZALES; ADVANCED *
SKIN AND MOHS SURGERY CENTER; *
DR. CLARENCE W. BROWN; DR. YAZAN *
ALGHALITH; DR. STEHPANIE BAYERS; *
DR. RAYMOND KLEINFELDER; DR. *
JONATHAN NATHAN; DR. EVAN STOKER; *
DR. SRYA TALASILA; DERMASSOCIATES, *
LTD; DR. GARY J. VICIK; SOUTHERN *
ILLINOIS DERMATOLOGY; DR. TED G. *
VAN  ACKER; **[INDIANA DEFENDANTS]:** *
FOREFRONT DERMATOLOGY; DR. KEVIN *
M. CRAWFORD; DR. ASHVIN R. *
GARLAPATI: THREE RIVERS *
DERMATOLOGY; DR. JEFFREY *
SASSMANNSHAUSEN; BILTMORE *
DERMATOLOGY; MR. RYAN PATTERSON *

BOOTH DERMATOLOGY & COSMETIC        *
CARE CENTER; DR. SALLY A. BOOTH;    *
RANDALL DERMATOLOGY & MEDSPA;       *
DR. JOHN K. RANDALL; DERMATOLOGY    *
CENTER OF NORTHWEST INDIANA;        *
DR. MITCHELL L. BRESSACK;           *
ASHVIN R. GARLAPATI; **[IOWA**      *
**DEFENDANTS]:** DERMATOLOGY        *
ASSOCIATES OF SOUIXLAND, PC; DR. J. *
MARL DEMAY; DR. DAVID G. CONGDON; *
**[KANSAS DEFENDANTS]:** KMC;       *
DERMATOLOGY; DR. MICHAEL KUCENIC;*
DR. JOSEPH GADZIA; DR. MEENA SINGH;  *
DR. KYLE ANDERSON; DR. JAMES ALLEN;*
DR. MAJDY ALBAHHAR; DR. LISA        *
WAXMAN; DR. LEE BITTENBENDER; DR.  *
DAVID MARTELL; **[LOUISIANA**       *
**DEFENDANTS]:** DIMITRI DERMATOLOGY;*
DR. ELIZABETH DIMITRI; DR. MEDI     *
MOSADEGH; DR. JORGE CRUS; DR.       *
THOMAS ORGERON; DR. JOEL PERDOMO;*
GRAFTON DERMATOLOGY; DR. LEE        *
GRAFTON; DR. TAMELA L. CHARBONNET*
DR. KRISTAL B. GUIDOZ; **[MICHIGAN**   *
**DEFENDANTS]:** MOULTON GROUP PC;    *
DR. PAULETTE MOULTON; HOLLAND       *
DERMATOLOGY; DR. BARBARA            *
DROZDOWSKI; DR. BRANDON MCNALLY;*
A COMPREHENSIVE DERMATOLOGY;        *
DR. ALI MOIN; THE NEW               *
DERMATOLOGY GROUP; DR. KEVAN        *
LEWIS; SOUTHWEST MICHIGAN           *
DERMATOLOGY; DR. CRAIG MOHNEY       *
DR. DAVID SEMLER; DR. JESSICA       *
LIGGETT; DR. RYAN JONES; CLARKSTON *
DERMATOLOGY & VEIN CENTER, PLLC;    *
DR. BRIAN KOPITZKI; DR. WENDY       *
MCFALDA;  DR. BRETT BENDER; DR.     *
MICHELLE DAWSON; OAKLAND HILLS      *
DERMATOLOGY; DR. CHRISTOFER         *

BUATTI; **[MINNESOTA DEFENDANTS]:** *
TAREEN DERMATOLOGY; DR. MAUREEN *
TAREEN; DR. LORRAINE GRIFFIN; DR. *
RYAN HOLSWARTH; PINNACLE *
DERMATOLOGY, LLC; DR. PHIL ECKER; *
**[MISSISSIPPI DEFENDANTS]:** *
DERMATOLOGY SPECIALISTS OF *
MISSISSIPPI d/b/a DERMATOLOGY *
SOLUTIONS GROUP, LLC; DR. PETER *
BARNES; DR. LISA R. CHASANT; DR. *
DAWN M. HANSEN; DERMATOLOGY *
CLINIC OF NORTH MISSISSIPPI; DR. TERRI*
H. HENSON; **[MISSOURI DEFENDANTS]:** *
CENTRAL MISSOURI DERMATOLOGY & *
MOHS SKIN CANCER SURGERY; DR. *
LINDALL PERRY; RIVERSIDE *
DERMATOLOGY AND SPA; DR. LINDA *
COOK; ASSOCIATES IN DERMATOLOGY; *
DR. JAMES DONNELLY; DR. RICHARD *
BELL; DR. YEOMAN'S DERMATOLOGY; *
DR. LANCE YEOMAN; BRANSON *
DERMATOLOGY, a/k/a SHAFFER RAINEY *
DERMATOLOGY; DR. CHRISTY RAINEY; *
**[MONTANA DEFENDANTS]:** *
ASSOCIATED DERMATOLOGY & SKIN *
CANCER CLINIC OF HELENA; DR. JEFFRY*
GLODES; **[NEW JERSEY DEFENDANTS]:** *
ABELES DERMATOLOGY; DR. GWEN *
ABELES; THE DERMATOLOGY CENTER *
OF HILLSBOROUGH TOWNSHIP NEW *
JERSEY; DR. ROBERT ILOWITE; *
**[NEW MEXICO DEFENDANTS]:** NEW *
MEXICO CANCER CENTER; DR. KARA *
BUCCI; DR. GREGG E. FRANKLIN; DR. *
SUSAN GUO; ALAMAGORDO *
DERMATOLOGY; DR. ALISA THOMPSON *
SEEBERGER; **[NEW YORK DEFENDANTS]***
LASERDERM DERMATOLOGY & *
COSMETIC LASER SURGERY; DR. DONNA*
SERURE; **[NORTH CAROLINA** *

**DEFENDANTS]:** DERMATOLOGY    *
ASSOCIATES OF COASTAL CAROLINA;  *
DR. JAMES POLO; DR. SEAN J. MURPHY;  *
DR. SCOTT MCCLELLAN; DR. CYNTHIA  *
POLO; PIEDMONT PLASTIC SURGERY &  *
DERMATOLOGY: DR. DANIEL T. NESS;  *
DR. GREGORY A. MANTOOTH; DR.   *
GREGORY M. SWANK; DR. MIGUEL A.  *
YANEZ; DR. BENSON TIMMONS; DR. ERIC*
T. EMMERSON; DR. PARAG BUTALA;  *
DR. STEVEN A SICILIANO; DR. ROSIANE  *
A. ROEDER; DR. BENJAMIN R. ESKENAZI *
DR. DARRELL W. FREEMAN; DR. DORI L.  *
HUNT; DR. CHARLES S. JOHNSON;   *
DR. PATRICK MCELGUNN; DR. TONYA S.  *
MCLEOD; DR. WILLIAM L. FLANNAGAN;  *
DR. LAURA B. ROSENZWEIG; DR. JAIME J.*
FANOURY; DR. LAURA KLINE; DR.   *
JOSHUA G. PORTER; DR. CHRISTOPHER A.*
SYNDER; DR. JERRY L. PRUITT; DR.  *
DONALD D. FRASER; DR. BETHANY   *
BERAGAMO; DR. GEORGE D. MAGEL;  *
DR. KIRSTEN B. HIGGINS; DR. NANCY J.  *
ASTLE; DR. EUPHEMIA W. MU; DR.   *
ROBERTA J. HAWK; DR. LARRY A.   *
NAPOLITANO; POLLEY CLINIC; DR.  *
DENNIS POLLEY; CENTRAL    *
DERMATOLOGY CENTER; DR. BETH G.  *
GOLDSTEIN; DR. DAVID T. DEVRIES;  *
DR. NICHOLAS A. TAYLOR; DR. REBECCA*
W. TODD BELL; DR. C. LYNN CHENG; DR. *
AMY L. GAGNON; DR. KARIN S.   *
LINTHICUM; DR. LISA A. CHRISTMAN;  *
DR. SARA M. JAMES; DR. KATHERINE S.  *
MARTIN; DR. NADIA S. WANG; DR.  *
RUTH F. WALTERS; PINNACLE   *
DERMATOLOGY, LLC; DR. KARA   *
BROOKS; COASTAL DERMATOLOGY &  *
SURGERY CENTER, PA; DR. HEATHER  *
LOESCH; **[NORTH DAKOTA**   *

-8-

**DEFENDANTS]:** FARGO CENTER FOR            *
DERMATOLOGY: DR. RACHEL NESS;                 *
**[OHIO DEFENDANTS]:** HABER                  *
DERMATOLOGY, INC.; DR. ROBERT                 *
HABER; SUMMIT DERMATOLOGY; DR.                *
THOMAS MYERS; **[OKLAHOMA**                   *
**DEFENDANTS]:** SOUTHSIDE                     *
DERMATOLOGY, PLLC; DR. ALISON A.              *
FISCHER; DR. ROBERT FISCHER;                  *
**[OREGON DEFENDANTS]:** CENTRAL              *
OREGON DERMATOLOGY; DR. MARK                  *
HALL; **[PENNSYLVANIA DEFENDANTS]**           *
DERMATOLOGY ASSOCIATES OF                     *
GREENSBURG; DR. STUART GLASSER;               *
LEHIGH VALLEY DERMATOLOGY                     *
ASSOCIATES, LTD.; DR. DAVID B. VASILY*
READING DERMATOLOGY; DR. JASON                *
HENDRIX; DR. DEAN BURGET; DR.                 *
STEPHEN SCHLEICHER; FARBER                    *
DERMATOLOGY; DR. HAROLD FARBER;               *
**[SOUTH CAROLINA DEFENDANTS]:**              *
WACCAMAW DERMATOLOGY; DR.                     *
ROBERT D. BIBB; DR. BRANDON J.                *
COAKLEY; DR. EDITH WINTER; GERMAIN*
DERMATOLOGY; DR. MARGUERITE                   *
GERMAIN; DR. EMILY C. KMETZ; DR.              *
BRUCE BARACH; DR. TAYLOR MULKEY; *
DR. JOSHUA BLACK; DR. CHRISTINE LIN; *
LOWCOUNTRY DERMATOLOGY; DR.                   *
SANDRA NASH HANNEGAN; DR.                     *
CYNTHIA IRBY WILSON; SPARTANBURG *
DERMATOLOGY & SKIN SURGERY                    *
CLINIC; DR. ELIZABETH S. DUNLAVEY;            *
DR. AARON S. KATZ; DR. BETH C.                *
DELSAVIO; DR. BLAIR W. CLEMENTSON; *
THE DERMATOLOGY GROUP; DR. DINA               *
V. HUNTER; DR. LEE T. JORDAN; DR.             *
SCOTT A. MAISCH; DERMATOLOGY &                *
SKIN CANCER CENTER OF SOUTH                   *
CAROLINA; DR. JOSEPH M. MASESSA;              *

-9-

SKIN CANCER CENTER; DR. RICHARD J.   *
DEANGELIS:**[TENNESSEE DEFENDANTS]***
PINNACLE DERMATOLOGY, LLC; DR. JAY*
SMITH; DR. MICHAEL BELL; DR. PAUL   *
SHAH; DR. WAYNE DAY; DR. K. DEAN   *
VINCENT; DYERSBURG SKIN & ALLERGY*
CLINIC; DR. KENTON BUSCH;     *
TANENBAUM DERMATOLOGY CENTER;  *
DR. ALAN TANENBAUM; RETIEF SKIN  *
CENTER; DR. CARLA RETIEF; DR. JOSH  *
GAPP; THE SKIN WELLNESS CENTER;  *
DR. MEREDITH T. OVERHOLT; DR.   *
KIMBERLY K. GRANDE; WELLSKIN   *
DERMATOLOGY & AESTHETICS; DR.   *
JAMES ALLRED; **[TEXAS DEFENDANTS]:** *
TRU-SKIN DERMATOLOGY; DR. DANIEL  *
J. LADD; DR. S. ROBERT HARIA; DR.   *
CARLO GAVINO; DR. TANYA KHAN; DR.  *
LIQIAO MA; DR. RUSSELL ROWE;    *
HEIGHTS DERMATOLOGY & AESTHETIC *
CENTER; DR. ALPESH DESAI; DR. TEJAS  *
DESAI: DR. DARIO KIVELEVITCH; DR.  *
OBEN OJONG; DERMATOLOGY & SKIN  *
CANCER SURGERY; DR. MATTHEW   *
BARROWS; DR. AJAY AMARNANI; DR.  *
CAROLYN LYDE; DR. CLARA HENRY;  *
DR. CHRIS HIXON; DR. HEATHER    *
FROEHLICH; DR. KAITLIN BLANKENSHIP;*
DR. MATTHIAS SOLOMON; DR. VIVIAN  *
YEE; MCGUINESS DERMATOLOGY &   *
PLASTIC SURGERY; DR. MICHAEL   *
MCGUINESS; DR. GRACE BROWN; DR.  *
SHAILY KESANI: DR. LEISA HODGES; DR. *
ELBA RUBIANES; DR. STEVEN EILERS;  *
DR. FELICIA EKPO; DR. KAREN ADAMS;  *
DR. ELIZABETH CARTER; DR. JENNIFER  *
SNIPES; DR. NATALIE WRIGHT; RAINEY&*
FINKLEA DERMATOLOGY AT CASTLE  *
HILLS; DR. LINDSEL FINKLEA; DR.   *
CHRISTY RAINEY; RAJAN     *

-10-

DERMATOLOGY; DR. BETTY RAJAN;      *
PINNACLE DERMATOLOGY, a/k/a      *
CHAPPELL ROSSO DERMATOLOGY;      *
DR. ROBERT CHAPPELL; DR. RITCHIE O.      *
ROSSO, JR.; BAYSIDE DERMATOLOGY;      *
DR. RONALD BROWN; UNITED      *
DERMATOLOGY ASSOCIATES; DR.      *
JEANNINE HOANG; DR. ASHISH      *
ARSHANAPALLI; COMPLETE      *
DERMATOLOGY; DR. MICHAEL      *
SONABEND; DR. JENNIFER MAENDER;      *
DR. PAYAL PATEL DIXIT; DR. BARTLEY      *
JOSEPH; DR. BRYAN HISCOX; ABSOLUTE *
DERMATOLOGY & MEDI-SPA; DR. LORI      *
HONEYCUTT; MEDICAL AND COSMETIC      *
DERMATOLOGY SERVICES; DR. KIM      *
ROSS; SOUTH TEXAS SKIN CANCER      *
CENTER; DR. RYAN O'QUINN; HOPKINS      *
DERMATOLOGY; DR. JANINE HOPKINS      *
DERMATOLOGY OF EAST TEXAS; DR.      *
MATTHEW ROWLEY; DR. LIDA R. LOWRY*
**[UTAH DEFENDANTS]:** ASPEN      *
DERMATOLOGY; DR. MICHAEL EYRE; DR.*
CHAD PETERSON; **[VIRGINIA**      *
**DEFENDANTS]:** PINNACLE      *
DERMATOLOGY, LLC; DR. MARK P. EID;      *
**[WISCONSIN DEFENDANTS]:**      *
FOREFRONT DERMATOLOGY; DR.      *
KENNETH KATZ; DR. BETSY WERNLI;      *
DR. JAMES AYNOTT; MR. SCOTT      *
BREMEN;      *
     *
           Defendants.      *

---

## JURY TRIAL DEMANDED

---

-11-

## AMENDED VERIFIED COMPLAINT UNDER THE
## FEDERAL FALSE CLAIMS ACT

Plaintiff-Relator, Daniel W. Creger, ("Relator" or "Creger"), through his attorneys, on behalf of the United States of America, ( the "Government" or the "Federal Government"), for his Amended Verified Complaint under the Federal False Claims Act,[1] the *Stark* Law[2] and the Anti-Kickback Statute,[3] and also on behalf of the captioned states, ("the States"), under their respective False Claims Acts against Defendants, Pinnacle Dermatology, ("Pinnacle"); SkinCure Oncology, ("SkinCure"); Chad A. Eckes, ("Eckes"); Mary Tolan, ("Tolan"); Dr. Jose Rios, ("Rios"); Dr. Paula K. Lapinski, ("Lapinski"); Kerwin J. Brandt, ("Brandt"); Dr. Daniel Ladd, ("Ladd"); Krista Hatcher, ("Hatcher"); Vance Varnier, ("Varnier"); Steven B. Bonner, ("Bonner"); Steven L. Scott, ("Scott"); L. Peter Smith, ("Smith"); CapX Partners, ("CapX"); Jeffrey Preffer, ("Preffer"); Fountain Partners, ("Fountain"); Tom Carter, ("Carter"); John Van Hooser, ("Van Hooser"); and the other Dermatology Practices and Dermatologists otherwise named in the caption of this Verified Amended Complaint whose names, addresses and contact information are attached to this Verified Amended Complaint as an Exhibit;[4]

---

[1]     31 U.S.C. § 3729 *et seq*.

[2]     42 U.S.C. § 1395nn

[3]     42 U.S.C. § 1320a-7b(b).

[4]     See Exhibit A, List of additional Dermatology Practice and Dermatologist, Defendants, together with their contact information.

-12-

which is incorporated by reference into the body of the language of said Complaint,

(sometimes collectively "defendants," or "co-conspirator defendants" or in the case of the

Dermatology Practice or Dermatologist, Defendants, "Co-conspirator Dermatologist(s)"),

alleges under the *Qui Tam* provisions of the False Claims Act and similar provisions of

comparable State False Claims Acts, in camera and under seal, based upon personal

knowledge and relevant, and material  documents as follows:

**Index To The Complaint**

I. Introduction.............................................................................................................19

II. Parties.................................................................................................................25

III. Jurisdiction and Venue............................................................................... 58

IV. Federal *Stark* Laws...................................................................................59

    A. Introduction.......................................................................................59

    B. The *Stark* Law Prohibits A Physician Making A Referral Of Designated
    Health Services To An Entity With Which He Or She Has A Financial
    Interest..............................................................................................60

    C. SkinCure's Contract Created Prohibited Financial Relationships With Co-
    conspirator Dermatologists   ...............................................................63

    D. Stark Law's Broad Definition Of Referral......................................65

    E. Review Of Exceptions Under *Stark* And Why They Do Not Apply To
    Defendants' Unlawful Conduct............................................................67

        1.    Possible General Exceptions Under 42 C.F.R. § 411.355

        2.    Possible Specific Exceptions Under *Stark*

            (a)    Physicians Services Exception Does Not Apply
                   § 411.355(a)(1)

(b)     In-office Ancillary Services Exception Does Not Apply
§ 411.355(b)

(c)     Durable Medical Equipment Lease Exception Does NJOt
Apply § 411.357(b)

(d)     Personal Services Arrangement Exception Does Not Apply,
§ 411.357(b)

V.     Introduction To The Federal Anti-Kickback Statute, (AKS)................................72

    A.     Liability Under The Anti-Kickback Statute..................................................72

    B.     No AKS Safe Harbors Apply To Save SkinCure's Fraudulent Scheme.....73

        (1) The Equipment Rental Safe Harbor Does Not Apply............................

        (2) The Personal Services And Management Safe Harbor Does Not
Apply.....................................................................................................

        (3) The Referral Services Safe Harbor Does Not Apply............................

        (4) The Referral Arrangements For Speciality Services Safe Harbor
Does Not Apply .....................................................................................

VI.     The Fraud And Conspiracy of Defendants To Willfully Violate Stark, AKS
And The False Claims Act........................................................................................75

    A.     Brief Summary Of Defendants' Fraud And Conspiracy............................75

    B.     OIG Special Advisory Bulletin of April 2003 Warning About Fraud
Schemes Like Defendants' Scheme Of Fraud And Conspiracy.................77

    C.     Defendants' Fraud And Conspiracy............................................................80

        (1)     Introduction And Back Ground Information...................................

        (2)     The Law Of Conspiracy.................................................................

(3)     Inception Of Defendants' Fraud And Conspiracy...........................

(4)     Dermatologists Join The Fraud As Co-conspirators.......................

(5)     SkinCure's Profits Received From The Equipment And Services
        It Provided Were Grossly Excessive–above Fair Market Value .....

(6)     Private Equity Investors Joined The Pinnacle Fraud And
        Conspiracy.......................................................................................

(7)     Private Equity Investors Knowingly Financed SkinCure And
        Pinnacle's Nationwide Fraud And Conspiracy................................

D. Specific Examples of Relator's First Hand Knowledge Of Defendants'
   Fraud And Conspiracy..........................................................................91

   (1) SkinCure's Fraudulent Proposal Made By Its CEO,
       Kerwin Brandt, To Brentwood Dermatology On November 8, 2017....

        (a) Background......................................................................

        (b) Stunning Admission Against Interest By SkinCure CEO
            Kerwin Brandt, Brentwood, Tennessee, November 8, 2017........

        (c)  Additional Admissions Against Interest Made By SkinCure,
             CEO, Brandt, To Relator.............................................

   (2) SkinCure Fraud And Conspiracy At The Skin Wellness Center,
       Knoxville, Tennessee................................................................

        (a) The Relator's Two Visits To The Skin Wellness Center
            On June 30, 2019, And About Two Weeks Later In
            July 2019......................................................................

        (b) The Admissions Against Interest Made By Defendant,
            Dr. Meredith Overholt, And By SkinCure Radiation Therapy
            Technician....................................................................

        (c) Reasonable Inferences.................................................

-15-

(3) SkinCure Fraud At Program At Murfreesboro Dermatology Clinic........

    (a) What The Relator Learned About The Details Of SkinCure's Fraudulent Contract With Murfreesboro Dermatology And Pinnacle......................................................................................

    (b) What The Relator Personally Observed About How SkinCure Set Up The Fraudulent Program At Murfreesboro Dermatology.........................................................

    (c) The Relator's Personal Observations Of How The SkinCure Fraudulent Program Worked........................................................

    (d) Admissions Against Interest Of Defendant, Eckes.....................

(4) Material Admissions Relator Gleaned From Sensus Account Executive, Amanda Redden....................................................................

(5) Federal And State Healthcare Programs Unaware Of Defendants' Submissions Of Fraudulent Invoices For Payment.................................

E. Defendants' Elaborate Coverup Of Their Fraud And Conspiracy.....................105

    (1) The Very Name "SkinCure Oncology" Is A Fraudulent Deception......

    (2) SkinCure And Its Co-conspirator Dermatologists Misrepresent Pwnership of the SRT-100 Superficial Radiation Machines.................

    (3) SkinCure and Co-conspirator Dermatologists Filed, Or Conspired To File, False Or Misleading SRT-100 Machine Registration Documents With The Various States

    (4) SkinCure Became Each Co-conspirator Dermatologist's Agent To Register SRT-100 Machines With State Agencies And To Bill Federal And State Healthcare Programs And Other Third Party Payers

    (5) SkinCure And Co-conspirator Dermatologists Made The Terms Of Their Fraudulent Business Arrangement Secret And Confidential

VII.   Truthfully Certifying Compliance Within Stark And AKS Is A Condition Of

-16-

Payment Under Federal Healthcare Law, And The False Claims Act..................116

VIII. Many Defendants Made Knowing, False Certifications To The Small
Business Administration To Unlawfully Obtain Loans Under The Federal
Paycheck Protection Program Or To Unlawfully Obtain Loan Forgiveness
Or Both...........................................................................................................120

    A.  Defendants' Ineligibility Due To Violations Of Federal Law When They
Applied For PPP Loans And PPP Loan Forgiveness.......................................120

    B.  Defendants' Ineligibility Due To Their Violations, And Conspiracy To
Violate, State Laws When They Applied For PPP Loans And PPP Loan
Forgiveness..........................................................................................................125

    C.  Specific Examples Of Defendants, Fraudulently Receiving PPP Loans
And PPP Loan Forgiveness..............................................................................127

IX. Damages To The Federal Government–Pro Forma Damage Estimates 2016 To
Present.............................................................................................................129

X.  Conclusion..........................................................................................................130

Claims For Relief

Count I—Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A) Presentment of False
or Fraudulent Claims, Statements or Records.................................................131

Count II—Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B) Creation or Use of
False Statements or Records Material To A False or Fraudulent Claim.........................132

Count III—Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A) Knowingly Causing
and Retaining Overpayments Received From the Government.......................................134

Count IV—Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G) Creating or Using
False or Fraudulent Claims, Statements or Records To Avoid Refunding Monies
To The Government............................................................................................136

Count V—Federal False Claims Act,  31 U.S.C. § 3729(a)(1)(A)&(B) Submission of
Express and Implied False Certifications With Presentments of False Invoices
To The Government For Payment........................................................................138

-17-

Count VI–Federal False Claims Act,  31 U.S.C. § 3729(a)(1)(C) Conspiracy Claim......139

Count VII—Relator's Retaliation Claim Under § 31 U.S.C. § 3730(h)..........................140

Count VIII—Violation of the California False Claims Act...............................................142

Count IX–Violation of the Connecticut False Claims Act................................................144

Count X—Violation of the Florida False Claims Act.......................................................147

Count XI—Violation of the Georgia False Claims Act.....................................................150

Count XII—Violation of the Illinois False Claims Act..................................................... 152

Count XIII—Violation of the Indiana False Claims Act................................................... 155

Count XIV—Violation of the Louisiana False Claims Act................................................ 157

Count XV—Violation of the Michigan False Claims Act................................................. 160

Count XVI—Violation of the Minnesota False Claims Act...............................................162

Count XVII—Violation of the New York False Claims Act.............................................164

Count XVIII—Violation of the North Carolina False Claims Act....................................166

Count XIX—Violation of the Tennessee False Claims Act..............................................169

Count XX—Violation of the Texas False Claims Act......................................................171

Prayers For Relief...........................................................................................................174

-18-

# I.    **Introduction**

1.    Every named defendant's fraudulent violation of the False Claims Act and conspiracy in this case began in 2016 with the collusion and conspiracy of three individuals who master-minded the fraudulent scheme to submit false and fraudulent invoices to Federal and State healthcare programs for payment and were co-founders of defendant, SkinCure Oncology, LLC, (SkinCure"): Dr. Daniel J. Ladd, Steven L. Scott and L. Peter Smith. They called it the "SkinCure, SRT Turnkey Implementation Program," or the "Turnkey Revenue Share Model." The fraudulent scheme involved SkinCure paying bribes and kickbacks to co-conspirator dermatologists to entice them to refer their patients to SkinCure for it to provide and over utilize Designated Health Services, ("DHS"), in the form of superficial radiation therapy, to the co-conspirator dermatologists' patients and then knowingly, fraudulently bill Federal and State healthcare programs  for such services.[5] Such scheme violated *Stark*, the Anti-Kickback Statute, (AKS), and the False Claims Act.[6] The contracts between SkinCure and its subsequent, co-conspirator dermatologists also provided, in part, that in exchange for unlawful referrals of the dermatologists' patients to SkinCure for superficial radiation therapy, they would unlawfully share Federal and State healthcare program reimbursements for such services on a sliding scale between 40% - 50%, depending on the volume and value of the services referred.

2.    The bribes and kickbacks, which SkinCure provided at no cost to its co-conspirator dermatologists included: (1) a $495,000, SRT-100-Vision superficial radiation machine, (sometimes, "SRT machine") (Owned by SkinCure); (2) a radiation therapy technician,

---

[5]    42 U.S.C. § 1320a-7b(b).

[6]    42 U.S.C. § 1320a-7b(b); 31 U.S.C. § 3729 et seq.

(employed and paid by SkinCure); (3) billing and collection services, (performed by SkinCure paid employees from it Burr Ridge, Illinois, home office); (4) State radiation machine registrations and filings, (paid for by SkinCure and performed by its home office employees); (5) services of a Medical Physicist to calibrate and maintain the SRT machine, (employed and paid for by SkinCure); (6) services of an account manager, (employed and paid for by SkinCure); (7) design and construction of a lead lined room at the co-conspirator dermatologist's clinic, at SkinCure's expense, to safely accommodate the SRT machine in compliance with State law; among other illegal remuneration.[7]

3.      But the big money kickback SkinCure paid each of its co-conspirator, dermatologists was 40% - 50% of Federal and State healthcare program reimbursements for superficial radiation therapy performed in the dermatologist's clinic by SkinCure on co-conspirator, dermatologist's patients. The exact percentage of Federal and State healthcare program reimbursements received by co-conspirator, dermatologists depended on the volume and value of their referrals of patients to SkinCure. Sharing Federal and State healthcare program reimbursements with SkinCure, and receiving such reimbursements directly from SkinCure, gave every co-conspirator, dermatologist a financial interest in SkinCure, such patient referrals to SkinCure unlawful and violations of *Stark* .[8]

4.      Defendants' *Stark* and AKS violations resulted in a fraudulent conspiracy by SkinCure and each co-conspirator, dermatologist to knowingly present false invoices to

---

[7]      See Exhibit B, SkinCure Marketing Documents, (CREGER00032-00086, 00115-00124).

[8]      42 U.S.C. § 1395nn(h)(6).

-20-

Federal and State healthcare programs for payment, constituting False Claims Act violations.[9]

5. The Government, at all material times, was completely unaware that SkinCure had paid kickbacks to co-conspirator, dermatologists' or that such dermatologists had made unlawful patient referrals, so SkinCure could provide DHS, (i.e. superficial radiation therapy), to their patients. The Government was also completely unaware that SkinCure was unlawfully sharing Federal and State healthcare programs reimbursements with its co-conspirator, dermatologists or that such dermatologists had a financial interest in SkinCure, at the time they referred patients to SkinCure.

6. SkinCure covered up its fraudulent scheme by tightly controlling the billing of superficial radiation therapy provided to patients, falsely using the co-conspirator, dermatologist's Medicare/Medicaid Provider/Supplier Billing Number. This was done because, at no material time, was SkinCure: (1) an approved Medicare/Medicaid Provider/Supplier; (2) in possession of a valid Medicare/Medicaid Provider/Supplier Billing Number; (3) authorized by Federal or State healthcare programs to provide superficial radiation therapy treatment to patients in its own name. SkinCure billings for such treatment under its co-conspirator, dermatologists' Medicare/Medicaid Provider/Supplier Billing Numbers, violated *Stark*, AKS and the False Claims Act, were fraudulent and unlawful.

7. From the co-conspirator, dermatologist's point of view, it was a beautiful scheme. At no expense or cost to them, they captured 40% - 50% of the reimbursement from Federal and State healthcare programs for DHS provided to their patients by SkinCure, in the co-conspirator,

---

[9] *United States ex rel. Augustine v. Century Health Services*, 289 F. 3d 409 (6th Cir. 2002).

-21-

dermatologist's clinic. Previously, such dermatologists had either surgically removed such cancerous lesions with reimbursement of a few hundred dollars or referred patients to a Mohs surgeon for microscopic excision, capturing 0% of the reimbursement for the Mohs Surgery. According to the medical literature, and the Academy of Dermatology, Mohs Surgery remains the Gold Standard for treating the vast majority of, non-melanoma skin cancers. Typical Medicare/Medicaid reimbursement for Mohs Surgery is about $1500 per lesion. Medicare reimbursement for SkinCure, SRT treatment is $7000-10,000 per lesion.[10] Medicare's significantly greater reimbursement for SRT treatment of non-melanoma skin cancers is the gasoline fueling SkinCure's fraud and conspiracy scheme and its knowing presentation of false, fraudulent invoices to Federal and State healthcare programs for payment.

8.    Neither SkinCure, nor any co-conspirator, dermatologist ever sought or received an advisory opinion from the Office of the Inspector General about whether the SkinCure, SRT Turnkey Implementation Program complied with *Stark*, AKS or the False Claims Act.

9.    SkinCure and its co-conspirator defendants are each guilty of knowingly presenting false invoices to Federal and State healthcare programs for payment or conspiring to do so.[11] SkinCure and its co-conspirator dermatologists are each guilty of knowingly making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim, or conspiring to do so.[12] SkinCure and its co-conspirators are guilty of knowingly

---

[10]    See Exhibits E and  Y, SkinCure Federal and State Healthcare Programs' Billing Fractions Chart, (CREGER00189 and CREGER00284).

[11]    31 U.S.C. § 3729(a)(1)(A) & (C).

[12]    31 U.S.C. § 3729(a)(1)(B) & (C).

submitting false invoices to Federal and State healthcare programs for payment, exceeding

$270,000,000.

10.     SkinCure, and each co-conspirator dermatologist, falsely certified, that they were

in compliance with Federal and State Law, including, Medicare laws and regulations and other

Federal and State healthcare program regulations and program instructions, including their false

implied certifications that they were in compliance with *Stark*, the Anti-Kickback Stature and the

False Claims Act.

11.     To avoid paying Illinois sales tax on its purchases of about 250, SRT-100

superficial radiation machines, (total value: $123,750,000), SkinCure and its co-conspirator,

dermatologists prepared, and conspired to prepare, false SRT-100 machine, State registration

documents, in violation of State law.  Such false registrations were prepared by SkinCure, with

co-conspirator dermatologist's, knowledge and approval, and falsely stated that the co-conspirator

dermatologists owned the SRT-100 machines.[13] At all material times, SkinCure owned each SRT-

100 machine placed in a co-conspirator dermatologist's clinic.[14] As a coverup, defendants lied

about truthful ownership of such SRT-100 machines, on State registration documents, as part of

their conspiracy to avoid paying State of Illinois sales taxes of at least $8,971,875.

12.     Additionally, SkinCure, and many co-conspirator dermatologist defendants, each

knowingly made applications containing false certifications that they were in compliance with

---

[13]     See Exhibit S, State of Tennessee,  X-Ray Equipment registration document for
SRT-100 machine placed by SkinCure at The Skin Wellness Center, Knoxville, Tennessee.
(CREGER00253).

[14]     See Exhibit E, SkinCure, SRT Turnkey Implementation Program Contract,
(CREGER00153-00189).

-23-

Federal and State laws in 2020 and 2021 under the Paycheck Protection Program, (PPP), of the CARES Act[15] to fraudulently claim eligibility to obtain PPP loans[16] and, thereafter, to fraudulently obtain PPP loan forgiveness.[17] Such false certifications were made and knowingly presented to the United States by these defendants to fraudulently obtain PPP loans and loan forgiveness, which constituted violations of the False Claims Act. Not knowing about defendant's false certifications and ineligibility, the United States granted PPP loans and PPP loan forgiveness. Had the United States known the truth about such false certifications and ineligibility, PPP loans and PPP loan forgiveness would never have been granted to such defendants. Such defendants have received from the United States PPP Loans and forgiveness totaling in excess of $30,000,000.

13.     Each defendant, with full knowledge that they were not entitled to receive any reimbursements from Federal or State healthcare programs, and those defendants who have fraudulently obtained PPP loans and loan forgiveness, have willfully refused to reimburse the United States or the states for such monies they have unlawfully received.[18]

14.     Relator is also entitled to a separate judgment against defendant, Pinnacle, for its retaliatory discharge of him because he engaged in covered, protected conduct and he was

_____

[15]     Section 1102 of the CARES Act, (P.L. 116-136, March 27, 2020), temporarily added the "Paycheck Protection Program" to the SBA's 7(a) Loan Program. Section 1106 of the Act provided for forgiveness of up to the full principal amount of qualifying loans under the Paycheck Protection Program.

[16`]     13 C.F.R. § 120.110(h); SBA Form 2483 (04/20), Revised (06/20) & (02/21); See Exhibit C, Paycheck Protection Program Forms, Documents and Note, (CREGER00125-00147).

[17]     SBA Form 3508 (06/20); See Exhibit D, (CREGER00148-00152).

[18]     31 U.S.C. § 3729(a)(1)(C) & (G).

-24-

proximally terminated after he engaged in such conduct.[19]

15.     Defendants' fraud against the State of Illinois for their failure to pay sales taxes totals at least $8,971,875.  The fraudulent conduct and conspiracy of the defendants does not quality for any exception or "Safe Harbor" under *Stark* or the Anti-Kickback Statute. All defendants have violated both statutes.  Defendants' healthcare and PPP Loan fraud against the United States exceeds $300,000,000.  False Claims Act penalties associated with such fraud could approach One Billion, ($1,000,000,000), Dollars.

## II.     The Parties

### The Plaintiff, Daniel W. Creger

16.     The Plaintiff, Daniel W. Creger, is over twenty-one years of age and presently resides at 4947 Laura Jeanne Boulevard, Murfreesboro, Tennessee 37129. He received his Bachelor of Science Degree, with Cum Laude Honors, from the College of Applied Sciences at Western Illinois University. He has been employed in healthcare for over 25 years in a variety of executive capacities. After college, initially,  he focused on pharmaceutical sales, marketing and training while he worked for Forest Pharmaceuticals, Inc., Centocor, Inc., Kos Pharmaceuticals, Elli Lily & Co., and Biogen Idec, Inc. After about ten years, his career path moved into healthcare consulting and management in the field of dermatology. Beginning in July 2011, he became Director of Strategic Initiatives at Dermatology Associated of Wisconsin, where he was employed for two-and-a-half years. During his tenure, he conducted business evaluations necessary to acquire ten private dermatology practices, with 26 dermatologists, negotiating each merger/acquisition and all physician employment contracts and he informed himself, through his

---

[19]      31 U.S.C. § 3730(h).

-25-

own personal research, about *Stark* Law, the Anti-Kickback and the False Claims Act.

17.    In January 2014, Creger formed, and was president and CEO of, Dermatology Practice Consultants, Inc. For the next two-and-a-half years, he was an independent consultant to dermatology practices and engaged in recruiting physicians, advising a regional dermatology platform in what turned out to be its successful acquisition by a private equity group. He kept up with the *Stark* Law, the Anti-Kickback Statute and the False Claims Act. He directed capital purchases of durable medical equipment, obtaining necessary certifications and certificates of compliance, while preparing pro forma economic projections, estimated project costs and recommended marketing plans and initiatives to ensure successful endeavors. He successfully completed accrediting for a surgical center with the Accreditation Association for Ambulatory Health Care, Inc. His consulting recommendations resulted in enhanced revenue streams for dermatology practices. He developed mission and vision statements for dermatology practices and platforms. He designed marketing strategies, press releases and brochures to promote the business activities of dermatology practices and platforms with whom he consulted.

18.    In late March 2017, Creger was approached by a headhunter, informed of the opportunity and interviewed for the open CEO position at defendant, Pinnacle. To schedule and arrange for the interview, he was not contacted by anyone at Pinnacle. He was contacted by Krista Hatcher, partner at Chicago Pacific Founders, which had just made its first loan to Pinnacle and had controlling interest in the Board of Directors of Pinnacle. He flew to Chicago from Nashville on the afternoon of April 18, 2017, had dinner with defendants, Jose Rios and Paula Lapinski, that evening. But his formal interview did not occur at the Pinnacle offices. He never even saw the Pinnacle offices or clinics.  The formal interview occurred the next day, April 19, at the Chicago

-26-

Pacific offices located at 980 North Michigan Avenue, Suite 1998, Chicago, Illinois 60611. During the formal interview, Creger was not interviewed by a single Pinnacle employee, nor was one ever present. He was interviewed by defendant, Mary Tolan, the founder of Chicago Pacific, and at the time of the interview, president of the Board of Directors of Pinnacle. Creger was also interviewed by Chicago Pacific partner and Pinnacle Board member, Krista Hatcher and Chicago Pacific partner, Greg Kazan. The interview lasted from about 8:00 A.M. until about 2:00 P.M. Creger was required to sign a confidentiality agreement by Chicago Pacific as a condition for the interview. Creger's reimbursements for plane fare, hotel bill, rental car and other travel expenses were all paid, not by Pinnacle, but by Chicago Pacific Founders. Chicago Pacific did not hire Creger as CEO of Pinnacle.

19.     In May 2017, Creger became CEO of Tennessee Dermatology Partners, Inc., located in Nashville, which, under his leadership, became the largest dermatology group in Tennessee with 35 providers in 18 locations. He kept up with *Stark*, AKS and the False Claims Act while so employed. He engaged in vendor negotiations and did pro forma analysis on proposed capital purchases for strategic locations as well as impact studies for new technologies throughout the organization. Significantly, in October 2017, Creger and Dr. John Q. Binhlam, a dermatologist at Brentwood Dermatology, a Tennessee Dermatology affiliate, were approached by defendant, Kerwin Brandt, CEO of defendant, SkinCure, and negotiations began for Brentwood Dermatology to sign up for the SRT Turnkey Implementation Program and for SkinCure to provide Brentwood, free of charge the following: (1) one, Sensus SRT-100 -Vision, superficial radiation machine, purchase price $495,000, (ownership remaining with SkinCure); (2) a radiation therapy technician, employed and paid by SkinCure; (3) design and construct a lead lined

-27-

treatment room for use and safe accommodation of the SRT machine, at SkinCure's expense; (4) billing and collection services performed by SkinCure paid employees; (5) services of a SkinCure paid, Medical Physicist to calibrate and maintain the SRT machine; (6) services of a SkinCure paid account manager; and other SkinCure provided benefits at no cost to Brentwood Dermatology.

20.     Defendant, Brandt, submitted a proposed Program Services Agreement, with a 14 page "Exhibit B," in fine print, containing extensive terms and conditions, together with a proposed Business Associates Agreement and 2017 Medicare Billing Allowables.[20] Creger and Dr. Binhlam both concluded that the proposal, as set forth in Brandtt's representations and contract documents, did not comply with *Stark* Law, the Anti-Kickback Statute or the False Claims Act and rejected the proposal. Brentwood Dermatology never contracted with SkinCure.

21.     In June 2018, Creger successfully negotiated the purchase from Sensus of a small SRT-100 radiation therapy machine for Dr. Keith Loven, a Tennessee Dermatology affiliated physician owning three practices in Goodlettsville, Henderson and Hermitage, Tennessee. Purchase price for the small machine was $160,000. Creger's employment with Tennessee Dermatology concluded in 2021. For a time, with full disclosure and permission, Creger was employed simultaneously by Defendant, Pinnacle, and Tennessee Dermatology.

22.     The period of such dual employment began in September 2019, when Creger was hired by Pinnacle as its Chief Growth Officer. Terms of that employment were set forth in a

---

[20]     See Exhibit E, SkinCure Proposal Letter and Contract Documents, (CREGER00153-00189).

-28-

written employment agreement,[21] negotiated with defendant, Chad Eckes. Creger's responsibilities as Chief Growth Officer were to expand the company by recruiting new dermatologists and acquiring new dermatology practices. But he also negotiated savings on cosmetic purchases that saved Pinnacle about $300,000 annually. He also negotiated the acquisition of a new dermatology practice, projected to add $400,000 in annual earnings. He also performed pro forma analysis and conducted impact studies of new technology lines of service for Pinnace such as in-house pharmacy dispensing.

23.     From September 3, 2019, until March 18, 2020, Creger was a member of Pinnacle's Executive Leadership Team, (ELT),comprised of its executive management.[22] The ELT met every week to discuss Pinnacle's business operations, including expansion of its system of dermatology practices, financial results, strategic initiatives and planning and setting operations, financial and marketing goals for the company. The members of the ELT were the hands-on executives responsible for the business and financial success of the company.

24.     During his August 2019, interview with Eckes, Creger learned that Pinnacle had contracted with, and  was a SkinCure partner, in the SRT Turnkey Implementation Program, which allowed SkinCure to bill Medicare/Medicaid and other federal healthcare programs under Pinnacle's Medicare Provider/Supplier Billing Number. During a September 2019, conversation with Eckes, Relator learned that, because it had agreed to place multiple SkinCure, SRT-100

---

[21]     See Exhibit F, Creger Employment Agreement with Pinnacle, (CREGER00191-00193).

[22]     Executive management members of the Executive Leadership Team from September 2019 until March 2020, were: CEO, Chad Eckes, COO, Matt Renn, Vice President Operations, Barbara Dominic, Board of Directors President, Mary Tolan, Pinnacle physicians and founders, Jose Rios and Paula Lapinski and Creger among others.

-29-

machines, Pinnacle was receiving a 47% share of reimbursements received from Federal and State healthcare programs. From his previous experience with SkinCure and its CEO, Kerwin Brandt, in November 2017, Creger already knew that SkinCure did not possess a Medicare Provider/Supplier Billing Number to legitimately bill Medicare/Medicaid or other federal healthcare agencies for Designated Health Services, including superficial radiation therapy. During his interview, Creger told Eckes that he did not think that the SkinCure SRT Turnkey Implementation Program was proper or appropriate. Throughout his employment with Pinnacle, Creger had several conversations with Eckes about the SkinCure SRT Program. During each conversation, Creger told Eckes the program was not proper. These conversations, with Eckes and others, including Pinnacle Vice President, Barbara Dominic, were protected, covered conduct under § 3730(h) of the False Claims Act. On March 18, 2020, 16 days after Creger told Barbara Dominic that the SRT Turnkey Implementation Program was illegal, Eckes terminated Creger's employment effective March 18, 2020.

**Defendant, Pinnacle Dermatology, LLC**

25.     Pinnacle Dermatology, LLC, a privately owned company, was formed in 2004 by Defendants, Dr. Jose Rios and Dr. Paula Lapinski, with its initial principal corporate office located in at 820 Springer Drive, Lombard, Illinois 60148. Pinnacle has recently relocated its principal corporate office to: 6716 Nolensville Rd., Ste. 250, Brentwood, Tennessee 37027, telephone: (615) 549-6674. Pinnacle has touted itself as a "Chicago Pacific founders portfolio company . . . [with] . . . more than 100 providers and 51 convenient locations in Greater Chicagoland, Northwest Indiana, the Indianapolis area, Tennessee, Minnesota, Michigan and poised for further expansion." In the summer of 2020, Pinnacle employed over 500 people its five

-30-

state service area.

26.    In March 2017, Pinnacle aligned with Defendant, Chicago Pacific Founders, receiving an infusion of investment capital, which it then deployed to acquire dermatology practices across its service area. Pinnacle chose Chicago Pacific to be its financier because, "[it was] one of the only healthcare based investment funds in dermatology to create an alternative model to national dermatology practices."[23] Chicago Pacific put four of its partners on the Pinnacle Board of Directors in March 2017, thereby, taking over, voting control of the Pinnacle Board.[24] Since March 2017, Pinnacle has rapidly expanded, reporting October 29, 2021, when it was acquired by BayPine LP, that it owned 87 clinical dermatology locations across 11 states, having added over 37 new dermatology practices since 2017.[25] Chicago Pacific sold its controlling interest in Pinnacle on October 29, 2021, to BayPine, LP, which assumed controlling interest in Pinnacle and its Board of Directors.[26]

**Defendant, SkinCure Oncology, LLC**

27.    Defendant, SkinCure Oncology, LLC, is a corporation founded in 2016 and incorporated in the State of Delaware on October 10, 2016, with its principal place of business located at 745 McClintock Drive, Burr Ridge, Illinois 60527. Its Chief Executive Officer is

---

[23]    See Exhibit G, March 2017, Pinnacle Press Release, ((CREGER00194-00196).

[24]    See Exhibit H, Pinnacle Board of Directors, March 2017, (CREGER00197-00205).

[25]    See Exhibit I, Press Release, BayPine acquires Pinnacle, October 29, 2021, (CREGER00206-00210).

[26]    See Exhibit J, Pinnacle Board of Directors, October 29, 2021, (CREGER0000211—227).

-31-

Defendant, Kerwin J. Brandt, who has been aggressively marketing SkinCure's unlawful SRT Turnkey Implementation Program all over the country, since 2016. The company was founded by three individuals: Dr. Daniel J. Ladd, Chief Medical Officer, and a major equity holder, Steven L. Scott, Chief Operating Officer and L. Peter Smith, an experienced healthcare entrepreneur and SkinCure equity owner.

28. From its inception, SkinCure has been fraudulently: (1) paying bribes and kickbacks to co-conspirator, dermatologists in exchange for their referral of patients for SkinCure to provide superficial radiation therapy in the dermatologist's clinic, using a SkinCure owned SRT machine, operated by a SkinCure employed radiation therapist; (2) sharing Federal and State healthcare program reimbursements with co-conspirator, dermatologists, with the exact percentage of such unlawful shares based on the volume and value of referrals to SkinCure; (3) billing Federal and State healthcare programs for DHS, (i.e. superficial radiation therapy), under the co-conspirator, dermatologist's Medicare/Medicaid Provider/Supplier Billing Number because SkinCure is not an approved Medicare Provider/Supplier for DHS, including superficial radiation therapy. SkinCure's bribe and kickback scheme does not qualify for any "Safe Harbor" or exception under *Stark* Law or the Anti-Kick Statute. At all material times, co-conspirator dermatologists had a financial interest in SkinCure.

29. On or about April 14, 2020, SkinCure made false certifications of eligibility on its application to the Federal, Small Business Administration, ("SBA"), to receive a PPP Loan of $2,417,500. Specifically, SkinCure falsely certified that at the time of submitting its application for such PPP Loan under the CARES Act, it was in compliance with all federal and states laws. At the time of its application, containing false certifications, SkinCure was in violation of: (1)

-32-

*Stark* Law, AKS and the False Claims Act; (2) the Sales Tax Laws of the State of Illinois, for failure to pay Illinois sales taxes on its purchases of Sensus, $123, 750,000 in SRT-100-Vision machines; and, (3) various State X-Ray Machine Registration Laws, Rules and Regulations. The United States was unaware of SkinCure's violations of such federal and state laws and, as a result, approved and gave SkinCure a PPP Loan in the amount of $2,417,500. SkinCure used the proceeds from such loan to pay its employees to continue to engage in preparing and submitting false and fraudulent billings to Federal and State healthcare programs for payment. On or about June 11, 2021, SkinCure made false and fraudulent application to the United States for forgiveness of the full amount of its $2,417,500 PPP Loan, which forgiveness was by granted by the United States. If SkinCure had been truthful on its PPP Loan or Loan Forgiveness Applications, the United States would never have given SkinCure any PPP Loan and would never have forgiven SkinCure's $2,417,500 PPP Loan. SkinCure has failed to repay the United States such loan, although SkinCure has been fully aware of its violations of federal and state law from October 16, 2016, to the present.

**Defendant, Chad A. Eckes**

30.    Defendant, Chad A. Eckes, has, at all material times, conducted business activities within the jurisdiction of this Court. We understand that Eckes currently resides within the jurisdiction of this Court. Since, 2017, Eckes has been the Chief Executive Officer of Pinnacle, currently with an office at its headquarters in Brentwood, Tennessee. In the summer of 2019, he negotiated Pinnacle's contract with SkinCure, which gave Pinnacle financial interest in SkinCure–receipt of bribes and kickbacks and 47% of reimbursements from Federal and State healthcare programs--and resulted in the knowing, unlawful referrals of Pinnacle patients to

-33-

SkinCure. Such conduct violated *Stark*, AKS and the False Claims Act. Eckes knew of, should have known of, or recklessly disregarded such violations. Since the summer of 2019, Mr. Eckes and Pinnacle have been in conspiracy with SkinCure to violate *Stark*, AKS, the False Claims Act and Illinois Sales Tax Laws.

**Defendant, Chicago Pacific Founders**

31.     Chicago Pacific Founders was formed in April 2014 by Defendant. Mary Tolan, among others, as a private equity investment enterprise, with its principal place of business located at 980 North Michigan Avenue, Suite 1998, Chicago, Illinois 60611, but it was, and has been, doing business in the State of Tennessee and within the jurisdiction of this Court. The company touts itself as a strategic healthcare services company and advertises that it will invest up to $75,000,000 of equity capital per opportunity in buyout and growth transactions for cash flow positive businesses.

32.     In March 2017, Chicago Pacific invested in Pinnacle Dermatology,  taking a controlling  interest in the company and its Board of Directors. To protect its financial interest, Chicago Pacific placed four partners on Pinnacle's seven voting member Board of Directors, thereby gaining complete control of the business activities of Pinnacle. In August/September 2019, Chicago Pacific, through the actions of its partners, Mary Tolan, Krista Hatcher, Vance Varnier and Steven Bonner, voted in favor of Pinnacle contracting with SkinCure to implement the fraudulent SRT Turnkey Implementation Program. Chicago Pacific and its partners thereby became co-conspirators with Pinnacle and SkinCure to: (1) defraud Federal and State healthcare programs; (2) defraud the State of Illinois of at least $8,971,875 in sales taxes on SkinCure's purchases of SRT-100-Vision machines; and (3) file false State SRT-100 registration documents,

-34-

which falsely stated the ownership of such machines.

**Defendant, Mary Tolan**

33.     Defendant, May Tolan, is a resident of a state other than the State of Tennessee but at all material times has conducted business activities within the jurisdiction of this Court. Tolan was an original founder of Chicago Pacific. However, she has a checkered business history. She was forced to resign as CEO of Accretive Health in the fall of 2013 after it was de-listed from the New York Stock Exchange and investigated by the Minnesota Attorney General for financial improprieties and questionable debt collection practices. The company was forced to restate its financial reports for 2011, 2012 and 2013 because it did not properly book revenues and expenses during those years. Shortly thereafter, in April 2014, she founded Chicago Pacific. Her bio at Chicago Pacific suggests that she is "bringing private equity into healthcare provisions . . . creating transformative changes to a field in eager need of them . . .Mary's experience has proved the ideal preparation."

34.     Under Tolan's leadership, in March 2017, Chicago Pacific first loaned money to Pinnacle and took an equity interest to fuel Pinnacle's rapid expansion through purchases of private dermatology practices in Minnesota, Illinois, Indiana, Michigan and Tennessee. A second loan to Pinnacle was facilitated by Tolan in May 2018. Tolan was Chairman of the Board of Directors of Pinnacle from March 2017 to October 29, 2021, when Chicago Pacific's controlling equity interest was bought out by private equity investor, BayPine LP.  She also insisted from March 2017 until October 2021, that Chicago Pacific partners, Krista Hatcher, Vance Varnier and Steven B. Bonner, also become controlling members of the Pinnacle Board.  Tolan, Hatcher, Varnier and Bonner were closely involved in the operations of Pinnacle including the hiring of

-35-

Chad Eckes as its CEO, the interviewing of Creger for the position, the acquisition of dermatology practices and the unlawful contract between Pinnacle and SkinCure, which they specifically approved.

35.    Defendant, Eckes, reported during the Executive Leadership Team meeting on October 22, 2019, that during the Pinnacle Board of Directors meeting on October 16, 2019, "Board Members are pleased with trajectory, don't want to give up what the budget was. Keep driving forward on all fronts . . . volume, charging enough, collecting enough and billable services i.e. Cool Sculpting and SRT. Overall pleased with results. . . ." Eckes told Creger that Tolan was present and chaired the October 16 Board meeting. Tolan, Hatcher, Varnier and Bonner were driving forces in approving and perpetuating Pinnacle's unlawful contract with SkinCure. Tolan knew about, and approved of, Pinnacle's unlawful contract with SkinCure, which made Tolan, Pinnacle and Chicago Pacific, co-conspirators with SkinCure, in the  schemes to defraud: (1) Federal and State healthcare programs; (2) SBA and unlawfully obtain a $2,417,500 PPP Loan and forgiveness; (3) unlawfully fail to pay the State of Illinois sales tax on SkinCure's purchase of about 250, SRT-100-Vison machines.; and, (4) file false State SRT-100 registration documents, which falsely stated the ownership of such machines.

**Defendant, Krista Hatcher**

36.    Defendant, Krista Hatcher, is a resident of a state other than the State of Tennessee, but, at all material times, has done business in Tennessee and within the jurisdiction of this Court. According to her Pinnacle bio, as a voting member of it Board of Directors, Hatcher is a partner at Chicago Pacific Founders and is responsible for sourcing and leading investments in healthcare and senior living. Throughout her career she has worked successfully with founder-led

-36-

growth companies to develop and execute strategies for sustainable, profitable growth and value creation. Working with executives at these companies, Hatcher has led strategic initiatives involving business development, add-on acquisitions, enhancement of operations efficiencies, and the recruitment, development and integration of the key management talent and teams needed to help these businesses successfully scale. She has also been very effective at leading and executing successful, value optimizing exit strategies for the high growth companies with which she has worked.

37.    Hatcher knew about, and approved of, Pinnacle's unlawful contract with SkinCure, which made Hatcher, Pinnacle and Chicago Pacific, co-conspirators with SkinCure, in the schemes to defraud: (1) Federal and State healthcare programs; (2) SBA and unlawfully obtain a $2,417,500 PPP Loan and forgiveness; (3) unlawfully fail to pay the State of Illinois sales tax on SkinCure's purchase of about 250, SRT-100-Vison machines; and, (4) file false State SRT-100 registration documents, which falsely stated the ownership of such machines.

**Defendant, Dr. Vance Varnier**

38.    Defendant, Dr. Vance Varnier, is a resident of a state other than the State of Tennessee, but at all material times, has done business in the State of Tennessee and within the jurisdiction of this Court. According to his Pinnacle bio, as a voting member of its Board of Directors, Varnier is a partner at Chicago Pacific Founders. Dr. Varnier is a medical doctor but has been an executive and investor in healthcare companies for the past 15 years or more. Varnier knew about, and approved of, Pinnacle's unlawful contract with SkinCure, which made Varnier, Pinnacle and Chicago Pacific, co-conspirators with SkinCure, in the schemes to defraud: (1) Federal and State healthcare programs; (2) SBA and unlawfully obtain a $2,417,500 PPP Loan

-37-

and forgiveness; and (3) unlawfully fail to pay the State of Illinois sales tax on SkinCure's purchase of about 250, SRT-100-Vison machines; and, (4) file false State SRT-100 registration documents, which falsely stated the ownership of such machines.

**Defendant, Dr. Jose Rios**

39.     Defendant, Dr. Jose Rios, is a medical doctor, President and co-founder of Pinnacle in 2004. His current principal place of business is in Brentwood, Tennessee at Pinnacle's current home offices, within the jurisdiction of this Court. His current residence is within the jurisdiction of this Court. Dr. Rios is a voting member of the Board of Directors and the Executive Leadership Team of Defendant, Pinnacle. Rios knew about, and approved of, Pinnacle's unlawful contract with SkinCure, which made Rios, Pinnacle and Chicago Pacific, co-conspirators with SkinCure, in the  schemes to defraud: (1) Federal and State healthcare programs; (2) SBA and unlawfully obtain a $2,417,500 PPP Loan and forgiveness; and (3) unlawfully fail to pay the State of Illinois sales tax on SkinCure's purchase of about 250, SRT-100-Vison machines; and, (4) file false State SRT-100 registration documents, which falsely stated the ownership of such machines.

**Defendant, Dr. Paula Lapinski**

40.     Defendant, Dr. Paula Lapinski, is a medical doctor, President and co-founder of Pinnacle in 2004. Her current principal place of business is in Brentwood, Tennessee at Pinnacle's current home offices, within the jurisdiction of this Court. Her current residence is within the jurisdiction of this Court. Dr. Lapinski is a voting member of the Board of Directors and the Executive Leadership Team of Defendant, Pinnacle. Lapinski knew about, and approved of, Pinnacle's unlawful contract with SkinCure, which made Lapinski, Pinnacle and Chicago Pacific, co-conspirators with SkinCure, in the  schemes to defraud: (1) Federal and State healthcare

-38-

programs; (2) SBA and unlawfully obtain a $2,417,500 PPP Loan and forgiveness; and (3) unlawfully fail to pay the State of Illinois sales tax on SkinCure's purchase of about 250, SRT-100-Vison machines; and, (4) file false State SRT-100 registration documents, which falsely stated the ownership of such machines.

41.     Dr. Lapinski was a dermatology administrator at Pinnacle's dermatology clinic located at 1124 Essington Road, Joliet, Illinois 60435-8423. As such administrator, on September 13, 2019, she registered Sensus, Model: SRT-100-Vision, superficial radiation therapy machine bearing Equipment ID No.: 7500, Class: Thr50-120kvp, Serial No.: 1903-2126, with said machine being, at all material times, owned by Defendant, SkinCure.[27] Dr. Lapinski registered said machine on behalf of Pinnacle as though Pinnacle owned the machine, which was not true. Such misleading registration was intentional and deceived the State of Illinois from learning that SkinCure had purchased and owned the said machine from Sensus, had it delivered to the State of Illinois but failed to pay Illinois sales tax on the $495,000 purchase price. Dr. Lapinski was an active participant with SkinCure in the conspiracy to defraud the State of Illinois from lawfully due Illinois sales tax on the purchase of said machine by SkinCure.

**Defendant, Kerwin J. Brandt**

42.     Defendant, Kerwin J. Brandt, is a resident of a state other than the State of Tennessee, but at all material times, has done, and is doing, business in the State of Tennessee and within the jurisdiction of this Court. Brandt has been the CEO of Defendant, SkinCure, since October 2016. Brandt has been involved since that time in heavily marketing the fraudulent SRT

---

[27]     See Exhibit K, Pinnacle, Dr. Paula Lapinski, SRT-100, Illinois Registration, (CREGER00228).

-39-

Turnkey Implementation Program to dermatologists throughout the country. In the summer of 2019, Brandt negotiated SkinCure's SRT Turnkey Implementation Program contract with Pinnacle. Brandt knew, should have known, or reckless disregarded that SkinCure's SRT Turnkey Implementation Program violated *Stark*, AKS and the False Claims Act and that it defrauded the State of Illinois of sales tax on $123,750,000 from SkinCure's purchases of about 250, SRT-100-Vison machines. Brandt was one of the moving forces behind the contracts with dermatologists and placement of Skincure owned, SRT-100 machines. Each dermatologist and dermatology practice contracting with SkinCure became a co-conspirator with Brandt and SkinCure to defraud Federal and State healthcare programs and the State of Illinois.

**Defendant, Dr. Daniel J. Ladd**

43.     Defendant, Dr. Daniel J. Ladd, is a resident of a state other than the State of Tennessee, but at all material times has conducted business in the State of Tennessee and within the jurisdiction of this Court. Dr. Ladd is a Dermatologist/Mohs Surgeon with his principal place of business located at: 3500 Jefferson Street, Suite 200, Austin, Texas 78731, where he founded Tru-skin Dermatology, which also has offices in Bastrop, LaGrange and Kerrville, Texas. Dr. Ladd is also president of Tru-Skin Development, LLC.

44.     In 2016, Dr. Ladd became a principal founder of Defendant, SkinCure, and is the company's Chief Medical Officer and one of its major equity holders. Dr. Ladd was one of the three individuals who master-minded the fraudulent scheme, the SRT Turnkey Implementation Program, which resulted in unlawful referrals of patients from dermatologists to SkinCure and bribes and kickbacks paid by SkinCure to such dermatologists which resulted in false invoices knowingly being submitted to Federal and State healthcare programs for payment and the State of

Illinois being defrauded out of Illinois sales tax on at least $123,750,000 in SRT machine purchases.

**Defendant, Steven B. Bonner**

45.      Defendant, Steven B. Bonner, an advisor to Chicago Pacific Founders, was a voting member of the Pinnacle Board of Directors from March 2017 until October 2021. According to his Pinnacle Bio, Bonner advises Chicago Pacific, serves on the Boards of firms it invests in and personally invests and mentors the firms that Chicago Pacific invests in. Bonner received his Bachelor of Arts Degree in Political Science from Amherst College and his Juris doctorate, Law Degree, from William Mitchell College of Law. He is a resident of a state other than the State of Tennessee, but at all material times was doing business in the State of Tennessee and within the jurisdiction of this Court. Bonner knew about, and approved of, Pinnacle's unlawful contract with SkinCure, which made Bonner, Pinnacle and Chicago Pacific, co-conspirators with SkinCure, in the  schemes to defraud: (1) Federal and State healthcare programs; (2) SBA and unlawfully obtain a $2,417,500 PPP Loan and forgiveness; and (3) unlawfully fail to pay the State of Illinois sales tax on SkinCure's purchase of about 250, SRT-100-Vison machines; and, (4) file false State SRT-100 registration documents, which falsely stated the ownership of such machines.

**Defendant, L. Peter Smith**

46.      Defendant, L. Peter Smith, has a long history as an executive, investor and entrepreneur in healthcare. He is a resident of an state other than the State of Tennessee, but at all material times was doing business in the State of Tennessee and within the jurisdiction of this Court. In 2016, Smith became a principal founder of Defendant, SkinCure, and is the

-41-

company's Chief Medical Officer and one of its major equity holders. Smith was one of the three individuals who master-minded the fraudulent scheme, the SRT Turnkey Implementation Program, which resulted in unlawful referrals of patients from dermatologists to SkinCure and bribes and kickbacks paid by SkinCure to such dermatologists which resulted in false invoices knowingly being submitted to Medicare/Medicaid and other federal healthcare programs for payment and the State of Illinois being defrauded out of Illinois sales tax on at least $123,750,000 in SRT machine purchases. Smith knew about, and approved of, Pinnacle's unlawful contract with SkinCure, which made Smith, Pinnacle and Chicago Pacific, co-conspirators with SkinCure, in the schemes to defraud: (1) Federal and State healthcare programs; (2) SBA and unlawfully obtain a $2,417,500 PPP Loan and forgiveness; and (3) unlawfully fail to pay the State of Illinois sales tax on SkinCure's purchase of about 250, SRT-100-Vison machines; and, (4) file false State SRT-100 registration documents, which falsely stated the ownership of such machines.

### Defendant, Steven L, Scott

47.     Defendant, Steven L.,Scott is the Chief Operating Officer of SkinCure. He is a resident of an state other than the State of Tennessee, but at all material times was doing business in the State of Tennessee and within the jurisdiction of this Court. In 2016, Scott became a principal founder of Defendant, SkinCure, and is one of its major equity holders. Scott was one of the three individuals who master-minded the fraudulent scheme, the SRT Turnkey Implementation Program, which resulted in unlawful referrals of patients from dermatologists to SkinCure and bribes and kickbacks paid by SkinCure to such dermatologists which resulted in false invoices knowingly being submitted to Medicare/Medicaid and other federal healthcare programs for payment and the State of Illinois being defrauded out of Illinois sales tax on at least

-42-

$123,750,000 in SRT machine purchases. Scott knew about, and approved of, Pinnacle's unlawful contract with SkinCure, which made Scott, Pinnacle and Chicago Pacific, co-conspirators with SkinCure, in the schemes to defraud: (1) Federal and State healthcare programs; (2) SBA and unlawfully obtain a $2,417,500 PPP Loan and forgiveness; and (3) unlawfully fail to pay the State of Illinois sales tax on SkinCure's purchase of about 250, SRT-100-Vison machines; and, (4) file false State SRT-100 registration documents, which falsely stated the ownership of such machines.

### Defendant, CapX Partners, a/k/a, Accord CapX LLC

48.     Founder in 1999, Defendant, CapX Partners, a/k/a, Accord CapX LLC, is a private equity concern specializing in equipment finance, serving equity sponsored and private held middle market companies, with office in Boston, New York City and its main corporate offices located at 155 N. Wacker Drive, #1760, Chicago, Illinois 60606. CapX Partners advertises itself as a hands-on lender, "thoroughly understanding your business and applying the right financing decisions is key to your success . . . and ours . . . . Our process involves an in-depth understanding of your strategic direction and organizational goals. We then quickly and efficiently conduct a comprehensive analysis of your opportunity and advise how we can help. The result: decisive actions, combined with flexible, creative and customized solutions that can respond to even the most complicated scenarios."

49.     In the fall of 2017, after "thoroughly understanding . . . [SkinCure's business] . . . [and gaining] . . . an in depth understanding of [SkinCure's] . . . strategic direction and organizational goals," CapX Partners agreed to loan SkinCure $2,500,000 to enable it to promote its fraudulent scheme of knowingly violating the *Stark* Law , the Anti-Kickback Statute, and then

-43-

knowingly presenting false invoices to Medicare/Medicaid and other federal healthcare programs for payment and conspiring with other defendants here to do so, all in violation of the False Claims Act. CapX Partners informed itself, and knew about SkinCure's fraudulent SRT Turnkey Implementation Program and scheme, before lending it $2,500,000 to promote the scheme. Confirming its own dirty hands in financing SkinCure's unlawful scheme, CapX's press release about its investment in SkinCure stated, "CapX boosts SkinCure Oncology's growth, preserving firm's working capital while providing $2.5 Million in growth financing."[28] When the loan closed in December 2017, CapX Partners became a co-conspirator with SkinCure to (1) defraud Federal and State healthcare programs; (2) unlawfully fail to pay the State of Illinois sales tax on SkinCure's purchase of SRT-100-Vison machines; and, (3) file false State SRT-100 registration documents, which falsely stated the ownership of such machines.

**Defendant, Jeffrey S. Pfeffer**

50.     Defendant, Jeffrey S. Pfeffer, co-founded CapX Partners in 1999. His responsibilities with the firm include its management as Managing Partner. He has over three decades of small to mid-size business finance experience. Pfeffer was involved with approving the CapX 2017, loan to SkinCure and in thoroughly understanding [SkinCure's business and he gained] . . . an in depth understanding of [SkinCure's] strategic direction and organizational goals," before approving and signing off on the CapX loan of $2,500,000 to SkinCure in December 2017. Pfeffer wither knew or should have known about or recklessly disregarded, SkinCure's scheme to defraud Medicare/Medicaid and other federal healthcare programs and

---

[28]      See Exhibit L SkinCure Press Release announcing $2,500,000 loan from CapX Partners, (CREGER00229-00230).          .

-44-

SkinCure's scheme to defraud the State of Illinois from receiving sales taxes duly owed by SkinCure on its purchases of SRT machines. SkinCure's unlawful schemes had been in place and underway for over a year in December of 2017, when CapX loaned SkinCure $2,500,000, which loan fueled the fire of SkinCure's fraud against the United States and the State of Illinois. When the loan closed in December 2017, CapX Partners became a co-conspirator with SkinCure to (1) defraud Federal and State healthcare programs; (2) unlawfully fail to pay the State of Illinois sales tax on SkinCure's purchase of SRT-100-Vison machines; and, (3) file false State SRT-100 registration documents, which falsely stated the ownership of such machines.

51.     Pfeffer's interaction and involvement with SkinCure during the investigative phase and throughout the process leading to the loan closing in December 2017, was at the very least a civil misprision, perhaps more. The American Heritage Dictionary defines misprision as "mal-administration or neglect in preventing or reporting a crime." Paying bribes and kickbacks to dermatologists in exchange for their patient referrals is a crime. By reasonable inference, Pfeffer under the Doctrine of Respondeat Superior, CapX Partners, either knew about, should have known about or recklessly disregarded SkinCure's payment of bribes and kickbacks to fuel the fraudulent business plan upon which SkinCure was founded.

**Defendant, Fountain Partners, d/b/a, SeaCoast Capital**

52.     Defendant, Fountain Partners, d/b/a, SeaCoast Capital, ("Fountain"), was founded in San Francisco, California in 2006 with a mission to become "the most flexible and efficient source of equipment lease capital for growing businesses." It specialized in financing equipment leasing for venture, growth, and expansion stage businesses. Fountain's affiliate SeaCoast Capital loaned SkinCure $30,000,000 in September 2019, to fuel a firestorm of SkinCure's fraudulent

-45-

claims presented to Medicare/Medicaid and other Federal and State healthcare

programs–violations of *Stark*, AKS and the False Claims Act and SkinCure's fraudulent failure to

pay Illinois sales tax owed on its purchases of SRT machines.

53.     Fountain knew that the $30,000,000 loan was intended to fund  SkinCure's

fraudulent schemes. It's announcement of the loan confirms Fountain's knowledge and dirty

hands:

> **"SkinCure Oncology Closes $30M Equity Financing**
> An early Fountain Partners' client, SkinCure Oncology announced a $30M
> growth equity round with SeaCoast Capital on September 24, 2019.
> **SkinCure's turnkey model for the delivery of Image-guided Superficial
> Radiation Therapy (IG-SRT) has proven to be a great fit with quality focused
> dermatologists and Mohs surgeons.** By working with physician partners,
> SkinCure is able to bring cancer center level radiation therapy for
> the treatment of non-melanoma skin cancers to local doctor's offices.
> **SkinCure Oncology has facilitate the treatment of more image guided
> superficial radiation therapy for patients that any other group in the
> world." [29]**

[emphasis added].

54.     In describing its process about who to loan to and who not to loan to, Fountain has

"created a process to make decisions efficiently and quickly. During our review and evaluation

process we ask for specific business information, a description of the asset(s) being financed, and

time with a member of management in an effort to deepen our understanding of the business

model. Through our non-formulaic and non-checkbox approach to underwriting, we have the

ability to understand both standard and complicated credit situations. . . ." If Fountain could

understand the complicated credit situations, then they certainly had no problem seeing the

SkinCure Program's chief aim–to defraud Federal and State healthcare programs and to defraud

---

[29]     See Exhibit Z, Fountain Partners, Portfolio News, (CREGER00285-00287).

the State of Illinois.

55.     From its website statement, five reasonable inferences stand out about why Fountain knew about the SkinCure business model, including: (1) the existence and specific details of the SkinCure Turnkey Program; (2) SkinCure's bribes and kickbacks paid to dermatologists; (3) dermatologist's unlawful patient referrals to SkinCure; (4) SkinCure's fraud against Federal and State healthcare programs and against the State of Illinois; and, (5) that SkinCure's revenue stream was largely funded by Medicare/Medicaid and other federal healthcare programs. Concerning point (5), what reasonably prudent businessman would loan $30,000,000 to a company less than three years old without knowing its principal revenue source. The reasonable inference is that Fountain and SeaCoast both knew about and became a co-conspirator with SkinCure in its SRT Turnkey Implementation Program and that it was designed to defraud its most significant revenue source, Federal and State healthcare programs and a co-conspirator with SkinCure to defraud the State of Illinois from payment of lawfully due sales taxes. When the loan closed in September 2019, Fountain became a co-conspirator with SkinCure to  (1) defraud Federal and State healthcare programs; (2) unlawfully fail to pay the State of Illinois sales tax on SkinCure's purchase of  SRT-100-Vison machines; and, (3) file false State SRT-100 registration documents, which falsely stated the ownership of such machines.

**Defendant, Tom Carter**

56.     Defendant, Tom Carter, is founder and Managing Partner of Fountain Partners. He had a principal role in analyzing and approving affiliated company, SeaCoast's $30,000,000 loan to SkinCure in September 2019. Carter either knew about, should have known about or recklessly disregarded SkinCure's unlawful SRT Turnkey Implementation Program and that it was designed

-47-

to present fraudulent invoices to Federal and State healthcare programs. Carter also either knew, should have known or recklessly disregarded that the proceeds from the $30,000,000 to SkinCure would be used by SkinCure to fund its scheme to defraud Federal and State healthcare programs and its fraudulent scheme to fail to pay Illinois Sales Tax, thereby becoming a co-conspirator with SkinCure in such fraud. When the loan closed in September 2019, Carter, personally, became a co-conspirator with SkinCure to (1) defraud Federal and State healthcare programs; (2) unlawfully fail to pay the State of Illinois sales tax on SkinCure's purchase of SRT-100-Vison machines; and, (3) file false State SRT-100 registration documents, which falsely stated the ownership of such machines.

**Defendant, John Van Hooser**

57.     Defendant, John Van Hooser, is founder and Managing Partner of Fountain Partners. He had a principal role in analyzing and approving affiliated company, SeaCoast's $30,000,000 loan to SkinCure in September 2019. Van Hooser either knew about, should have known about or recklessly disregarded SkinCure's unlawful SRT Turnkey Implementation Program and that it was designed to present fraudulent invoices to Federal and State healthcare programs. Van Hooser also either knew, should have known or recklessly disregarded that the proceeds from the $30,000,000 to SkinCure would be used by SkinCure to fund its scheme to defraud Federal and State healthcare programs and its fraudulent scheme to fail to pay Illinois Sales Tax, thereby becoming a co-conspirator with SkinCure in such fraud. When the loan closed in September 2019, Carter, personally, became a co-conspirator with SkinCure to (1) defraud Federal and State healthcare programs; (2) unlawfully fail to pay the State of Illinois sales tax on SkinCure's purchase of SRT-100-Vison machines; and, (3) file false State SRT-100 registration

-48-

documents, which falsely stated the ownership of such machines.

**Defendant, David Romagnoli**

58.     Defendant, David Romagnoli, is Vice President of SeaCoast Capital. He had a principal role in analyzing and approving, SeaCoast's $30,000,000 loan to SkinCure in September 2019. Romagnoli either knew about, should have known about or recklessly disregarded SkinCure's unlawful SRT Turnkey Implementation Program and that it was designed to present fraudulent invoices to Federal and State healthcare programs. Romagnoli also either knew, should have known or recklessly disregarded that the proceeds from the $30,000,000 SeaCoast loan to SkinCure would be used by SkinCure to fund its scheme to defraud Federal and State healthcare programs  and its fraudulent scheme to fail to pay Illinois Sales Tax, thereby becoming a co-conspirator with SkinCure in such fraud. When the loan closed in September 2019, Romagnoli, personally, became a co-conspirator with SkinCure to  (1) defraud Federal and State healthcare programs; (2) unlawfully fail to pay the State of Illinois sales tax on SkinCure's purchase of  SRT-100-Vison machines; and, (3) file false State SRT-100 registration documents, which falsely stated the ownership of such machines.

**Defendant, Thomas Gorman**

59.     Defendant, Thomas Gorman, is a Partner of SeaCoast Capital. He had a principal role in analyzing and approving SeaCoast's $30,000,000 loan to SkinCure in September 2019. Gorman either knew about, should have known about or recklessly disregarded SkinCure's unlawful SRT Turnkey Implementation Program and that it was designed to present fraudulent invoices to Federal and State healthcare programs. Gorman also either knew, should have known or recklessly disregarded that the proceeds from the $30,000,000 SeaCoast loan to SkinCure

-49-

would be used by SkinCure to fund its scheme to defraud Federal and State healthcare programs and its fraudulent scheme to fail to pay Illinois Sales Tax, thereby becoming a co-conspirator with SkinCure in such fraud. When the loan closed in September 2019, Gorman, personally, became a co-conspirator with SkinCure to (1) defraud Federal and State healthcare programs; (2) unlawfully fail to pay the State of Illinois sales tax on SkinCure's purchase of SRT-100-Vison machines; and, (3) file false State SRT-100 registration documents, which falsely stated the ownership of such machines.

**Defendant, BayPine, LP**

60.     On October 29, 2021, defendant, BayPine LP, a private equity firm, purchased controlling interest in defendant, Pinnacle. The purchase price was undisclosed. On its website, BayPine admits that:

> (1)     "We take time to understand the business and the specific future challenges the company faces."
>
> (2)     "We pinpoint key opportunities to evolve business processes, from dynamic pricing to predictive maintenance."
>
> (3)     "**Stronger partnerships make better companies.** BayPine represents a new kind of private equity. Our joy comes from building deeper relationships and from being hands-on with our investments to make strong businesses even stronger."

BayPine protected its investment by placing four of its partners on the Pinnacle Board of Directors: defendants, Joel Hackney, Anjan Mukherjee, Wan Ling Martello, and Andrew Goldfarb.[30] This gave BayPine controlling interest of the Pinnacle Board.

61.     The BayPine defendants, by their due diligence review of Pinnacle's business

---

[30]     Hereinafter sometimes referred to as the "BayPines defendants."

-50-

practices, knew that Pinnacle had signed nearly a dozen SRT Turnkey Implementation Program

contracts with SkinCure. Such defendants knew or should have known that Pinnacle's SRT

contracts with SkinCure, violated *Stark*, AKS and the False Claims Act. The BayPine defendants

had such knowledge before they acquired controlling interest in Pinnacle on October 29, 2021.

The BayPine defendants, after acquiring controlling interest of Pinnacle, continued to instigate,

approve and authorize Pinnacle entering into additional SRT Turnkey Implementation Program

contracts with SkinCure to defraud Federal and State healthcare programs. This included the

specific contract to install a SkinCure SRT-100 superficial radiation machine at Pinnacle's office

at 595 William R. Latham, Sr. Dr., Bourbonnais, Illinois 60914-2319, with such machine, bearing

Serial No.: 2112-2213, registered with the State of Illinois on March 15, 2022.[31]    Such machine

was purchased and installed by SkinCure at Pinnacle's Bourbonnais, IL location, and began

operation by a SkinCure employed radiation therapy technician on about March 25, 2022. Soon

thereafter, SkinCure began knowingly submitting fraudulent invoices for payment to Federal and

State healthcare programs for SRT treatment provided by SkinCure at Pinnacle's, Bourbonnais, IL

location. The BayPine defendants knew that such invoices violated *Stark*, AKS and the False

Claims Act.[32]  When its loan to acquire controlling interest in Pinnacle closed on October 29,

2021, BayPine and its partners, each, became co-conspirators with SkinCure, Pinnacle, and other

defendants, to defraud Federal and State healthcare programs and to defraud the State of Illinois of

lawfully due sales taxes on at least $123,750,000 in SkinCure purchases of SRT-100 machines.

---

[31]    See Exhibit P, State of Illinois, X-Ray Equipment Registration Document, (CREGER00242).

[32]    *Id.*

-51-

**Defendant, Joel Hackney**

62.     Defendant, Joel Hackney, ("Hackney"), is a Partner of BayPine LP. He had a

principal role in analyzing and approving BayPine's acquisition of controlling financial interest in

defendant, Pinnacle, on October 29, 2021. Hackney either knew about, should have known about

or recklessly disregarded Pinnacle's dozen or more contracts with SkinCure and Pinnacle's

participation in SkinCure's unlawful SRT Turnkey Implementation Program and that it was

designed to violate *Stark*, AKS and the False Claims Act and present fraudulent invoices to

Federal and State healthcare programs and fail to pay Illinois Sales Tax. As a member of the

Pinnacle Board of Directors in the Spring of 2022,  Hackney also approved and authorized,

Pinnacle to enter into another SRT Turnkey Implementation Program contract for SkinCure to

purchase, install and operate a SRT-100 superficial radiation machine, Serial No.: 2112-2213, at

Pinnacle's Bourbonnais, IL clinic. Hackney knew about and approved  SkinCure's submission of

false invoices to Federal and State healthcare programs for payment for superficial radiation

treatment provided with such SkinCure SRT-100 machine operated by the SkinCure radiation

therapy technician from Pinnacle's Bourbonnais, IL clinic.  Defendant, Hackney, knew that such

invoices violated *Stark*, AKS and the False Claims Act. When BayPine's loan to acquire

controlling interest in Pinnacle closed on October 29, 2021, BayPine,  and its partners, including

Hackney, each, became co-conspirators with SkinCure, Pinnacle, and other defendants, to defraud

Federal and State healthcare programs and to defraud the State of Illinois of lawfully due sales

taxes on at least $123,750,000 in SkinCure purchases of SRT-100 machines.

**Defendant, Anjan Mukherjee**

63.     Defendant, Anjan Mukherjee, ("Mukherjee"), is a Partner of BayPine LP. He had

-52-

a principal role in analyzing and approving BayPine's acquisition of controlling financial interest defendant, Pinnacle, on October 29, 2021. Mukherjee either knew about, should have known about or recklessly disregarded Pinnacle's dozen or more contracts with SkinCure and Pinnacle's participation in SkinCure's unlawful SRT Turnkey Implementation Program and that it was designed to violate *Stark*, AKS and the False Claims Act and present fraudulent invoices to Federal and State healthcare programs and fail to pay Illinois Sales Tax. As a member of the Pinnacle Board of Directors in the Spring of 2022, Mukherjee also approved and authorized, Pinnacle to enter into another SRT Turnkey Implementation Program contract for SkinCure to purchase, install and operate a SRT-100 superficial radiation machine, Serial No.: 2112-2213, at Pinnacle's Bourbonnais, IL clinic. Mukherjee knew about and approved SkinCure's submission of false invoices to Federal and State healthcare programs for payment for superficial radiation treatment provided with such SkinCure SRT-100 machine operated by the SkinCure radiation therapy technician from Pinnacle's Bourbonnais, IL clinic. Defendant, Mukherjee, knew that such invoices violated *Stark*, AKS and the False Claims Act. When BayPine's loan to acquire controlling interest in Pinnacle closed on October 29, 2021, BayPine, and its partners, including Mukherjee, each, became co-conspirators with SkinCure, Pinnacle, and other defendants, to defraud Federal and State healthcare programs and to defraud the State of Illinois of lawfully due sales taxes on at least $123,750,000 in SkinCure purchases of SRT-100 machines.

### Defendant, Wan Ling Martello

64.     Defendant, Wan Ling Martello, ("Martello"), is a Partner of BayPine LP. She had a principal role in analyzing and approving BayPine's acquisition of controlling financial interest defendant, Pinnacle, on October 29, 2021. Martello either knew about, should have known about

or recklessly disregarded Pinnacle's dozen or more contracts with SkinCure and Pinnacle's participation in SkinCure's unlawful SRT Turnkey Implementation Program and that it was designed to violate *Stark*, AKS and the False Claims Act and present fraudulent invoices to Federal and State healthcare programs for payment and fail to pay Illinois Sales Tax. As a member of the Pinnacle Board of Directors in the Spring of 2022, Martello also approved and authorized, Pinnacle to enter into another SRT Turnkey Implementation Program contract for SkinCure to purchase, install and operate a SRT-100 superficial radiation machine, Serial No.: 2112-2213, at Pinnacle's Bourbonnais, IL clinic. Martello knew about and approved SkinCure's submission of false invoices to Federal and State healthcare programs for payment for superficial radiation treatment provided with such SkinCure SRT-100 machine operated by the SkinCure radiation therapy technician from Pinnacle's Bourbonnais, IL clinic. Defendant, Martello, knew that such invoices violated *Stark*, AKS and the False Claims Act. When BayPine's loan to acquire controlling interest in Pinnacle closed on October 29, 2021, BayPine, and its partners, including Martello, each, became co-conspirators with SkinCure, Pinnacle, and other defendants, to defraud Federal and State healthcare programs and to defraud the State of Illinois of lawfully due sales taxes on at least $123,750,000 in SkinCure purchases of SRT-100 machines.

**Defendant, Andrew Goldfarb**

65.     Defendant, Andrew Goldfarb, ("Goldfarb"), is a Partner of BayPine LP. He had a principal role in analyzing and approving BayPine's acquisition of controlling financial interest defendant, Pinnacle, on October 29, 2021. Goldfarb either knew about, should have known about or recklessly disregarded Pinnacle's dozen or more contracts with SkinCure and Pinnacle's participation in SkinCure's unlawful SRT Turnkey Implementation Program and that it was

-54-

designed to violate *Stark*, AKS and the False Claims Act and present fraudulent invoices to Federal and State healthcare programs and fail to pay Illinois Sales Tax. As a member of the Pinnacle Board of Directors in the Spring of 2022, Goldfarb also approved and authorized, Pinnacle to enter into another SRT Turnkey Implementation Program contract for SkinCure to purchase, install and operate a SRT-100 superficial radiation machine, Serial No.: 2112-2213, at Pinnacle's Bourbonnais, IL clinic. Goldfarb knew about and approved SkinCure's submission of false invoices to Federal and State healthcare programs for payment for superficial radiation treatment provided with the SkinCure SRT-100 machine operated by the SkinCure radiation therapy technician from Pinnacle's Bourbonnais, IL clinic. Defendant, Goldfarb, knew that such invoices violated *Stark*, AKS and the False Claims Act. When BayPine's loan to acquire controlling interest in Pinnacle closed on October 29, 2021, BayPine, and its partners, including Goldfarb, each, became co-conspirators with SkinCure, Pinnacle, and other defendants, to defraud Federal and State healthcare programs and to defraud the State of Illinois of lawfully due sales taxes on at least $123,750,000 in SkinCure purchases of SRT-100 machines.

**Defendant, Dermatology Practices' and Dermatologists' Healthcare Fraud**

66.     Each of the dermatology practices and dermatologists identified in Exhibit A, either contracted to join, or in the case of the individual dermatologist members of the dermatology practices, approved of, the fraudulent SkinCure, SRT Turnkey Implementation Program. Rather than repeat the same virtually identical operative facts for each separate defendant, the general facts of the fraudulent scheme to which each co-conspirator, defendant

-55-

joined upon contracting with SkinCure are set forth in detail below.[33]

67.     Upon contracting with SkinCure to join its fraudulent SRT Turnkey
Implementation Program, each dermatology practice, defendant, and dermatologist, defendant,
became a co-conspirators with SkinCure to: (1) defraud Federal and State healthcare programs by
knowingly presenting fraudulent invoicess to such programs for payment; (2) defraud the State of
Illinois of sales taxes due on SkinCure's purchases of at least $123,750,000 of SRT-100-Vison
machines; and, (3) prepare and file false SRT-100 State Registration Documents, which falsely
identified ownership of the SRT-100 machines. The practices and the dermatologists received
bribes and kickbacks in exchange for their unlawful referral of patients for SkinCure to provide
superficial radiation therapy to such patients and then for SkinCure to bill Federal and State
healthcare programs for such services using the physician's Medicare/Medicaid, Supplier/Provider
Billing Number.[34]

68.     The bribes and kickbacks received by such defendants, free of charge, from
SkinCure, included the following: (1) $495,000 SRT-100-Vision, superficial radiation machine;
(2) radiation technician therapist, employed by SkinCure; (3) build out of lead lined treatment
room for SRT machine at doctor's clinic; (4) services of Medical Physicist, employed by
SkinCure, to calibrate and maintain the SRT machine; (5) SRT machine registrations and fees
with various state agencies; (6) billing services for SRT treatment to Federal and State healthcare
programs, using the co-conspirator's Medicare/Medicaid, Provider/Supplier Billing Number. At

---

[33]     See specific examples of Defendants' fraudulent schemes and conspiracy at ¶¶
129-154, herein.

[34]     42 U.S.C. § 1395nn; 42 U.S.C. § 1320a-7b(b); See Exhibit B, SkinCure
advertising materials, (CREGER00032-00124) and Exhibit E, (CREGER00153-00189).       .

-56-

no material time, has SkinCure ever had a Medicare/Medicaid, Provider/Supplier Billing Number or been authorized to directly bill any Federal 0f State healthcare program for superficial radiation therapy treatment provided by SkinCure to co-conspirator dermatologist's patients.[35] SkinCure lied to Federal and State healthcare programs about who provided SRT treatment for such patients. SkinCure mislead such programs by billing SRT treatments under co-conspirator, dermatologists' Medicare/Medicaid, Provider/Supplier Billing Numbers to make it falsely appear that co-conspirator dermatologists were providing SRT treatment to their own patients. Truthfully, SkinCure provided such SRT treatment--without authorization.

69.     The referrals of each co-conspirator dermatologist's patient to SkinCure for SRT treatment also violated *Stark* because each co-conspirator dermatologist had a financial interest in SkinCure at the time of such referrals. The SkinCure contract provided for SkinCure to prepare and submit invoices, collect payments and then share Federal and State healthcare program reimbursements on a sliding scale with co-conspirator dermatologists receiving 40%-50% and SkinCure receiving 50%-60%, with the exact share determined, unlawfully, by the value and volume of patient referrals to SkinCure.[36] The sharing of such reimbursements and co-conspirator, dermatologists' reliance upon SkinCure to pay them their share, and to pay them bribes and kickbacks, gave such co-conspirators an unlawful financial interest in SkinCure.

70.     Co-conspirator, dermatologists' financial interest in, and unlawful patient referrals to, SkinCure and SkinCure's  payment of bribes and kickbacks violated *Stark,* AKS and the False

---

[35]     *Id.*

[36]     *Id.*

-57-

Claims Act.[37]

### III.  **Jurisdiction And Venue**

71.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. § 3732, the latter specifically conferring jurisdiction on this Court for actions brought under 31 U.S.C. §§ 3729 and 3730.

72.  Personal jurisdiction and venue are proper in this District under 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a), as defendants can be found, reside, transact business or otherwise engaged in the illegal conduct at issue within the District.

73.  This action arises under the provisions of Title 31 U.S.C. § 3729 *et seq.*, more commonly known as the False Claims Act, which provides that the United States District Courts shall have exclusive jurisdiction over actions brought under that Act.

74.  Section 3732(a) of the Federal False Claims Act provides, "Any action under section 3730 may be brought in any judicial district in which the defendant or in the case of multiple defendants, any one defendant can be found, resides, transacts business, or engages in any act proscribed by section 3729 occurred."

75.  Relator has filed his original verified complaint in this matter within the six year statute of limitations under the False Claims Act. As discussed below, this action seeks recovery under the False Claims Act for violations of the Federal *Stark* Law and the Anti-Kickback Statute, for false and fraudulent claims submitted by SkinCure, on behalf of its co-defendant, co-conspirators for reimbursement payments from Federal and State healthcare programs from 2016 to the present and beyond. This action also seeks recovery for similar violations of the False

---

[37]  42 U.S.C. § 1395nn; 42 U.S.C. § 1320a-7b(b); 31 U.S.C. § 3729 et seq.

Claims Acts of each of the State co-plaintiffs during the same period.

76.     This action will also seek recovery under the False Claims Act for the submission of false applications, containing false certifications, express and implied, of eligibility for Paycheck Protection Program loans and loan forgiveness under the CARES Act.

77.     This action also seeks recovery under the Illinois False Claims Act for failure to pay Illinois Sales Taxes of at least $8,971,875 and for conspiracy to fail to pay such Illinois Sale Tax.

78.     Additionally, Relator brings his claim for retaliatory discharge against Defendant, Pinnacle, under 31 U.S.C. § 3730(h).

79.     Relator has complied with 31 U.S.C. § 3730(b)(2) by serving a copy of his written Amended Disclosure Statement, containing all of the material evidence and information in his possession, accompanies with substantial, material, supporting documents upon the United States Attorney for the Middle District of Tennessee and upon the Attorney General of the United States, before filing his Verified Amended Complaint. Relator, through counsel, also has spoken by telephone with representatives of the United States Attorney's Office for the Middle District of Tennessee to provide notice to the Federal Government before submitting his Disclosure Statement and before filing his Verified Amended Complaint.

IV.     **Federal *Stark* Laws**

A.     **Introduction**

80.     The Federal *Stark* Law was "enacted to address over-utilization, anti-competitive behavior, and other abuses of healthcare services that occur when physicians have financial relationships with certain ancillary entities to which they refer Medicare or Medicaid patients . . .

-59-

Physician financial arrangements may have anti-competitive effect to the extent that those relationships discourage other providers from entering a market in which patients are primarily referred to physician-owned entities or DHS entities that maintain generous compensation arrangements with physicians. . . . Anti-competitive behavior can increase program costs, if the DHS entities with which physicians have financial relationships are favored over others, more cost efficient providers or providers that furnish higher quality care. . . . Over-utilization increases program costs because Medicare (or Medicaid) pays for more items or services than are medically necessary."[38]

**B.    The *Stark* Law Prohibits A physician Making A Referral Of Designated Health Services To An Entity With Which They Have A Financial Interest**

81.    "The approach taken by Congress in enacting Section 1877 of the [*Stark*] Act is preventive because it essentially prohibits many financial arrangements between physicians and entities providing DHS . . . Specifically, Section 1877 of the Act imposes a blanket prohibition on the submission of Medicare claims (and payment to the States or FFP[39] under Medicaid Programs) for certain DHS when the service provider has a financial relationship with the referring physician, unless the financial relationship fits into one of several specific exceptions."[40]

82.    When the *Stark* Laws were introduced in Congress in 1989, the sponsors of the law had correctly concluded that a physician's referral of DHS to an entity with which the physician had a financial interest–including those entities paying the physicians

---

[38]    69 Federal Register 16124 (March 26, 2004).

[39]    Federal Financial Participation.

[40]    66 Federal Register 859.

kickbacks–corrupted the entire healthcare field. **"The evidence is clear that Americans are wasting millions of dollars each year for unnecessary tests and procedures . . . in other cases, the best and most convenient care is being denied."[41] Unfortunately, one of the reasons some physicians perform unnecessary procedures is that they earn higher profit as a result. This is particularly true in the case of physicians who invest in facilities to which they can refer patients for specialty care."**[42] [emphasis added].

83.    Congress enacted the *Stark* Law in two parts, commonly known as *Stark I* and *Stark II.* Enacted in 1989, *Stark I* applied to referral of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a  prohibited financial interest with the clinical lab provider.[43]

84.    In 1993, Congress extended the *Stark* Law (*Stark II*) to referral for ten additional designated health services (DHS).[44] Beginning January 1, 1995, *Stark II* applied to patient referrals by physicians with a prohibited financial relationship for the following ten additional "designated health services:" (1) in patient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients, equipment and supplies; (8) prosthetics, orthotics and prosthetic devices and supplies; (9) outpatient prescription drugs; and

---

[41]    135 CONG. REC. 4995 (Mar. 20, 1989) (Remarks of Rep. Stark (D.-Cal.)).

[42]    135 CONG. REC. 12932 (June 21, 1989) (Remarks of Rep. Stark (D.-Cal.)).

[43]    See Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

[44]    See Omnibus Budget Reconciliation Act of 1993, P.L. 103-166, § 13562, Social Security Act Amendments of 1994, P.L. 103-432 § 152..

-61-

(10) home health services.[45]

85.     In support of *Stark II*, Representative Stark, testifying before Congress, again
made convincing remarks about the extent of corruption in healthcare in the United States and the
pressing need for expanding the reach of *Stark II* to stop the fraud. "Studies have shown that as
many as 25% of procedures provided to patients in this country are not needed.[46] **"Enough
evidence has accumulated to show that buying and selling of referrals is costing all of us
money and subjecting many of us to medical procedure and tests that we do not need. By
enacting a comprehensive, across-the-board, ban on referrals, we can protect and improve
customers' confidence in their physicians, as well as in the healthcare system generally."**
[emphasis added].

86.     The *Stark* Law broadly defines prohibited "financial relationships" to include
"compensation arrangements" in which any "remuneration" is paid by a supplier of radiation
therapy services or durable medical equipment, and related services–both listed DHS services–to a
referring physician,[47] "directly or indirectly, overtly or covertly, in cash or in kind."[48]

"The *Stark* Law broadly defines a prohibited 'compensation arrangement:'

(A) The term 'compensation arrangement' means any arrangement involving
any remuneration between a physician (or an immediate family member
of such physician) and any entity other than an arrangement involving
only remuneration described in subparagraph (C).

---

[45]     See 42 U.S.C. § 1395nn(h)(6).

[46]     139 CONG. REC. E84 (Jan. 6, 1993) (Remarks of Rep. Stark (D.-Cal.)).

[47]     See 42 U.S.C. § 1395nn(h)(5) & (6).

[48]     See 42 U.S.C. § 1395nn(a)(2)(B) & (h)(1); See also: 42 C.F.R. § 411.354(c).

-62-

(B) The term 'remuneration' includes any remuneration, directly of indirectly or indirectly, overtly or covertly, in cash or in kind."[49]

87.     This language makes clear that Congress intended the definition of "financial relationship" to include any type of financial relationship in which physicians receive any remuneration of any kind from a supplier of DHS, directly, indirectly, overtly, covertly. And that includes any relationships where an entity furnishing DHS pays a physician kickbacks in any form. Paying kickbacks to induce: (1) referral of patients or (2) DHS business, corrupts the integrity of every claim submitted as a result. Such kickback schemes violate *Stark* and the Anti-Kickback Statute.

88.     In addition to prohibiting any supplier of DHS from submitting claims under these circumstances, the *Stark* Law also prohibits payments by federal healthcare programs of such claims: "No payment may be made under this subchapter for a DHS, which is provided in violation of subsection (a)(1) of this section.[50] If a provider of DHS submits prohibited claims and collects payments, the regulations implementing 42 U.S.C. § 1395nn require that any entity collecting payment for a healthcare service, "performed under a prohibited referral, must refund all collected amounts on a timely basis."[51]

**C.      SkinCure's Contract Created Prohibited Financial Relationships With Co-defendant Dermatologists**

89.     The terms of the SkinCure, SRT Turnkey Implementation Program contract[52]

---

[49]     See 42 U.S.C. § 1395nn(h)(1).

[50]     See 42 U.S.C. § 1395nn(g)(1); See also: 42 C.F.R. § 411.353(b)(c)&(d).

[51]     42 C.F.R. § 353.

[52]     See Exhibit E, (CREGER00153-00189); See particularly ¶ 3, (CREGER00156).

-63-

created unlawful financial relationships between SkinCure and its co-conspirator dermatologists, prohibited under *Stark*. The contract created prohibited financial relationships, which included a variable compensation scheme based on the volume and value of SRT referrals, by co-conspirator dermatologists to SkinCure.[53] Under the contract, SkinCure billed Federal and State healthcare programs for SRT using the co-conspirator dermatologist's Medicare Provider/Supplier, Billing Number and the dermatologist received at least 40% of Medicare reimbursements, which could increase to 50% as the volume and value of referrals to SkinCure increased.[54] Such billing arrangement gave the false impression that the SRT was being provided by the co-conspirator dermatologist, when in truth it was provided by SkinCure. Bribes and kickbacks provided by SkinCure included: its SRT-100 machine, operated by its radiation therapist, calibrated by a SkinCure medical physicist, registered by SklnCure with the various state agencies, in a leaded lined treatment room constructed and provided by SkinCure, all free of charge to the dermatologist. SkinCure provided, DHS in the form of SRT to co-conspirator dermatologist's referred patients in exchange for an unlawful sharing of Federal and State healthcare program reimbursements. Under SkinCure's SRT Turnkey Implementation Program, co-conspirator dermatologists were given a financial interest in SkinCure, in at least three ways. First, such dermatologists were paid valuable bribes and kickbacks by SkinCure. Second, such dermatologists, had an ever increasing financial interest in SkinCure as the volume and value of

---

[53]     *Id.*

[54]     *Id.*

-64-

their patient referrals made to SkinCure increased.[55] Third, they had a separate financial interest in SkinCure because they relied upon SkinCure to bill, collect and pay them their unlawful share of Federal and State healthcare program reimbursements.[56] Such financial interests, made co-conspirator, dermatologist's patient referrals to SkinCure for SRT--*Stark* violations.

### D. *Stark* **Law's Broad Definition Of Referral**

90.     The *Stark* Law defines "referral" as "the request or establishment of a plan of care by a physician, which includes the provisions of designated health services.[57] In a Sixth Circuit case, involving the alleged violation of the Anti-Kickback Statute, the Court analyzed the meaning of the terms "induce" or "inducement."[58] The Court's analysis of such terms is applicable to *Stark* Law. The term "induce" is "the necessary intent 'to lead or move by influence or persuasion.'"[59] Although the term induce applies to the party offering or paying remuneration, it shed light on . . . the recipient of the remuneration, implying that the recipient must be duly induced or 'move[d]' . . . . An important aspect of inducement is that the remuneration be directed towards an individual or entity 'in position to generate federal healthcare program business.'"[60]

---

[55]     See Exhibit E, Program Services Agreement, Principal Terms, ¶ 3. "Management Fees," (CREGER00156).

[56]     42 U.S.C. § 1395nn; 31 U.S.C. § 3729 et seq.

[57]     See 42 U.S.C. § 1395nn(h)(5)(A).

[58]     *Jones-McNamara v. Holzer Health Systems*. 630 Fed. Appx. 394, 401 (6th Cir. 2015) (Citing and relying upon Anti-Kickback Provisions, 56 Fed. Reg. 35938, 35952 (July 29, 1991)).

[59]     *Id.* at 401.

[60]     *Id.* at 401.

91.     The accompanying regulations applying the *Stark* Law also broadly define referral as, among other things, a "request by a physician that includes the provision of any designated health services for which the payment may be made under Medicare, the establishment of a plan of care by a physician that includes the provision of a designated health service, or the certifying or re-certifying of the need for such a designated health service . . . .[61] A referring physician is defined in the same regulation as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals to another person or entity."[62]

92.     *Stark* Law broadly defines prohibited "financial relationships" to include any "compensation" paid directly or indirectly to a referring physician. The *Stark* Law exceptions identify specific transactions that will not trigger its referral and billing prohibitions. These include certain general exceptions for Physician Services and In-Office Ancillary Services. A physician must meet specific requirements to qualify for these general exceptions.[63] Additionally, there are certain exceptions, specifically related to compensation arrangements.[64] To avoid the referral and billing prohibitions in the *Stark* Law, an entity supplying designated health services must satisfy one of the exceptions.

93.     Not a single general *Stark* exception[65] or a specific *Stark* exception related to

---

[61]     42 C.F,.R. § 411.351.

[62]     *Id.*

[63]     *Id.*

[64]     42 C.F.R. § 411.357.

[65]     42 C.F.R. § 411.353.

-66-

compensation arrangements, apply to the facts of the present case to allow defendants to avoid *Stark's* billing and referral prohibitions.[66]

94.     Once Relator or the Government has established proof of each element of a violation under the Act, the burden shifts to the defendant to prove that the conduct was protected by an exception. If no exception applies to a *Stark* violation, then all such referrals from the referring physician to the DHS entity are subject to prohibition. If the prohibited referrals have been reimbursed by the Government or the States, the physician and the DHS entity, together with any co-conspirators in the scheme, are liable to repay the Government and the States, the amount they reimbursed–trebled–under the Federal False Claims Act and under most state False Claims Acts.[67]

95.     Defendants cannot meet their burden of proof to avoid liability under *Stark*.

**E.     Review Of Exceptions Under Stark And Why They Do Not Apply To Defendants' Unlawful Conduct**

**1.     Possible General Exceptions Under 42 C.F.R. § 411.355**

**(a)     Physician Services § 411.355(a)(1)**

96.     This possible exception to Stark's referral prohibition deals with physician services provided personally by another physician member of the physician's group practice or under such physician's supervision.[68] Supervision services provided under this section must "[comply] with all other applicable Medicare payment and coverage rules for the physician

---

[66]     42 C.F.R. § 411.357.

[67]     42 C.F.R. § 411.353; 31 U.S.C. § 3729(a)(1).

[68]     *Id.*

services."[69] Such services violated Medicare payment and coverage rules in at least two ways,. First, the SRT radiation therapy services were provided to each co-conspirator dermatologist's patients as a direct result of bribes and kickbacks paid by SkinCure to each co-conspirator dermatologist. Second, SkinCure and its co-conspirator dermatologists unlawfully shared the Medicare/Medicaid reimbursement for such services based on the value and volume of such services referred to SkinCure.[70] The Physician Services exception does not apply to save co-conspirator defendants' illegal referrals of DHS–SRT superficial radiation therapy services--to SkinCure.

### (b)      In-office Ancillary Services Exception Does Not Apply, § 411.355(b)

97.      This exception requires that the ancillary services can be provided by "An individual who is supervised by the referring physician or . . . [if a group practice] . . . by another physician in the group practice provided that the supervision complies with all other applicable Medicare payment and coverage rules for the services.[71] Billing for the ancillary services by an independent third party billing company acting as agent for a physician group practice must comply with multiple regulations, including 42 C.F.R. § 424.73(b)(3), which requires the following:[72]

---

[69]      42 C.F.R. § 411.355(a)(1)(i)&(ii).

[70]      42 C.F.R. § 411.357(d)(1)(v); See Exhibit E, Program Services Agreement, Principal Terms, ¶ 3. "Management Fees," (CREGER00156). See Exhibit B, Press Releases, June 14, 2018, advertising its ". . . turnkey revenue-share model. . . ." (CREGER00039 and May 18, 2020, advertising its ". . . shared-revenue model. . . ." (CREGER00051).

[71]      42 C.F.R. § 411.355(b)(1)(iii).

[72]      42 C.F.R. § 424.73(b)(3), 42 C.F.R. § 424.80(a)&(b)(5).

-68-

"Medicare may pay an agent who furnishes billing and collection services to the provider, if the following conditions are met:

    i.    The agent receives the payment under an agency agreement with the provider;

    ii.    The agent's compensation is not related in any way to the dollar amounts billed or collected;

    iii.    The agent's compensation is not dependent upon the actual collection of payment;

    iv.    The agent acts under payment disposition instructions that the provider may modify or revoke at any time; and,

    v.    The agent in receiving the payment acts only on behalf of the provider."

98.    The In-office Ancillary Services exception requirements are not met for at least the following four reasons:

    i.    As agent, SkinCure's compensation was related to the amount collected from Medicare/Medicaid because it was paid a percentage of the reimbursement on a sliding scale based on the volume and value of the physician referrals and the reimbursement received;[73]

    ii.    SkinCure, as agent, would not be paid if no Medicare/Medicaid reimbursement was paid;[74]

    iii.    The co-conspirator dermatologists could not unilaterally modify or revoke the share of the Medicare/Medicaid reimbursement it received from SkinCure;[75]

---

[73]    42 C.F.R. § 424.73(b)(3)(ii); See Exhibit E, Program Services Agreement, Principal Terms, ¶ 3. "Management Fees," (CREGER00156); See Exhibit B, Press Releases, June 14, 2018, advertising its ". . . turnkey revenue-share model. . . ." (CREGER00039 and May 18, 2020, advertising its ". . . shared-revenue model. . . ." (CREGER00051).

[74]    42 C.F.R. § 424.73(b)(3)(iii).

[75]    42 C.F.R. § 424.73(b)(3)(iv).

-69-

iv.  SkinCure, as agent, in receiving Medicare/Medicaid reimbursements was acting in its own behalf and as agent for its co-conspirator dermatologists.[76]

Therefore, SkinCure does not meet the In-office Ancillary Services exception to save the defendants' illegal referral of referrals of DHS–SRT superficial radiation therapy services--to SkinCure.

### (c)   Durable Medical Equipment Lease Exception Does Not Apply § 411.357(b)

99.    The Durable Medical Equipment Lease Exception does not apply for at least five reasons. First, there was no legitimate lease for the SRT-100 machine between SkinCure and the defendant, co-conspirator, dermatologists. Second, the SRT-!00 machine was not exclusively used by the purported lessee. It was operated exclusively by the purported lessor's radiation therapist. Third, there were no rental charges for the SRT-100 machine. There was only an unlawful Medicare/Medicaid reimbursement revenue sharing between SkinCure and the co-conspirator dermatologists.[77] Fourth, the purported rental charges are not consistent with fair market value and the reimbursement sharing between SkinCure and the co-conspirator dermatologists, was based on the volume and value of referrals to SkinCure.[78]  The Reimbursement Table of the SRT-100

---

[76]      42 C.F.R. § 424.73(b)(3)(v).

[77]      See Exhibit E, Program Services Agreement, Principal Terms, ¶ 3. "Management Fees," (CREGER00156); See Exhibit B, Press Releases, June 14, 2018, advertising its ". . . turnkey revenue-share model. . . ." (CREGER00039 and May 18, 2020, advertising its ". . . shared-revenue model. . . ." (CREGER00051).

[78]      See Exhibit E, Program Services Agreement, Principal Terms ¶ 3, "SkinCure agrees that upon the Practice achieving an Average Daily (ADC) census of 15 or greater patients for three consecutive months, Management Fee Percentage [to SkinCure] will transition to 55 percent from 60 percent. Upon Practice achieving an Average Daily Census (ADC) of 20 or greater patients for three consecutive months, Management Fee Percentage . . . will transition to

-70-

manufacturer, Sensus, states that a reasonable monthly rental charge for an SRT-100 is $6000.[79]

Fifth, the purported lease arrangement was not commercially reasonable. Therefore, the Durable

Medical Equipment Lease Exception does not apply to save the defendant, co-conspirator

dermatologists' illegal referrals of DHS business to SkinCure nor does it save the related unlawful

billing arrangements.

### (d) Personal Services Arrangement Exception Does Not Apply, § 411.357(d)

100.    The Personal Services Arrangement Exception does not apply for at least three

reasons. First, the compensation for personal services rendered by SkinCure to its co-conspirator

dermatologists was a variable share of the Medicare/Medicaid reimbursement based on the

volume and value of referrals to SkinCure.[80] The compensation paid to SkinCure was grossly in

excess of the fair market value of the services rendered by SkinCure. The services rendered by

SkinCure were procured through its payment of bribes and kickbacks to its co-conspirator

dermatologists in exchange for their unlawful referrals. Therefore, the Personal Services

Arrangement Exception does not apply to save the defendant, co-conspirator dermatologists'

illegal referrals of DHS business to SkinCure nor does it save the related unlawful billing

arrangements.

---

50 percent." (CREGER00156).

[79]    See Exhibit M, Sensus, SRT-100-Vision Multi-Scenario Reimbursement Table, (CREGER00231).

[80]    See Exhibit E, Program Services Agreement, Principal Terms, ¶ 3. "Management Fees," (CREGER00156). See Exhibit B, Press Releases, June 14, 2018, advertising its ". . . turnkey revenue-share model. . . ." (CREGER00039 and May 18, 2020, advertising its ". . . shared-revenue model. . . ." (CREGER00051).

## V.     Introduction to The Anti-Kickback Statute (AKS)

### A.     Liability Under The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)

101.     The Anti-Kickback Statute, (AKS), prohibits any person or entity from offering, making or accepting payment to induce or reward any person for referring, recommending or arranging for federally funded healthcare services, including services provided under Medicare, Medicaid and TRICARE healthcare programs.[81] AKS prohibits a provider of DHS from offering or paying "any remuneration . . . directly, indirectly, overtly or covertly, in cash or in kind to any person to induce such person to . . . refer an individual for the furnishing or arranging for the furnishing of any item of service for which payment may be made in whole or in part under a federal healthcare program.[82] The Sixth Circuit has held that the AKS is to be broadly interpreted, and that so long as one purpose of the remuneration is to induce referrals, a violation may be found.[83]

102.     The Sixth Circuit has also held that a kickback violation requires remuneration paid: (1) to a person or entity in position to refer federal healthcare program patients, and (2) that could reasonably induce the person or entity to refer such patients.[84] An intent to induce referrals has been found to mean "an intent to gain influence over the reason or judgment of . . .

---

[81]     42 U.S.C. § 1320a-7b(b).

[82]     *Id.*

[83]     *United States v. Millennium Radiology, Inc.*, 2014 U.S. Dist. LEXIS, at *18 (S.D. Ohio Sept. 30, 2014).

[84]     *Jones-McNamara v. Holzer Health Systems*, 630 F. Appx. 394, 400-401 (6th Cir. 2015.

-72-

physicians."[85] The falsity of a claim is determined at the time the claim is submitted to a federal

healthcare program for payment.[86] If a healthcare provider violates its continuing duty to comply

with Medicare Regulations on which payment is conditioned, the provider for its [wrongful]

claims submitted to Medicare for payment is liable under the False Claims Act.[87]

      **B.**    **No AKS Safe Harbors Apply To Save SkinCure's Fraudulent Scheme**

          **1.**      **The Equipment Rental Safe Harbor Does Not Apply**

103.    The Equipment Rental Safe Harbor does not apply for at least four reasons:

    (1)    Dominion, control and operation of the SkinCure owned SRT-100-Vision machine was maintained by SkinCure, whose employee, the radiation therapy technician, operated and controlled the SRT machine at all material times; and SkinCure retained the right to remove the machine from the dermatologist's practice;

    (2)    Purported rental charges for the SRT machine–60% of Medicare and other third party reimbursements–vastly exceeded fair market value for the lease of such a machine;

    (3)    Purported rental charges improperly took into account the volume and value of the co-conspirator dermatologist's patient referrals to SkinCure for SRT; and,

    (4)    The purported rental charges were not commercially reasonable.[88]

---

[85]    *United States ex rel. Wilkens v. Medtronic, Inc.*, 2016 U.S. Dist. LEXIS 2993167, at *7 (D. Mass. May 23, 2016) (citing *United States v. McClatchey*, 217 F. 3d 832,834 (10th Cir. 2000).

[86]    *United States v. Southland Mgm't Corp.*, 288 F. 3d 665, 681 (5th Cir. 2002).

[87]    *United States es rel. Augustine v. Century Health Services.*, 289 F. 3d 409, 415 (6th Cir. 2002).

[88]    42 C.F.R. § 1001.952(c).

-73-

### 2. The Personal Services And Management Safe Harbor Does Not Apply

104. The Personal Services And Management Safe Harbor does not apply for each of the reasons set forth in ¶¶ 97 & 98, immediately above, and for the related reason that the aggregate compensation paid by co-conspirator dermatologists to SkinCure–the 60% Medicare fee share--was not fair market value or commercially reasonable.[89] The services performed by SkinCure involved a business arrangement that violated *Stark*, AKS and the False Claims Act in addition to violating the Sales Tax Laws of the State of Illinios. SkinCure failed to pay Illinois sales tax on at least $123,750,000 worth of SRT-100-Vision machines purchased from Sensus.[90]

### 3. The Referral Services Safe Harbor Does Not Apply

105. The Referral Services Safe Harbor does not apply for each of the reasons set forth in ¶¶ 97, 98 immediately above.

### 4. The Referral Arrangement For Specialty Services Safe Harbor Does Not Apply

106. The Referral Arrangement For Specialty Services Safe Harbor does not apply for each of the reasons set forth in ¶¶ 97, 98, 99 immediately above. Also, this safe harbor does not apply to save defendants' fraudulent scheme and conspiracy because they shared the Medicare/Medicaid reimbursement.[91] SkinCure is not a lawful member of any medical practice group.

---

[89] 42 C.F.R. § 1001.952(d)(5).

[90] 42 C.F.R. § 1001.952(d)(6).

[91] 42 C.F.R. § 1001.952(s).

-74-

## VI.    The Fraud And Conspiracy Of Defendants To Willfully Violate *Stark*, AKS And The False Claims Act

### A.    Brief Summary Of Defendants' Fraud And Conspiracy

107.    SkinCure's SRT Turnkey Implementation Program contract created unlawful financial relationships with co-conspirator dermatologists by providing them with a Federal and State healthcare program reimbursement sharing arrangement based on the volume and value of their patient referrals to SkinCure.[92] Such contract violated *Stark*. Additionally, such contract violated AKS. SkinCure paid bribes and kickbacks to co-conspirator dermatologists–free SRT machines, free radiation therapists, free state registrations of SRT machines, free lead lined treatment rooms, free medical physicist to calibrate and maintain the SRT machines and free billing services--to induce them to make unlawful referrals of their patients to SkinCure for SRT, which SkinCure provided in the dermatologist's clinic. No safe harbor or exception applied to legitimize SkinCure's contracts with co-conspirator dermatologists. SkinCure then billed Federal and State healthcare programs for SRT services induced by unlawful referrals and by bribes and kickbacks, which constituted *Stark*, AKS and False Claims Act violations.

108.    Other defendants, principally private equity investors, with full knowledge of the SkinCure fraudulent scheme against Federal and State healthcare programs, joined the conspiracy. Defendant, CapX Partners, and its specific partners, Jeffrey S. Preffer, Tom Carter and John Van Hooser, reviewed and studied the SkinCure Marketing plan in December 2017, before loaning it $2,500,000 to fuel its fraudulent scheme against federal and state healthcare programs.[93]

---

[92]    See Exhibit E, Program Services Agreement, (CREGER00153-00189).

[93]    See Exhibit L, SkinCure Oncology Press Release, December 2017, announcing $2,500,000 loan from CapX Partners, (CREGER00229-00230).

Defendant, Chicago Pacific Founders through its partners, Mary Tolan, Krista Hatcher, Vance

Varnier and Steven Bonner, who were each on the seven member Board of Directors of

Defendant, Pinnacle Dermatology, took an active, hands on role in running the business affairs of

Pinnacle and conspired with SkinCure and its co-conspirator dermatologists to violate *Stark*, AKS

and the False Claims Act. Mary Tolan was president of the Pinnacle Board from March 2017 until

October 29, 2021. During such time, these private equity investors pumped millions of dollars

into Pinnacle. When SkinCure first presented its fraudulent scheme to Pinnacle in August 2019,

Tolan, Hatcher, Varnier and Bonner voted to conspire with SkinCure to defraud the United States,

by authorizing Pinnacle to contract with SkinCure and commit to placing multiple SRT-100

machines at several of its clinics..

      109.    On October 29, 2021, Defendant, BayPine, LP, with full knowledge of the

SkinCure conspiracy and scheme to violate *Stark*, AKS and the False Claims Act, loaned Pinnacle

$30,000,000 to continue such violations. BayPine took control of the Pinnacle Board of Directors

by placing Defendants, Joel Hackney, Anjan Mukherjee, Wan Ling Martello and Andrew

Goldfarb, on the Board.[94] Since October 29, 2021, with full knowledge and approval of

controlling Board members, Pinnacle has placed at least one SkinCure owned SRT machine in a

Pinnacle practice location to continue its violations of *Stark*, AKS and the False Claims Act.[95]

---

[94]    See Exhibit J, Pinnacle Board of Directors, October 29, 2021, (CREGER00211-00227).

[95]    See Exhibit P, Pinnacle Illinois X-Ray Equipment Registration, 3/15/2022, (CREGER00242).

-76-

**B. The OIG Special Advisory Bulletin Of 2003 Warning About Schemes Just Like Defendants' Scheme Of Fraud And Conspiracy**

110.    For over 30 years the Office of Inspector General, (OIG), has been warning business and healthcare officials about fraudulent schemes involving complex contractual arrangements between physicians and providers of DHS that violate *Stark*, AKS and the False Claims Act and defraud Federal and State healthcare programs. In 2003, OIG Special Advisory Bulletin entitled, "Contractual Joint Ventures," warned of almost the precise factual scenario presented by the SkinCure fraudulent scheme.[96] OIG warned that "kickbacks" are harmful because they can: (1) distort medical decision-making; (2) cause overutilization; (3) increase costs to federal healthcare programs; and, (4) and result in unfair competition by freezing out competitors unwilling to pay kickbacks.[97]

111.    The Opinion focused on "questionable contractual arrangements where the healthcare provider in one line of business, (the "owner"), expands into a related healthcare business by contracting with an existing provider, (the "manager/supplier"), of a related service, [DHS for example], to provide the new service to the owner's existing patient population, including [Federal and State] healthcare program patients. The manager/supplier not only manages the new line of business, but may also supply it with inventory, employees, space, billing, and other services. In other words, the owner contracts out substantially the entire operation of the related line of business to the manager/supplier–otherwise a potential

_____

[96]    See Exhibit N, OIG Advisory Opinion, "Contractual Joint Ventures," which refers to OIG Special Fraud Alert issued on December 19, 1989, reported at 59 FR 65372, (CREGER00232-00238).

[97]    *Id.*

competitor–receiving in return, profits of the business as remuneration for its federal healthcare program referrals."[98]

112.    "The problematic arrangements typically exhibit certain common elements:

(a)    The owner expands into a related line of business, which is dependent on referrals from, or other business generated by, the owner's existing business. . . . [T[he new business [line] primarily serves the owner's existing patient base.

(b)    The owner neither operates the new business nor commits substantial financial capital or human resources to the new venture. Instead, it contracts out substantially all the operations of the new business. The manager/supplier typically agrees to provide not only management services, but also a range of other services, such as inventory necessary to run the business, office and healthcare personnel, billing support and space. While the manager/supplier essentially operates the business, the billings of insurers and patients [and Federal/State healthcare programs] is done in the name of the owner. . . . While the contract terms of these arrangements may appear to place the owner at financial risk, the owner's business risk is minimal because of the owner's ability to influence substantial referrals to the new business.

(c)    The manager/supplier is an established provider of the same services as the owner's new line of business. In other words, absent the contractual arrangement, the manager/supplier would be a competitor of the new line of business. . . .

(d)    The owner and the manager/supplier share the economic benefit of the owner's new business. The manager/supplier takes its share in the form of payments under the various contract(s) with the owner; the owner receives its share in the form of the residual profit from the new business.

(e)    Aggregate payments to the manager/supplier vary typically with the value or volume of business generated for the new business by the owner. . . . In other words, the aggregate payments to the manager/supplier will vary with referrals from the owner. Likewise, the owner's payments. . . also vary based on the owner's referrals

_____

[98]        *Id.*

-78-

to the new business. Through these contractual payments, the
parties are able to share profits of the new line of business."[99]

113.    The new business line between an owner and a manager/supplier under these

circumstances is a joint venture, and provision of items of service to a joint by a participant in the

venture is not an "arms length" transaction. OIG has specifically stated that it has never intended

to protect business arrangements between a physician and a supplier of services when they enter

into a collusive arrangement and seek to share profits with each other.[100]

114.    The following characteristics are those of a "Suspect" Contractual Joint Venture:

(a)    **New Line of Business.**  The owner typically seeks to expand into a health
care service that can be provided to the owner's existing patients.

(b)    **Captive Referral Base.** The newly-created business predominantly or
exclusively serves the owner's existing patient base. . . .  The owner does
not intend to expand the business to serve new customers. . . . "

(c)    **Scope of Services Provided By The Manager/Supplier.**  The
manager/supplier provides all or many of the following key services:

●    day-to-day management;
●    billing services;
●    equipment;
●    personnel and related services;
●    office space;
●    training;
●    healthcare items, supplies and services.

(d)    **Remuneration.**  The practical effect of the arrangement, viewed in its
entirety, is to provide the owner the opportunity to bill insurers, patients
and Federal and State healthcare programs for business otherwise provided
by the manager/supplier. The remuneration from the joint venture to the
owner and to the manager/supplier takes into account the value and volume
of business the owner generates.

---

[99]      *Id.*

[100]     *Id.* See also: 56 FR35977 (July 29, 1991).

(e) **Exclusivity.** The parties may agree to a non-compete agreement.

115. The business arrangement between SkinCure and its dermatologist, co-defendants, with knowing participation of the private equity defendants, is virtually a factual "mirror image" of the unlawful scheme outlined by OIG in its Special Advisory Bulletin in 2003. SkinCure and its co-defendants entered into a scheme, which violated *Stark* and AKS and involved the knowing presentment of false and fraudulent invoices to Federal and State healthcare programs for payment in violation of the False Claims Act.

## C. Defendants' Fraud And Conspiracy To Violate *Stark*, AKS And The False Claims Act

### 1. Introduction And Back Ground Information

116. Most Baby Boomers are 65 years of age or older, Medicare beneficiaries, and moving through the healthcare system. They are increasingly in need of dermatology care due to the unwise sun exposure of their youth. Accordingly, the demand for dermatology services is rapidly expanding for this demographic group, which is increasingly presenting in ever greater numbers for treatment for melanoma and non-melanoma skin cancers. About 70% of all non-melanoma skin cancers are in patients 65 years of age or older–Medicare beneficiaries. The gold standard for treating non-melanoma skin cancers, the majority of skin cancers, is Mohs Surgery, which is microscopic surgery where the surgeon, surgically removes a thin top layer of the cancerous lesion, sends it to an on-site lab to be frozen so the surgeon can examine it, in office, under the microscope. If cancer cells remain, the surgeon removes another layer, and the process begins again until cancer cells are no longer present. Mohs Surgery has proven cost effective, safe and is the medical standard of care for treating the vast majority of non-melanoma basal and

-80-

squamous cell carcinomas.

117. There is, however, a small subset of these cancers, which are better treated by superficial radiation therapy, (SRT). The possible indications for SRT over Mohs Surgery are: (1) location of the cancerous lesion–the nose, ears and face and areas of the body with poor blood flow; and (2) patient co-morbidities such as diabetes, heart conditions or any medical conditions that make patients poor candidates for surgery or recovery from surgery. But the vast majority of patients presenting with basal or squamous cell skin cancers for treatment, are best treated with–gold standard– Mohs Surgery.

118. Recently, with the development of more and better superficial radiation therapy machines, including image guided machines, IG-SRT, which have gained approval for medical use by the Food & Drug Administration, Federal and State healthcare program reimbursement for these new SRT machines has sky-rocketed. For example, a physician charging for SRT treatment could receive Federal and State healthcare program reimbursements from $7000-$10,000 perhaps more, while reimbursement for Mohs Surgery is about $1500. And significantly, most dermatologists are not Mohs Surgeons. Private equity investors have recognized that by shifting the treatment for non-melanoma skin cancers away from the long standing, gold standard lower paying, Mohs Surgery, to better paying SRT treatment, they can realize huge financial profits.

## 2. The Law Of Conspiracy

119. Simply stated, a civil conspiracy is "An agreement between two or more persons to commit an unlawful act that causes damage to a person or property."[101] A conspiracy may be a continuing one; actors may drop in and drop out; the details of operation may change from time-

---

[101]     BLACK'S LAW DICTIONARY 375 (10th ed. 2014).

to-time; the members need not know each other or the part played by others; a member need not know all the details of the plan or the operation; he must, however, know the purpose of the conspiracy and agree to become a party to a plan to effectuate that purpose.[102] The general Federal conspiracy statute creates an offense "[i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose."[103] To conspire to defraud the United States means primarily to cheat the Government out of property or money, but it also means to interfere or obstruct one of its lawful governmental functions by deceit, craft, trickery, or at least by means that are dishonest.[104] Section 371 reaches "any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government."[105]

120.    Although the essence of conspiracy is agreement, an express agreement is not necessary to prove a civil conspiracy.[106]  Tacit understanding, created and executed over time, is enough to constitute an agreement even absent personal communication.[107] Once the existence of a conspiracy has been established, slight evidence is needed to connect a particular participant to the conspiracy.[108] Each conspirator is liable for the overt acts committed by any member of the

---

[102]    *Craig v. United States*, 81 F. 2d 816, 822 (9th Cir. 1936).

[103]    18 U.S.C. § 371.

[104]    *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924).

[105]    *Tanner v. United States*, 483 U.S. 107, 128 (1987).

[106]    *Hobson v. Wilson*, 737 F. 2d 1, 51 (D.C. Cir. 1984).

[107]    *Direct Sales Co. v. United States*, 319 U.S. 703, 714, 63 S. Ct. 1265, 1271, 87 L. Ed. 1674 (1943).

[108]    *United States v. Braasch*, 505 F. 2d 139, 148 (7th Cir. 1974).

-82-

conspiracy, even if the defendant did not personally commit the acts.[109] Each conspirator need not

have known all of the details of the illegal plan or all of the participants involved.[110] A conspirator

may join at any point in the progress of the conspiracy and be held responsible for all that may be

or has been done.[111] "A conspiracy, once established, is presumed to continue until the contrary is

established.[112] Under the False Claims Act, defendants are jointly and severally liable for damages

assessed by a trier of fact.[113]

### 3. Inception Of Defendants' Fraud And Conspiracy Against Federal And State Healthcare Programs

121.     In 2016, defendant, D. Daniel Ladd, together with his two co-conspirators and

founders of SkinCure, defendants, Steven Scott and L. Peter Smith, master-minded an unlawful

program to defraud Federal and State healthcare programs by knowingly presenting fraudulent

bills for payment to such programs that were based on kickbacks and unlawful referrals, which

violated *Stark*, AKS and the False Claims Act. The essential elements of SkinCure's unlawful

program–the SRT Turnkey Implementation Program–are the following:

> (1)     Enter into confidential, secret contracts with dermatologists by which
> SkinCure would provide to the dermatologists at no charge:

---

[109]     *Poliafico v. United States*, 237 F. D 97, 104 (6th Cir. 1956).

[110]     *Hooks v. Hooks*, 771 F. 2d 935, 944 (6th Cir. 1985).

[111]     *Braverman v. United States*, 125 F. Ed 283, 286 (6th Cir. 1942); rev'd on other grounds 317 U.S. 49, 63 S. Ct. 99, 87 L. Ed. 23 (1942).

[112]     *Hyde v. United States*, 225 U.S. 347, 32 S. Ct. 793, 56 L. Ed. 1114 (1912).

[113]     *United States. v. Stevens*, 605 F. Supp.2d 863, 867 (W.D. Ky. 2008); *United States v. Augustine Century Health Services*, 136 F. Supp. 2d 876, 895 (M.D. Tenn. 2000); aff'd 289 F. 3d 409 (6th Cir. 2002).

-83-

(i)      a $495,000, Sensus SRT-100--Vision superficial radiation machine, with its ownership remaining with SkinCure;

(ii)     a board certified radiation therapy technician, a SkinCure employee, who would operate the machine in the dermatologist's clinic;

(iii)    plans and construction of a lead-lined room at dermatologist's clinic to safely accommodate operation of the SRT machine;

(iv)     State radiation registrations, filings and fees;

(v)      billing and collection services in the name of the dermatology practice, using its Medicare Provider/Supplier Billing Number;

(vi)     services of a medical physicist to calibrate and maintain the SRT machine;

(vii)    a SkinCure employed account manager.[114]

(2)      SkinCure was given complete access to the co-conspirator dermatologists' patient bases, 70% of which were Medicare beneficiaries.[115]

(3)      In return for the kickbacks  provided to the co-conspirator dermatologists by SkinCure, and the unlawful patient referrals to SkinCure, such defendants shared the reimbursements and fees generated–70% of which were paid by federal healthcare programs–for SRT administered in the dermatologists' clinics. Such share was on a sliding scale, with the dermatologists receiving between 40%-50% of the reimbursements and fees, depending on the volume and value of the referrals made by such dermatologists to SkinCure.[116]

(4)      There were mutual non-compete and confidentiality provisions in the

---

[114]     See Exhibit B, (CREGER00032-00090); and Exhibit E, (CREGER0000155, 00159-00162).

[115]     See Exhibit E, "Terms & Conditions, Section 2.5(a), (CREGER00161).

[116]     See Exhibit E, Program Services Agreement ¶ 3, (CREGER00153-00189); See Exhibit B, Press Releases, June 14, 2018, advertising its ". . . turnkey revenue-share model. . . ." (CREGER00039 and May 18, 2020, advertising its ". . . shared-revenue model. . . ." (CREGER00051).                 .

-84-

contract.[117]

(5)     This unlawful arrangement included sharing of the reimbursements received for SRT treatment of beneficiaries of Federal and State healthcare programs.[118]

(6)     By the unlawful arrangement, co-conspirator dermatologists each received a financial interest in SkinCure by relying on SkinCure to:

   (i)     correctly prepare and submit bills to Federal and State healthcare programs for SRT treatment performed by SkinCure in the dermatologist's office, using the dermatologist's Medicare, Provider/Supplier Billing Number;[119]

   (ii)    prosecute appeals for any SRT treatment billing disputes with Federal or State healthcare programs;

   (iii)   receive reimbursements from Federal and State healthcare programs for SRT treatment;

   (iv)    deposit such reimbursements into an account controlled by SkinCure;

   (v)     share such reimbursements and transmit between 40%-50% of such reimbursements to the co-conspirator dermatologist based on the volume and value of the SRT treatment referrals to SkinCure;

   (vi)    monitor the volume and value of co-conspirator dermatologists' referrals to SkinCure and increase the reimbursement share paid to such dermatologists as the volume and value of such referrals increased;

   (vii)   pay them appropriate shares from the Federal and State healthcare

---

[117]     See Exhibit E, Program Services Agreement ¶ 7, Bates:            ; Terms & Conditions, Article VIII, Confidential Information. . . : (CREGER00156-00157).

[118]     See Exhibit E, Program Services Agreement, Principal Terms ¶ 3, (CREGER00156); See Exhibit B, Press Releases, June 14, 2018, advertising its ". . . turnkey revenue-share model. . . ." (CREGER00039 and May 18, 2020, advertising its ". . . shared-revenue model. . . ." (CREGER00051).

[119]     See Exhibit E, Terms & Conditions, Section 2.5, (CREGER00161).

-85-

program reimbursements based on the volume and value of their referrals of SRT treatment to SkinCure.

### 4. Dermatologists Join The Healthcare Fraud As Co-conspirators

122. SkinCure's fraudulent SRT Turnkey Implementation Program was an incredibly sweet deal for co-conspirator dermatologists, particularly for those who were not also Mohs Surgeons. Instead of sending their non-melanoma skin cancer patients out-of-clinic to a Mohs Surgeon, and receiving no part of the Mohs surgical fee reimbursement, they kept the patients in-clinic, allowing the SkinCure employed radiation therapy technician to treat their patients with the SkinCure, SRT-100 machine, for which the co-conspirator dermatologists paid nothing. In the case of Federal and State healthcare program reimbursement–at least $7,300-- for such SkinCure provided SRT treatment, the referring co-conspirator, dermatologist received at least 40% of such reimbursement or $2,920, SkinCure pocketed 60% or at least $4,380. Even the Mohs Surgeons almost doubled their Federal and State healthcare program reimbursements by choosing SkinCure provided, SRT treatment over Mohs Surgery–$2,920 versus about $1,500 for Mohs Surgery.

123. SkinCure's fraudulent SRT Turnkey Implementation Program, in addition to violating *Stark*, AKS and the False Claims Act, also violated the fundamental premise of every Federal and State healthcare program. Medical decisions and medical treatments must be provided, in the best medical interest of the patient, not the best financial interest of the physician or medical provider. Defendants' unlawful fraud and conspiracy failed the test.

### 5. SkinCure's Profits Received From The Equipment And Services It Provided Were Grossly Excessive–Above Fair Market Value

124. Through its SRT Turnkey Implementation Program, SkinCure was paid vastly more than fair market for the equipment and services that it gave to its co-conspirator

-86-

dermatologists to obtain unlawful referrals of patients for SRT treatment. The publications of SRT-100 manufacturer, Sensus, stated that the monthly rental of an SRT-100 machine should be $6,000.[120] The same document also states that each patient on average presents for treatment with 1.25 lesions. Certainly, Sensus, as manufacturer of the SRT-100, knows what constitutes a fair market rental for the machine. SkinCure advertises that it pays its radiation therapy technicians, working in the co-conspirator dermatologist's office, $35.00 per hour–$5,600 per month. SkinCure pays billing and collection employees $12-$19 per hour to work at it Burr Ridge, Illinois home office, liaison between co-conspirator dermatologist and Federal and State healthcare programs to prepare, submit and collect reimbursements from such healthcare programs, using the co-conspirator dermatologist's Medicare Provider/Supplier Billing Number. SkinCure has never had its own Medicare Provider/Supplier Billing Number because it has never been authorized by Medicare to provide SRT services. Such employees devote small amounts of time each month for each co-conspirator's billing needs. SkinCure's monthly out-of-pocket expenses for one SRT-100 machine are estimated at no more than $15,000.

125.    One machine treating as few as 10 patients per month having 1.25 lesions, or 12.5 lesions per month would generate at least $91,250 in reimbursements with 70% of those, or $63,875, being Medicare reimbursements. SkinCure received 60% of such reimbursements for a minimum of $38,325 per month revenue with profits of $23,325, per machine. But many of SkinCure's SRT-100 machines treated 30 or more of co-conspirator dermatologists' patients each month. SkinCure's monthly profits for each SRT-100 machine ranged between almost $25,000

---

[120]    See Exhibit M, "The Sensus Healthcare Multi-Scenario NMSC Vision SRT-100 Reimbursement Table," (CREGER00231).

and $100,000 or more. In its March 8, 2022, press release, SkinCure admitted that it had ordered 240 Sensus, SRT-100-Vision, Image Guided Superficial Radiation machines.[121] The total cost of such machines was about $120,000,000. SkinCure and its co-conspirator dermatologists' total profits from Federal and State healthcare program reimbursements realized from the operation of such machines, at the present time, could range between $10,000,000-$40,000,000 per month. Under the unlawful  SRT Turnkey Implementation Program, SkinCure received about 60% and co-conspirator dermatologists received about 40% of such profits from Federal and State healthcare reimbursements.

### 6. <u>Private Equity Investors Joined The Pinnacle Fraud And Conspiracy</u>

126.    Private equity investors in Pinnacle, defendants, Chicago Pacific Founders, Mary Tolan, Krista Hatcher, Vance Varnier and Steve Bonner, exercised operational control over the Board of Directors and the business activities of Pinnacle from March 2017, until October 29, 2021, when they sold their controlling interest to BayPine, LP, another private equity investor. By their votes on the Pinnacle Board in the summer of 2019, they joined with do-defendants, Chad Eckes, Jose Rios and Paula Lapinski, and approved, authorized and instigated Pinnacle's contract with SkinCure, joining its fraudulent SRT Turnkey Implementation Program. During the time of their controlling interest in Pinnacle, Chicago Pacific, Tolan, Hatcher, Varnier and Bonner approved and authorized Pinnacle to contract with SkinCure for it to install at least ten SRT-100 machines at different Pinnacle locations under the fraudulent Turnkey Implementation Program. Those locations included Pinnacle offices at: (1) 1124 Essington Road, Joliet, IL60435-8423; (2)

---

[121]     See Exhibit O, SkinCure Oncology, Press Release, March 8, 2022, (CREGER00239-00241).

2500 W. Higgins Rd., Ste. 1040, Hoffman Estates, IL 60169-2049; (3) 10720 165th St., Orland Park. IL 60467-8714; (4) 103 N. Haven Rd., Ste 7, Elmhurst, IL 60126-2973; and, (5) Murfreesboro, and Belle Meade, TN among other locations.[122]

127.    When BayPine LP purchased controlling interest in defendant, Pinnacle, it took control of its Board of Directors.[123]  After acquiring controlling interest of Pinnacle, BayPine continued to instigate, approve and authorize Pinnacle entering into additional SRT Turnkey Implementation Program contracts with SkinCure to defraud Federal and State healthcare programs. One such contract included the SkinCure SRT-100 machine, Serial No.: 2112-2213 installed about March 25, 2022, and operated by SkinCure at Pinnacle's location at  595 William R. Latham, Sr. Dr., Bourbonnais, IL 60914-2319.[124]

### 7.    Private Equity Defendants Knowingly Financed SkinCure And Pinnacle's Nationwide Fraud And Conspiracy

128.    Private equity defendants loaned SkinCure at least $32,500,000 to finance its fraudulent SRT Turnkey Implementation Program, which, as of March 8, 2022,  has resulted in at least 240, SRT-100 superficial radiation machines being placed in dermatologists offices all over the United States from coast-to-coast.[125]  Such defendants either knew, should have known or recklessly disregarded the fact that the SkinCure business model was based on paying bribes and

---

[122]    See Exhibit Q, Four of Pinnacle's Illinois X-Ray Equipment Registrations, (CREGER0000243-00246).

[123]    See ¶ 60 herein.

[124]    *Id.*

[125]    SkinCure's private equity co-conspirators are: CapX Partners, a/k/a, Accord CapX LLC, Jeffrey S. Pfeffer, Fountain Partners, d/b/a, Seacoast Capital, Tom Carter, John Van Hooser, David Romagnoli and Thomas Gorman..

-89-

kickbacks to co-conspirator dermatologist, defendants in exchange for unlawful referrals of their

patient populations to SkinCure for it to provide Designated Health Services in the form of SRT-

100 superficial radiation therapy.

129.    Such defendants also knew, should have known or recklessly disregarded the fact

that SkinCures's SRT Turnkey Implementation Program contracts gave each contracting, co-

conspirator dermatologist a financial interest in SkinCure as outlined in ¶ 121(6),

hereinabove. Such private equity defendants also knew that co-conspirator dermatologists:

(1)    referred their patients to SkinCure and relied upon SkinCure to
prepare and bill for SRT services, which SkinCure performed in
their offices, including billings to Federal and State healthcare
programs;

(2)    relied upon SkinCure to collect reimbursements form Federal
and State healthcare programs;

(3)    relied upon SkinCure to prosecute any appeals of billings, for
SkinCure provided SRT services;

(4)    relied upon SkinCure to receive reimbursements and deposit
same  into a SkinCure controlled bank account;

(5)    relied upon SkinCure to share and transmit to them, the
reimbursements, including reimbursements from Federal
and State healthcare programs, according to the terms of the
SRT Turnkey Implementation Program contract, ( i.e 40%-
50% of the reimbursed amount);

(6)    relied upon SkinCure to monitor the volume and value of the
co-conspirator dermatologist's referrals to SkinCure and
increase the split paid to such dermatologists as the volume and
value of such referrals increased;

(7)    especially, relied upon SkinCure to pay them appropriate shares
from the Federal and State healthcare program reimbursements
based on the volume and value of their referrals of their patients
to SkinCure for SRT treatment.

-90-

Private equity defendants knew that the foregoing referrals and reliances gave each co-conspirator dermatologist a financial interest in SkinCure, which made referrals of their patients to SkinCure for SRT treatment a *Stark* violation.

    **D.**    **Specific Examples Of Relator's First Hand Knowledge Of Defendants' Fraud And Conspiracy**

    130.    Relator has first hand knowledge of at least three separate instances, and the details, of SkinCure's fraudulent SRT Turnkey Implementation Program: (1) Brentwood Dermatology, Dr. John Q. Binhlam, November 8, 2017; (2) The Skin Wellness Center, Dr. Meredith Overholt, June/July 2019; and (3) Pinnacle Dermatology, CEO, Chad Eckes, August 2019-March 18, 2020.

    **1.**    **SkinCure's Fraudulent Proposal Made By Its CEO, Kerwin Brandt To Brentwood Dermatology On November 8, 2017**

    **(a)**    **Background**

    131.    In October 2017, the Tennessee Dermatology Association meeting was held at Bass Pro Shops at the Pyramid on Mud Island in Memphis, Tennessee. While at the meeting, Relator met two sales representatives from Sensus Healthcare, Stephanie Owen, Regional Sales Manager from Florida and Amanda Redden, Account Representative from Nashville. The discussion began with Relator explaining his experience with brachytherapy, another radiation treatment for non-melanoma skin cancer and how Medicare reimbursement for the procedure went from $40,000 per lesion to $180 per lesion once Medicare adjusted the code for the application of superficial radiation. Since relator was CEO of Tennessee Dermatology, the largest dermatology platform in Tennessee, Stephanie and Amanda were trying to sell SRT machines

through Relator to the group.[126]

132.    At one point during the discussion, Stephanie said, "if capital outlay is a concern of yours, we have a partner company called SkinCure where they outlay all of the capital . . . it is a turnkey agreement where SkinCure does everything for you . . . the only downside is that they keep a percentage of the collections, but you will get our premium device . . . the SRT-100-Vision. With it, you will be able to bill for a higher amount." Creger then asked Stephanie, "So if I understand this, SkinCure will provide everything, we just need to refer the patients and share in the revenue?" Stephanie affirmed Creger's understanding. Creger then asked her where SkinCure had this program up and running. Stephanie told him, "in Branson, Missouri, Cleveland, Ohio and several places in Florida."

        **(b)    Stunning Admissions Against Interest By SkinCure CEO, Kerwin
                Brandt, Brentwood, Tennessee, November 8, 2017**

133.    On November 8, 2017, defendant, Kerwin Brandt, CEO of SkinCure, met in Brentwood over dinner with Relator and Dr. John Q. Binhlam of Brentwood Dermatology, an affiliate of  Tennessee Dermatology. The purpose of the meeting was for Brandt to present the SkinCure, SRT Turnkey Implementation Program and about placing a SRT-100-Vision machine at Brentwood Dermatology.  During the meeting, Brandt told Relator and Dr. Binhlam that through the program SkinCure would do the following:

        (1)    buy the SRT-100-Vision machine and place it in Brentwood Dermatology's
               clinic at no charge;[127]

        (2)    employ and place a board certified radiation therapy technician at the

---

[126]    See Exhibit R, Relator, Dan Creger's Timeline, (CREGER00247-00252).

[127]    See Exhibit B, (CREGER00032-00090) ; and Exhibit E, (CREGER00153-00189)

Brentwood Dermatology clinic, at no charge, to operate the SRT machine and administer supervision radiation therapy to Dr. Binhlam's patient's; (Brandt underscored that a SkinCure employee, not a Brentwood Dermatology employment, would deploy and operate the SRT machine);[128]

(3)     at all times maintain ownership of the SRT-100-Vision machine and "if it is not producing a specified amount [of revenue] then we will remove it at our discretion;"[129]

(4)     take 60% of all revenue for SRT treatment, because SkinCure is funding the $495,000 cost for the SRT machine, paying for the board certified radiation therapy technician and for the lead lined treatment room, machine registration and other expenses; (the dermatology practice would receive the other 40% of revenues or reimbursements;[130]

(5)     bill for treatment using the SRT machine under the practice's Tax ID Number and in the case of Medicare/Medicaid patients, using the practice's CMS Provider/Supplier Billing Number.[131]

134.    After Brandt's initial explanation, Relator looked at him in disbelief. . . . Brandt's response was, "Yeah, I know, nobody has a business model like this. . . ." Creger then asked, "Who else is doing this with you?" Brandt's response was, "We have devices and agreements in Branson, Missouri, just outside Cleveland in Stow, Ohio and all over Florida. We could have 50 SRT units in place by the end of the year." Creger responded, "Seriously, that's nearly $25,000,000 in capital outlay; you must have a deep pocket or own a bank?" Brandt responded, that, "Funding is not an issue for us. . . . We keep 60% and the physicians get 40%. That is more

---

[128]    See Exhibit B, (CREGER00032)    .

[129]    See Exhibit E, Program Services Agreement, ¶ 6, (CREGER000156)..

[130]    *Id.*

[131]    See Exhibit E, Terms & Conditions, Section 2.5 (a), (CREGER00161).

-93-

than a fair business arrangement with no [financial] risk for the practice and we are funding all the expenses. We are taking all of the financial risks, and you are getting the referral income. I'll sent the agreement that all the practices have signed, tomorrow morning so you can look ir over. . . ." The next morning, November 9, 2017, Brandt E-Mailed the proposed contract documents for Brentwood Dermatology to Relator.[132]

135.     The foregoing admission against interest–admissions of SkinCure's violations of *Stark*, AKS and the False Claims Act–by defendant, Kerwin Brandt, the highest ranking executive officer of defendant, SkinCure, together with their documentary confirmation through the proposed contract documents E-Mailed to Relator of November 9, 2017, can only be described as stunning.

136.     During an early December 2017, telephone conversation with Brandt, Relator told him that he and Dr. Binhlam were not comfortable with the SkinCure, SRT Turnkey Implementation Program and that Brentwood Dermatology would not be signing up for the program. Brandt offered assurances, but Relator told him, "No thanks, Brentwood Dermatology and Tennessee Dermatology are going to pass. No hard feelings."

**(c)     Additional Admissions Against By Brandt To Relator**

137.     In March 2019, at the American Academy of Dermatology meeting in Washington, D.C., Relator talked with Brandt and said to him, "I understand you have placed [SRT] machines in Atlanta, Savannah, Durham, Charlotte, with Demitir in Louisiana, Tareen in Minneapolis, New York, New Jersey and all over Florida." Brandt replied and said, "and in

---

[132]     See Exhibit E, SkinCure, CEO, Brandt, E-Mail of November 9, 2017, together with SkinCure contract documents, sent to Relator and Dr. Binhlam. (CREGER00153-00189).

-94-

Connecticut, Ohio, Illinois and Michigan . . . how did you hear about all of those?" Relator replied, "I'm well known and know a lot of people. 2018 was a good year for you . . .. Have you changed your fee from the 60/40 split?" In a condescending tone, Brandt said, "We have so much business coming in we don't need to lower our agreement. . . . If the practice does not want to do it, then they just don't sign it." From March 2019, Brandt avoided Relator at professional meetings that they both attended.

      **2.**      **SkinCure Fraud And Conspiracy At The Skin Wellness Center, Knoxville, Tennessee**

      **(a)**      **Relator Made Two Visits To The Skin Wellness Center In The Summer Of 2019**

138. On June 28, 2019, in his capacity as CEO of Tennessee Dermatology, Relator made a cold call on The Skin Wellness Center in Knoxville and met with its owner, dermatologist, Dr. Meredith Overholt. Relator had previously met Dr. Overholt at the American Academy of Dermatology meeting in Washington, D.C. in March 2019. She welcomed Relator and showed him around the clinic and specifically showed him the SRT machine that SkinCure had installed. Relator told Dr. Overholt, "You are doing much better than our clinics to shell out $500,000 for an SRT machine."

139. Dr. Overholt then introduced Relator to the radiation therapy technician who operated the SkinCure SRT machine. She was wearing a lab shirt with the SkinCure logo and the words "SkinCure" embossed over the breast pocket. Relator then turned to Dr. Overholt and said, " You didn't buy the SRT machine after all, you did the agreement with Kerwin?" To which Dr. Overholt replied, "You know Kerwin? It's an amazing thing they do for you. I have no money laid out, and I get 40% of the revenue. . . . We had to give up this room that used to be an employee

-95-

coat room. SkinCure handles the billings and collections . . . they even provide the radiation technologist. I guess that's why they have over 100 places that have signed their agreement. It seems like a no-brainer."

140.     Relator had a brief conversation with the technician where he asked, "So let me get this straight, you are an employee of SkinCure; not The Skin Wellness Center, is that right?" The technician replied, "That's correct. I work for SkinCure, but I'm located here and work at The Skin Wellness Center."

141.     Then, on July 17, 2019, Relator was back in Knoxville and took Dr. Overholt and her medical partner, Dr. Kimberly Grande, and their office manager to dinner at Chesapeake's Restaurant in Knoxville. Over dinner, the three women affirmed to Relator that, "What SkinCure does is a no-brainer. Pretty slick, we refer patients and we get paid. It has substantially helped our financial picture. It seems almost too good to be true. No issues for us so far . . . works seamlessly." In other discussions with Dr. Overholt, she told Relator that The Skin Wellness Center expected to realize about $1,000,000 annually from their 40% reimbursement from the use of the single SkinCure SRT-100 machine at their clinic. And yes, it would be a no-brainer if it were not illegal–a violation of *Stark*, AKS and the False Claims Act.

**(b)     Admissions Against Interest By Dr. Overholt And The SkinCure Radiation Therapy Technician**

142.     During his two visits to The Skin Wellness Center, with Dr. Overholt and the SkinCure radiation therapy technician, several admissions against interest were made to Relator, including the following by Dr. Overholt:

(a)     She and The Skin Wellness Center had contracted with SkinCure using its SRT Turnkey Implementation Program;

-96-

(b)     SkinCure had provided Dr. Overholt and The Skin Wellness Center, free of charge, with the following:

    (i)     one $495,000 SRT-100-Vision superficial radiation therapy machine;

    (ii)    a board certified, radiation therapy technician;

    (iii)   a lead lined, State approved treatment room;

    (iv)    registration and filing services and fees with the State of Tennessee;

    (v)     billing and collection services for the treatment of all The Skin Wellness Center patients receiving SRT treatment using the SkinCure SRT-100 machine, including billings to all Federal and State healthcare programs;

(c)     Dr. Overholt confirmed that The Skin Wellness Center received from SkinCure, 40% of all reimbursements, which SkinCure received for treatment of her patients using the SkinCure, SRT-100 machine, which included 40% of all reimbursements from Federal and State healthcare programs;

(d)     She further confirmed that she no longer refers her patients out-of-clinic to a Mohs Surgeon;

(e)     SkinCure treats 25-30 patients per month, referred by Dr. Overholt and her medical partner, Dr. Grande, using the SkinCure, SRT-100 machine, operated by the SkinCure employed radiation therapy technician;

(f)     Dr. Overholt admitted that her revenues at The Skin Wellness Center had increased by about $1,000,000, in the last year from referrals of her patients to SkinCure for SRT treatment.

**(c)     Reasonable Inferences**

143.    From these admissions against interest, reasonable inferences follow, including:

(a)     Dr. Overholt, Dr. Grande and The Skin Wellness Center received massive bribes and kickbacks, which violated the AKS;

(b)     Such bribes and kickbacks and such defendants' reliance upon SkinCure to prepare invoices for SRT services performed defendants' patients, at The Skin Wellness Center office, submit the invoices to Federal and State healthcare programs for payment, and then for SkinCure to divide the reimbursements it received from such programs for such services and share those reimbursements with The Skin

-97-

Wellness Center, based on the volume and value of their referrals, gave The Skin Wellness Center a financial interest in SkinCure;

(c)     Such financial interest that Dr. Overholt, Dr. Grande and The Skin Wellness Center had in SkinCure, made every referral of a patient to SkinCure for SRT treatment, a violation of *Stark*;

(d)     SkinCure, not The Skin Wellness Center, was providing DHS, in the form of SRT treatment, to The Skin Wellness Center, patients;

(e)     SkinCure's radiation therapy technician, not Dr. Overholt, was the "Radiation Safety Officer" or "Person In Charge of X-Ray Equipment" at The Skin Wellness Center;

(f)     SkinCure prepared and submitted the Tennessee Registration for its SRT-100, X-Ray machine located at The Skin Wellness Center;

(g)     SkinCure falsely represented, two material facts, on the Tennessee registration for its SRT-100, X-Ray machine, located at The Skin Wellness Center that, (1) "THE SKIN WELLNESS CENTER' was owner of the SkinCure owned SRT-100 machine; and, (2) "Meredith Overholt [was the] Registration Safety Officer or Person in charge of X-ray equipment;"[133]

(h)     Such false representations were made by SkinCure to give the appearance to Federal and State healthcare programs that The Skin Wellness Center was performing the SRT treatments, rather than SkinCure, to hide the unlawful patient referrals to SkinCure. Dr. Overholt, Dr. Grande and The Skin Wellness Center conspired with SkinCure to make such false representations;

(i)     Such false representations were made by SkinCure to deceive Federal and State healthcare programs and the State of Illinois and hide from them the fact that SkinCure, not The Skin Wellness Center, was the actual owner of the Tennessee registered, Sensus, SRT-100 machine bearing Serial No.: 1812-2104.  Dr. Overholt, Dr. Grande and The Skin Wellness Center conspired with SkinCure to make such false representations, with the further intention to allow SkinCure to unlawfully fail to pay sales tax to the State of Illinois on the purchase of such machine;

;

(j)     For personal financial gain, Dr. Overholt and Dr. Grande referred their patients to

---

[133]     See Exhibit S, Tennessee Registration Of X-Ray Equipment prepared by SkinCure for the SRT-100 machine that it placed at The Skin Wellness Center clinic. (CREGER00253).

-98-

SkinCure for SRT treatment and virtually stopped referring any patient out-of-clinic for Mohs Surgery, even though such surgery remains the Gold Standard for treating most non-melanoma skin Cancers, at much lower cost;

(k)     SkinCure's SRT Turnkey Implementation Program encourages, and in the case of Dr. Overholt and Dr. Grande and The Skin Wellness Center, actually caused over utilization of SRT superficial radiation therapy, for financial gain; and,

(l)     SkinCure's SRT Turnkey Implementation Program is not an arms length transaction but a collusive arrangement that over utilizes SRT treatment at the expense of Mohs Surgery, the medical "Gold Standard" treatment for non-melanoma skin cancers, about $1,500 per lesion rather than the nearly $7,500 per lesion for SRT treatment;

(m)    SkinCure's SRT Turnkey Implementation Program unnecessarily increases the cost to Federal and State healthcare programs for treatment of non-melanoma skin cancers;

(n)     SkinCure's SRT Turnkey Implementation Program creates unfair competition by tending to squeeze out dermatologists unwilling to receive kickbacks in exchange for unlawful referrals; and,

(o)     SkinCure's SRT Turnkey Implementation Program creates unfair competition by tending to skew patients to more expensive SRT treatment rather than Mohs Surgery because the co-conspirator, dermatologist–even a Mohs Surgeon--makes more money from SRT reimbursements than from "Gold Standard" Mohs Surgery reimbursement.

**3.      SkinCure Fraud At Pinnacle's Murfreesboro Dermatology Clinic**

144.    In July 2019, Relator interviewed, in Nashville, face-to-face, with defendant,

Chad Eckes, Pinnacle Dermatology's CEO, for the position of Chief Growth Officer at Pinnacle.

At the end of the meeting, Eckes asked Relator about implementing radiation therapy into a clinic

for treatment of non-melanoma skin cancers. Eckes further asked Relator it he had heard of the

SkinCure business model. Relator told Eckes that he had met Kerwin Brandt but that he was not a

fan of the SkinCure program or business model and for that reason Tennessee Dermatology had

rejected the SkinCure proposal for Dr. Binhlam.

145.     In reply, Eckes said, "I like SkinCure. There is no financial risk for us. It is all upside and they take care of everything. We have a couple of SkinCure agreements in place and Murfreesboro will be the first one in Tennessee." Relator told Eckes, "You should do it the legitimate way and buy the machine like any other service line you provide to patients." Eckes replied, "I'd rather use our capital for other purposes . . . especially when Kerwin is willing to use his capital. This is a no-brainer for me . . . . Relator replied, "If you hire me, you will have someone on your team who has done the whole soup to nuts roll out of SRT into a clinic, without using the SkinCure model. Do it the right way in the first place." Eckes concluded the discussion on SkinCure and its SRT program by saying, "I'd have to look at our agreement [with SkinCure] to see if we can even do that, you know, add a SRT machine without them even involved."

146.     Relator's July 2019, colloquy with Eckes was a precursor to his later covered, protected  conduct that resulted in his retaliatory discharge. Even at the interview stage, Relator was telling the CEO of Pinnacle that the SkinCure SRT Turnkey Implementation Program was improper.

147.     Relator was hired as Pinnacle's Chief Growth Officer and began work on September 3, 2019, the same day Pinnacle purchased Murfreesboro Dermatology. Relator had another face-to-face conversation with Eckes about the SkinCure SRT Program during the second week of September 2019. At that time, Eckes told relator that, "We, [Pinnacle], have committed to place several SkinCure, SRT-100 machines different clinics in return for a 47% share of the reimbursements from third party payers, including Federal and State healthcare programs. Relator again told Eckes that the SkinCure program was improper. On September 16, 2019, Pinnacle purchased Bell Meade Dermatology in Bell Meade, Tennessee. Dr. Jay Smith, dermatologist and

-100-

Mohs Surgeon, working at both Tennessee Pinnacle locations, informed Relator that Pinnacle had decided to bring the SkinCure SRT Program to its just acquired Murfreesboro clinic. During a September 2019 conversation, Dr. Smith told Relator that , "SkinCure does it all, they pay for the expensive SRT machine with all the bells and whistles, they pay for the construction remodel [the lead lined treatment room] and they bring their own radiation technician. All I need to do is refer the patients to them, and everybody splits the money."

148.    Eckes told Relator in either September or October 2019, that he had "pulled the trigger for the SkinCure agreement for Murfreesboro. We should be up and going by November 2019." On that occasion Relator told Eckes. "You know my thoughts on SkinCure . . . ." Eckes then said, "I hope it all is above board because we are putting one in Minneapolis and one in Bell Meade. I have commitments on hitting certain EBITDA numbers and SkinCure . . . [is] a big part of hitting those numbers I have committed to hitting with the [Pinnacle] Board. It's a big nut to hit, so we have to execute on the plans I submitted to the Board."

149.    Defendant, Eckes, the CEO of Pinnacle, was far more interested in hitting his financial numbers to please the Chicago Pacific private equity investors who controlled the Board of Directors of Pinnacle, in 2019 and 2020, than complying with the law or caring for the best medical interests of Pinnacle's cancer patients.

150.    Dr. Smith expressed his concerns to Relator that he did not believe that the Belle Meade clinic had sufficient patients to justify a SkinCure owned SRT-100 machine. Smith also told Relator that he had expressed the same concerns to Pinnacle's Regional Vice President, Barbara Dominic. Her reply was that, "Well Chad [Eckes] says otherwise and one is going in there."  The bottom line: Pinnacle's executives and Board of Directors made medical decisions for

financial reasons driven by profits, not the medical needs or best interests of Pinnacle's cancer patients.

151. As Chief Growth Officer for Pinnacle, Relator had first hand knowledge of the preparation, installation, operation and billing procedures for the SkinCure SRT machine at Pinnacle's Murfreesboro clinic. SkinCure did the following at Murfreesboro:

    (1)    purchased and paid for a SRT-100-Vision superficial radiation therapy machine at no charge to Pinnacle;

    (2)    designed, constructed and paid for a lead lined treatment room at Pinnacle's Murfreesboro clinic where patients referred by Pinnacle to SkinCure were treated using the SkinCure SRT-100 machine;

    (3)    solicited, interviewed, and hired a board certified radiation therapy technician, paid her salary, provided her benefits, paid her withholdings and placed her at Pinnacle's Murfreesboro clinic at no cost to Pinnacle;

    (4)    prepared and filed all Tennessee registrations and paid registration fees for the SkinCure owned, SRT-100 , machine installed at no cost to Pinnacle;

    (5)    prepared invoices and submitted such invoices to Federal and State healthcare programs for payment, using Pinnacle's Tax ID Number and its CMS, Medicare Provider/Supplier Billing Number at no charge to Pinnacle;

    (6)    paid Pinnacle its 47% share of all third party payer reimbursements, including reimbursements from Federal and State healthcare programs.

152. The SkinCure radiation therapy technician at the Murfreesboro clinic was Kathleen Robertson. She was interviewed, selected and hired by SkinCure without input from Pinnacle. One day, she just showed up at Pinnacle's Murfreesboro clinic. She wore a lab shirt with the SkinCure logo on it with "SkinCure" embossed under the logo. Ms. Robertson was the only person who operated the SkinCure SRT-100 machine form the time it was installed and operational, until Relator's employment with Pinnacle was unlawfully terminated on March 18,

2020. She exercised complete dominion and control over the SkinCure SRT machine, its function and operation, providing superficial radiation therapy to Pinnacle's patients referred to SkinCure for such treatment. Kathleen Robertson was the radiation safety officer at Pinnacle's Murfreesboro clinic November 2019 until March 18, 2020, when Relator was fired.

153.     The details of SkinCure's procedure and preparation of fraudulent billing and invoices for SRT treatment for submission to Federal and State healthcare programs was the following:

(1)     The patient was seen by a Pinnacle dermatologist at its Murfreesboro clinic;

(2)     The treating dermatologist decided if the patient's skin cancer could be treated using SkinCure's SRT-100 machine, and, if so, would mark the area of the body to be treated;

(3)     A the dermatologist's order, the patient would be escorted to the SkinCure, radiation therapy techician, Kathleen Robertson, for SRT treatment;

(4)     Using the SkinCure owned SRT machine, Ms. Robertson would make machine settings, determine the time of treatment and select particular machine appurtenances to administer superficial radiation therapy to the area of the body marked by the dermatologist;

(5)     Once SRT treatment was completed, Ms. Robertson then accessed the Pinnacle Electronic Medical Access billing software, ("EMA"), and entered into the patient's chart, the CPT Codes for the treatment services that she had just provided to the patient;

(6)     Later that day of perhaps the next day, SkinCure billing personnel from its Burr Ridge, Illinois home office accessed the patient's chart at the Murfreesboro clinic, through EMA, to obtain billing information for a particular patient;

(7)     The Burr Ridge billing personnel then prepared a bill for submission to any third party payers, including Federal and State healthcare programs, using the Pinnacle's, Medicare/Medicaid,

-103-

Provider/Supplier Billing Number;

(8) The Burr Ridge billing person submitted the bill to the third party payer including, Federal and State healthcare programs for payment;

(9) Third party payers, including Federal and State healthcare programs paid SkinCure directly for invoices it submitted, using the Pinnacle's, Medicare/Medicaid, Provider/Supplier Billing Number;

(10) Pinnacle relied upon SkinCure to prepare invoices and bills for SRT treatment it provided to Pinnacle's patients, submit the bills and invoices to third party payers, including Federal and State healthcare programs and then collect the reimbursements and pay the 47% share to Pinnacle; and,

(11) SkinCure paid Pinnacle its 47% share of the reimbursements it received from Federal and State healthcare programs.

The bills submitted by SkinCure's Burr Ridge billing personnel to Federal and State healthcare programs for payment were fraudulent because the SRT treatment services being billed were obtained due to kickbacks paid by SkinCure to Pinnacle in exchange for its unlawful referral of patients to SkinCure at Pinnacle's Murfreesboro clinic.

### 4. Material Admissions Relator Gleaned From Sensus Account Executive, Amanda Redden

154. Amanda Redden, Sensus Account Executive stationed in Nashville continued to call on Relator over the next two years until she left the employ of Sensus in about September 2019. She was trying to sell Sensus SRT machines to the dermatology practices of Tennessee Dermatology. During Relator's communications with Redden, she told him about the SRT-100 machines that had been placed in states other than Tennessee. Relator asked her, "How are you able to hit your numbers?" She replied, "SkinCure is behind it . . . with their turnkey, no financial risk to the dermatologist, program." Redden told Relator that SkinCure had placed SRT-100

-104-

machines in Los Angles, California, at Demitir Dermatology in Louisiana, at multiple locations

with Piedmont Plastic Surgery and Dermatology throughout North Carolina, a practice in Jackson,

Tennessee, Dermatology Specialists in Huntsville, Alabama and at practices in Durham and

Charlotte, North Carolina and two practices in Greenville, South Carolina.

**5.    Federal And State Healthcare Programs Only Paid Reimbursements For SRT-100 Treatment Because They Were Unaware Of Defendant's Submission Of Fraudulent Invoices For Payment**

155.    Federal and State healthcare programs, not knowing of defendants' violations of

*Stark* and AKS and their knowing submission of false, fraudulent invoices for payment, paid such

invoices; have done so since October 2016 and continue to do so. Had such healthcare programs

known about such violations of law and the knowing submissions of such false and fraudulent

invoices for payment, they would not have paid defendants one dime.

**E.    Defendants' Elaborate Coverup Of Their Fraud And Conspiracy**

**1.    The Very Name "SkinCure Oncology" Is A Fraudulent Deception**

156.    The defendant conspirators' coverup of their fraud began at the inception of

SkinCure, when its deceptive name–"SkinCure Oncology"–was selected. SkinCure does not

provide medical oncology services. SkinCure does not likely have in its employ even one single

person who is a trained, licensed medical oncologist or radiation oncologist. SkinCure is a sales

organization marketing superficial radiation therapy services, and selling them by paying bribes

and kickbacks in exchange for unlawful patient referrals from its co-conspirator dermatologists,

through its unlawful SRT Turnkey Implementation Program.

157.    Why would SkinCure represent itself to be an oncology service provider, when it

is not? To appear to be a physician group, practicing medicine, providing physician, medical

services to hide and coverup its unlawful scheme of: (1) paying bribes and kickbacks to co-conspirator, dermatologists to gain access to their patients; (2) receiving unlawful referrals of such patients–in violation of *Stark*; (3) having SkinCure employed radiation therapy technicians administer SRT treatment to such patients, using SkinCure owned SRT-100 superficial radiation machines; (4) knowingly submitting fraudulent invoices to Federal and State healthcare programs for such SRT treatments, using co-conspirator, dermatologists' Tax ID and Medicare, Provider/Supplier Billing Numbers; (5) collecting reimbursement for such services from Federal and State healthcare programs; (6) unlawfully sharing such reimbursements based on the volume and value of such patient referrals to SkinCure; and, (7) unlawfully misrepresenting to federal and state agencies the true ownership of the SRT-100 machines providing such radiation services, by filling false registrations of such machines, among other unlawful activities.

2. **SkinCure And Its Co-conspirator Dermatologists Misrepresent Ownership Of The SRT-100 Superficial Radiation Machines**

158. SkinCure and its co-conspirator, dermatologists have misrepresented who actually owns the $495,000, SRT-100 machines places in such co-conspirator's clinics. SkinCure's SRT Turnkey Implementation Program contract documents state plainly that, although a SRT-100 machine will be placed in a co-conspirator's office, ownership of such machine remains with SkinCure.[134] Such contract documents also provide that SkinCure will prepare and file, and pay filing fees to the appropriate state agency to register each SRT-100 machine placed in a co-conspirator's office. SkinCure and its co-conspirators prepare and execute SRT-100 registration documents that either expressly or impliedly, falsely state or suggest that the SRT-100 machines

---

[134] See Exhibit E, "Terms And Conditions, Section 1.2(a)," (CREGER00159).

-106-

are owned by the co-conspirator dermatologist, not SkinCure.[135]

159.    Why would SkinCure and its co-conspirators falsely state or suggest that SkinCure is not the legal owner of the SRT-100 machines? There are at least three reasons, First, SkinCure, not the co-conspirator dermatologist is the one providing SRT treatment to the patients using the SkinCure owned SRT-100 machine operated by the SkinCure employed radiation therapy technician at the co-conspirator dermatologist's clinic. SkinCure is not a qualified Medicare Provider/Supplier of DHS and  does not presently possess, nor has it ever possessed, a Medicare Provider/Supplier Billing Number. SkinCure is not qualified or authorized to bill any Federal or State healthcare program, including, but not limited to, Medicare, for any item of DHS in its own name. SkinCure misrepresented its ownership of the SRT-100 machines to make it appear that the co-conspirator dermatologist owned the machine and provided SRT radiation treatment to its own patients.

160.    Second, if SkinCure tried to claim that it is a *bona fide* leasor[136] of the SRT-100 machine placed in the clinic of a co-conspirator, dermatologist, it could not even argue any entitlement to an exemption or "Safe Harbor," if the Government discovered that it was actually operating equipment that it had purportedly leased to its co-conspirator, dermatologists for a lease amount that took into account the volume and value of referrals.[137]

161.    Third, to promote the cover-up, it was essential that the co-conspirator,

---

[135]    See ¶¶ 41, 143(g) herein.

[136]    SkinCure is not a *bona fide* leasor of the SRT-100 machine because it had no discrete lease amount in the SRT Turnkey Implementation Program contract documents with it co-conspirator dermatologists.

[137]    42 C.F.R. § 411.357(b)(2); 42 C.F.R. § 1001.952(c)(1)(3)&(5).

-107-

dermatologist appear to own and operate the SRT-100 machine and then bill Federal and State healthcare programs for radiation treatment services performed using it. This provided SkinCure and its conspirator, dermatologists with the added benefit that the false billings for SRT treatment were spread out among many different authorized healthcare providers, who actually possessed valid Medicare/Medicaid Provider/Supplier, Billing Numbers. If SkinCure, which was not authorized to provide DHS, and at all material times lacked a Medicare/Medicaid, Privoder/Supplier Billing Number sent Federal and State healthcare programs invoices for SRT in its own name, they would have been rejected..

### 3. SkinCure And Co-conspirator Dermatologists Filed, Or Conspired To File, False Or Misleading SRT-100 Machine Registration Documents With The Various States

162. Every State requires that radiological equipment employed for medical purposes be registered with a designated State agency. The public policy behind this requirement is to protect the public from the unauthorized or inappropriate use of radiation equipment. Under its SRT Turnkey Implementation Program, SkinCure undertook responsibility to register the SRT-100 machines, which it placed in its co-conspirator's clinics.[138] SkinCure and its co-conspirator dermatologists violated State law in two material ways. First, when registering the machines, with full approval and agreement of its co-conspirators, SkinCure either falsely stated or falsely inferred that each SRT-100 machine was owned by the co-conspirator dermatologist. Second, SkinCure either falsely stated or falsely inferred on the State registration documents that a co-conspirator dermatologist employee controlled or operated the SRT-100 machine. In truth, the

---

[138] See Exhibit E, Terms & Conditions, Section 2.8, (CREGER00162; and See Exhibit B, (CREGER00032).          .

-108-

SkinCure employed, radiation therapy technician operated and exercised complete dominion and control over the SRT-100 machine placed by SkinCure at each co-conspirator's clinic. Co-conspirator, dermatologists were complicit in such false representations, in that, they each allowed their names, or the names of their dermatology practices, to be placed by SkinCure on the State registration documents that contained material false statements about the ownership, control and operation of the SRT-100 machines being registered.[139]

(a)     **SkinCure's False Registration Documents To State of Georgia**

163.     Relator knows of several examples of such false SRT-100 documents being filed by SkinCure on behalf of its co-conspirator dermatologists. For example, Relator has obtained from the State of Georgia Healthcare Facility Regulation Division a copy of two inspection reports completed on September 18 & 30, 2019, at defendant Cole Dermatology & Aesthetics Center, PC, 3525 Holcomb Bridge Road, Suite 100, Peachtree Corners, Georgia 30092.[140] Each inspection report required informant to provide the name of the entity, which was the "Provider or Supplier" of the X-Ray services. On each form, SkinCure identified Cole Dermatology & Aesthetic, PC as the provider or supplier of X-Ray services, which was a false statement. No Cole Dermatology employee ever operated the SkinCure owned SRT-100 machine placed at its clinic. At all times, such SRT-100 was operated and under the exclusive dominion and control of the SkinCure employed radiation therapy technician  placed at Cole Dermatology's clinic by SkinCure.

---

[139]     See Exhibit S, (CREGER00253).                          .

[140]     See Exhibit V,  Two State of Georgia Inspection Reports concerning Sensus, SRT-100 Vision Superficial X-Ray System, (CREGER00262-00263).

**(b)** **SkinCure's, Pinnacle's And Dr. Lapinski's False Statements To The State of Illinois**

164.     SkinCure filed a false and misleading X-Ray equipment registration document

for an SRT-100 machine, Serial No.: 1903-2126, located at Pinnacle's clinic at 1124 Essington,

Rd., Joliet, IL 60435-8423, with the State of Illinois, Emergency Management Agency on

September 13, 2019.[141] Such registration contained a material false statement inferring that

Pinnacle Dermatology owned, operated and maintained dominion and control over such SRT-100

machine. In the registration document, SkinCure falsely identified "Administrator: Paula K.

Lapinski, M.D." Relator was employed by Pinnacle on September 13, 2019, and has personal

knowledge that Dr. Lapinski, did not own, operate or exercise dominion and control over the

SRT-100 placed at Pinnacle's Joliet, Illinois clinic by SkinCure. Based on personal first hand

knowledge, Dr. Lapinski was not the administrator for such SRT-100 machine. Furthermore,

Pinnacle did not own, operate or maintain dominion or control over the SRT-100 machine. At all

material times, SkinCure owned, operated and maintained dominion and control over such SRT-

100 machine and was the "Administrator" of such SRT-100 machine. To coverup its fraudulent

activity and conspiracy, SkinCure's identity is nowhere to be found on the Illinois document

registering the SRT-100 machine, owned by SkinCure and over which SkinCure maintained

operation, dominion, control and administration.

165.     At about the same time, two additional and similarly false and misleading Illinois

registration documents were filed by SkinCure for two SkinCure owned SRT-100 machines

placed at Pinnacle clinics located at: (1) 2500 W. Higgins Rd., Ste. 1040, Hoffman Estates, IL

---

[141]     See Exhibit K, Registrations of SRT-100 machine at Pinnacle Joliet, I, (CREGER00228).

60169-2049, (SRT-100, Serial No.:1903-2124); and, (2) 10720 165th St., Orland Park, IL 60467-8714, (SRT-100, Serial No.:1903-2116).[142] The Orland Park registration is most interesting and misleading because it identifies the "Facility Contact:" as "Pam Malik, Implementation Mgr." Relator has first hand knowledge that Pam Malik was employed by SkinCure at all material times and was its employee overseeing the preparation and installation of SRT-100 machines in co-conspirator dermatologists' clinics all over the country. In the Pinnacle, Orland Park, SRT-100, Illinois registration document, Pam Malik is misleadingly never identified as a SkinCure employee. From the information contained on such registration document, which was incomplete, the only reasonable inference is that Ms. Malik was a Pinnacle employee. Such inference, which was part of SkinCure's coverup about its ownership of the SRT-100 machine placed at Pinnacle's Orland Park clinic, was false.

166. SkinCure has placed at least six additional SRT-100 machines at non-Pinnacle, dermatology clinics in Illinois with similarly false and misleading information about who owns the SRT-100 machines and who has dominion, control and administration of the machines:

(1)     Dermassociates, Ltd., 3608 W. Main St.. Belleville, IL, 62226-6225; (Serial No.: 1705-2031); Registration Date: 8/31/2017;

(2)     Southern Illinois Dermatology, 220 N. Park Ave., Ste 2, Herrin, IL 62948-3150; (Serial No.: 1806-2079); Registration Date: 10/22/2018;

(3)     Musick Dermatology, 4948 Benchmark Centre Drive, Swansea, IL 62226-2027; (Serial No.: 1806-2071); Registration Date: 11/27/2018;

(4)     Schaberg Dermatology, 4949 Autumn Oaks Dr., Maryville, IL 62062-8557; (Serial No.: 1909-2151); Registration Date: 2/19/2021;

---

[142]     See Exhibit T, Registrations of SRT-100 machines at Pinnacle Orland Park and Hoffman Estates, (CREGER00254-00255).

(5)     Summit Dermatology & Aesthetic Surgery, 1S210 Summit Ave., Oakbrook Terrace, IL 60181-3933; (Serial No.: 2003-2176); Registration Date: 6/3/2021; and,

(6)     Illinois Dermatology Institute, 901 N. Elm St., Ste250, Hinsdale, IL 60521-3647; (Serial No.: 1912-2159); Registration Date: 8/26/2020.[143]

**(c)     SkinCure's False SRT-100 Registrations In Tennessee**

167.    On about March 20, 2019, SkinCure submitted a certified X-Ray Equipment Registration Document to the State of Tennessee, Department of Environment and Conservation, Division of Radiological Health on behalf of The Skin Wellness Center in Knoxville for an SRT-100 machine, Serial No.: 1812-2104, which SkinCure had placed at The Skin Wellness Center clinic.[144] Such document contained material false statements. First, SkinCure's certification that The Skin Wellness Center owned the SRT-100 machine, bearing Serial No.: 1812-2104 was false.[145] SkinCure owned the machine. When Relator visited The Skin Wellness Center on June 30, 2019, he was told by defendant, Dr. Meredith Overholt, that such SRT-100 machine was furnished to her clinic free of charge by SkinCure, which retained ownership of the machine and further retained the right to remove the machine from her clinic if did not produce sufficient revenue.

168.    Second, SkinCure falsely certified that Meredith Overholt was the "Radiation Safety Officer or Person in charge of x-ray equipment." SkinCure conveniently, and with deliberate calculation, left Overholt's title, "Dr.," off the SRT-100 registration form, lest including

---

[143]     See Exhibit U, Six Illinois SRT-100 Registrations, (CREGER00256-00261).

[144]     See Exhibit S, State of Tennessee Registration of X-Ray Equipment Document, (CREGER00253).

[145]     *Id.*

-112-

it would raise any suspicions that a physician would condescend to function in such a capacity, when such functions are almost always fulfilled and performed by the person maintaining dominion and control over the X-Ray equipment and actually operating it to provide radiation therapy to patients. That person was not Meredith Overholt, a/k/a, Dr. Meredith Overholt, owner of The Skin Wellness Center but the SkinCure radiation therapy technician. SkinCure's certified statements otherwise on an official State of Tennessee registration document were false. In it contract, SkinCure was obligated to provide its Practice Partner with a "radiation safety officer."[146]

169.    SkinCure lied about who owned the SRT-100 that it placed at The Skin Wellness Center and about who was the "Safety Officer" and "person in charge of x-ray equipment," as part of its nationwide coverup. SkinCure was hiding from Federal and State healthcare programs the identify of who was actually providing DHS in the form of superficial radiation therapy services. SkinCure could not bill for those services in its own name. At no material time, has SkinCure been a qualified Medicare Provider/Supplier of DHS. At no material time, has SkinCure ever possessed a valid Medicare Provider/Supplier Billing Number.

170.    But to perpetrate their fraudulent billing scheme against Federal and State healthcare programs, SkinCure had to make it appear that their co-conspirator dermatologists owned the SRT-100 machines and provided radiation therapy services to their patients.  To further its fraudulent scheme, SkinCure had to misrepresent to the various states in the SRT-100 registration documents that an employee of the co-conspirator dermatologist was the "radiation

---

[146]    See Exhibit E, Terms & Conditions, Section 1.4 "Personnel. After consultation with the Practice, SkinCure shall provide to the Practice the services of a radiation safety officer. . . . (CREGER00160).

safety officer," when in truth such officer was employed by SkinCure. Why did SkinCure make such false representation? They did so to fraudulently bill for SkinCure provided, radiation therapy services under their co-conspirator dermatologists' Medicare Provider/Supplier Billing Number. For their unlawful billing scheme, SkinCure and its co-conspirator dermatologists were handsomely rewarded. In Dr. Overholt's case, at The Skin Wellness Center, SkinCure took 60% of the Federal or State healthcare program reimbursement, while Dr. Overholt and The Skin Wellness Center received 40% of such reimbursement. Dr. Overholt told Relator that she received 40% of the reimbursement for no cost or capital outlay in exchange for referring her patients to SkinCure for SRT treatment. Dr. Overholt, Dr. Grande and The Skin Wellness Center's contract with SkinCure gave them a financial interest in SkinCure–their receipt from SkinCure of bribes and kickbacks and 40% share of the Federal and State healthcare program reimbursements for SRT treatment–which made their patient referrals to SkinCure a *Stark* violation.

171.    The Skin Wellness Center, Dr. Overholt and Dr. Grande accepted bribes and kickbacks from SkinCure in violation of the Anti-Kickback Statute. During Relator's visits with Dr. Overholt on June 30 and July 17, 2019, she admitted receiving from SkinCure at The Skin Wellness Center, the following at no charge: (1) an SRT-100 Vision machine, valued at $495,000; (2) a radiation therapy technician employed by SkinCure; (2) design and construction of a lead-lined treatment room to house the SRT-100 machine and safely provide superficial radiation therapy to her patients; (3) a medical physicist to calibrate and set up the SRT-100 machine; (4) billing services to Federal and State healthcare programs and to other third party payers; (5) registration of the SRT-100 with the State of Tennessee; and, (6) a share of the reimbursement from Federal and State healthcare programs, which would increase based on the volume and value

of her patient referrals to SkinCure.

**4.      SkinCure Became Each Co-conspirator Dermatologist's Agent
To Register SRT-100 Machines With State Agencies And To Bill
Federal and State Healthcare Programs and Other Third Party
Payers**

172.    Why would SkinCure demand within the terms of its SRT Turnkey

Implementation Program that it become the agent for each co-conspirator dermatologist for

purposes of registering SRT-100 machines and to bill Federal and State healthcare programs?[147]

There is one simple reason: to maintain tight control over the fraud and conspiracy narrative.

SkinCure could not run the risk of allowing any co-conspirator to tell Federal or State healthcare

programs the truth about its bribes and kickbacks paid to co-conspirators or its unlawful fee

sharing arrangement with co-conspirator dermatologists. SkinCure could not prepare truthful,

State, SRT-100 registration documents and allow the States to learn, or to place on an official

State Record, that SkinCure was the owner of the SRT-100 machine and supplier and provider of

superficial radiation therapy services to its co-conspirator, dermatologist's patients. And why is

that? Because SkinCure was not a qualified Medicare Provider/Supplier and did not possess a

Medicare Billing Number. So even though SkinCure provided such SRT services, it was not

qualified to bill for those services in its own name.

173.    SkinCure had to maintain exclusive control over its fraudulent billings submitted

to Federal and State healthcare programs to control the narrative and cover up its fraudulent

scheme from the Government.

174.    Moreover, SkinCure had to control registrations of the SRT-100 machines with

---

[147]      See Exhibit E, "Terms And Conditions, Section 1.3," ((CREGER00159-00160).

-115-

the various state agencies to hide from Federal and State healthcare programs that: (1) SkinCure owned the SRT-100 machine providing SRT treatment; and, (2) SkinCure, not the co-conspirator dermatologist, was providing the SRT treatment services being billed to Federal and State healthcare programs. Control of such registrations was essential to SkinCure's cover up and to preserve its false representations to such healthcare programs that dermatologist co-conspirators were providing such SRT services.

## 5. SkinCure And Co-Conspirator Dermatologists Made The Terms Of Their Fraudulent Business Arrangement Secret And Confidential

175.   SkinCure and so-conspirator dermatologists made their business arrangement secret and confidential. Why would they do that? A reasonable inference is that they knew that their scheme was unlawful and they did not want to divulge its terms. Certainly, they did not want the Government to discover that SkinCure was paying its co-conspirator dermatologists bribes and kickbacks and at least 40% of the reimbursements received from Federal and State healthcare programs. They also did not want the Government to know about the financial interest that SkinCure's SRT Turnkey Implementation Program gave each co-conspirator dermatologist in SkinCure through bribes and kickbacks received, and their compensation arrangement including their unlawful sharing of such reimbursements.[148]

## VII. Truthfully Certifying Compliance With Stark And AKS Is A Condition Of Payment Under Federal Healthcare Law, Including The False Claims Act

176.   In a frequently cited, important decision, from the United States District Court, Middle District of Tennessee, the Court held that the defendants' continued participation in the

---

[148]   See Exhibit E, Program Services Agreement, Principal Terms ¶ 1(a)(b)(c), (CREGER00155) and see Exhibit B, (CREGER00032-00090, 00115-00124)

Medicare program constituted an "implied certification that [they] will abide by and adhere to all statutes, rules and regulations governing the program.[149] Each time SkinCure and its co-conspirator defendants submitted a claim to a Federal or State healthcare program related to or derived from their knowing violations of such statutes, rules and regulations, they violated the implied certification or "continuing adherence to the requirements for participation in the program[s]."[150] In another important opinion, another federal district court held that, both the mere submission of claims for payment, statutorily prohibited by *Stark* and the submission of claims with false certifications of compliance with *Stark* and AKS, violate the False Claims Act.[151]

177.    In the certification section of every Medicare enrollment application, every physician must certify, among other things, that they "understand that payment of a claim is conditioned upon the claim and the underlying transaction complying with the Federal Anti-Kichback Statute . . . [and] . . . the *Stark Law* . . . . I will not knowingly order and/or certify an item and/or service . . . that allows a false or fraudulent claim to be presented to Medicare."[152]

178.    SkinCure and all of its co-conspirator defendants knew that the claims for payment presented to Federal and State healthcare programs for SRT services provided by SkinCure were based on, and procured by, unlawful  bribes and kickbacks paid by SkinCure to its co-conspirator dermatologist defendants. Each defendant knew at the time such claims were

---

[149]    *United States ex rel. Pogue v. American Healthcare, Inc.*, 914 F. Supp. 1507, 1509 (M.D. Tenn. 1996).

[150]    *Id.*

[151]    *Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017 (S.D. Tex. 1998).

[152]    Medicare Enrollment Application, CMS 8550 at Section 8.

-117-

presented for payment that the bribes and kickbacks they received from SkinCure included, but were not limited to: (1) placement at no charge of a $495,000 SRT-100 machine in each co-conspirator dermatologist's clinic; (2) provision of a radiation therapy technician at no charge; (3) provision of design and construction of a lead lined treatment space at the co-conspirator dermatologists's clinics at no charge; (4) provision of registration services for the SRT-100 machine with appropriate State agencies and payment of registration fees at no charge; (5) provision of a medical physicist to set up, calibrate and maintain such calibration for the SRT-100 at no charge; (6) provision of billing and collection services for reimbursements for SRT treatment services, including, but not limited to, Federal and State healthcare programs; and, (7) reliance upon SkinCure to adjust the co-conspirator dermatologist's reimbursement share based on the volume and value of such reimbursements. Such claims were also based on co-conspirator dermatologist defendants' unlawful referrals of their patients to SkinCure for SRT treatment, when such defendants knew they had an unlawful financial interest in SkinCure and further knew that they did not fall within a *Stark* Law exception. All defendants, including the venture capital defendants, at the time they provided millions of dollars in loans to SkinCure and to Pinnacle to fund the fraudulent scheme knew about the foregoing bribes and kickbacks and the unlawful referral of patients.

179. By their knowing and willful presentment of false and fraudulent invoices to Federal and State healthcare programs–which defendants knew at the time of presentment to be false and in violation of *Stark* and AKS–defendants are each guilty of a false, implied certification to Federal and State healthcare programs. A truthful certification of compliance with *Stark* and AKS, is a condition of receiving reimbursement funds from Federal and State healthcare

-118-

programs.[153] False certification of compliance with *Stark* and AKS is a *prima facie* violation of the False Claims Act.[154]

180.    By their false certifications to Federal and State healthcare programs, defendants were not even entitled to present invoices to Federal or State healthcare programs for payment. Had Federal or State healthcare programs been aware of defendants; false certifications, at the time of presentment of their false invoices for payment, such claims would have been rejected. And Federal and State healthcare programs would have paid SkinCure and its co-conspirator dermatologists–not one dime.

181.    SkinCure and each of its co-conspirator dermatologists, knew, should have known or recklessly disregarded the fact that the invoices for SRT treatment that they submitted to Federal and State healthcare programs for payment were false and that they had no legal right to submit such invoices for payment. SkinCure and each of its co-conspirator, dermatologist defendants, knew, should have known or recklessly disregarded the fact that they were obligated to repay Federal and State healthcare programs for all reimbursements they received from such programs due to their submission of false and fraudulent invoices.[155] Each defendant has willfully refused to repay Federal and State healthcare programs, the monies such defendants have unlawfully received.[156]

---

[153]    *United States ex rel. v. Lewis*, 264 F. Supp. 2d 612, 614 (N.D. Ill. 2003), aff'd 517 F. 3d 449 (7th Cir. 208).

[154]    *Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017 (S.D. Tex. 1998).

[155]    31 U.S.C. § 3729(a)(C)&(G).

[156]    *Id.*

-119-

**VIII.** **Many Defendants Herein Made Knowing, False Certifications To The Small Business Administration Beginning In March 2020 To Unlawfully Obtain Loans Under the Federal Paycheck Protection Program Or To Unlawfully Obtain Loan Forgiveness Or Both**

      **A.** **Defendants' Ineligibility Due To Violations Of Federal Law When They Applied For PPP Loans And PPP Loan Forgiveness**

182.    In late March 2020, in response to the Corona Virus pandemic, Congress enacted the CARES ACT, which included the Paycheck Protection Program, (PPP), launched in April 2020, in an effort to provide economic relief to small businesses affected by the pandemic via loans administered through the Small Business Administration. One big plus for obtaining a PPP Loan was that small business owners could apply for forgiveness for some, or all, of the loan amount. Eligibility for PPP Loans and PPP Loan forgiveness required the applicant to certify that they were in compliance with federal and state law.

183.    To apply for a PPP Loan, a small business had to submit a Paycheck Protection Program Borrower Application Form.[157] The loan application contained "CERTIFICATIONS AND AUTHORIZATIONS," that were material and prerequisite to enable a small business to be eligible to qualify for a PPP Loan., including, but not limited to:

> "●     I have read the statements included in this form, including the Statements Required by Law and Executive Orders, and I understand them.
>
> ●     The applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Corona Virus Aid, Relief, and Economic Security Act (CARES Act) (the PAYCHECK PROTECTION PROGRAM RULE).

\*            \*            \*

---

[157]    See Exhibit C, SBA Form 2483 (04/20), (CREGER00125-00147).

-120-

- I will comply whenever applicable, with the civil rights and other limitations in this form.

  \*                    \*                    \*

- The Applicant is not engaged in any activity that is illegal under federal, state or local law.

  \*                    \*                    \*

- I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under law, including under 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 U.S.C. 645 By imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally funded institution, under 18 U.S.C. 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000."[158]

Businesses engaged in any illegal activity are ineligible for SBA loans.[159]

184.    Beginning in April 2020, SkinCure and 58 other defendants made knowing, false, fraudulent certifications and applications for PPP Loans from SBA, received at least $30,268,600 total in such loans, and in most cases received unlawful forgiveness from SBA for the loans.[160] Such defendants falsely certified that they were in compliance with federal and state laws at the time their PPP Loan and Loan Forgiveness Applications were submitted to SBA. At the time of their certifications, such defendants were not in compliance with federal or state law and thus

---

[158]    *Id.*

[159]    13 C.F.R. § 120.110(h).

[160]    See Exhibit X, List of Defendants who made false, fraudulent certifications and application to receive PPP Loans and forgiveness, for which they were ineligible, with documents supporting loan and forgiveness amounts for each such defendant. (CREGER00269-00283). See also Exhibit CC, (CREGER00305-00410).

-121-

ineligible for PPP Loans or Loan forgiveness.

185.    These defendants were guilty of violations of *Stark Law*, AKS and the False
Claims Act at the time they submitted PPP Loan Applications. SkinCure knew it had paid, and
each co-conspirator dermatologist, defendant knew they had received bribes and kickbacks, in
exchange for the unlawful referral of their patients to SkinCure for it to provide SRT
services–DHS. Such defendants knew that SkinCure had paid them bribes including: (1)
placement at no charge of a $495,000 SRT-100 machine in each co-conspirator dermatologist's
clinic; (2) provision of a radiation therapy technician at each co-conspirator dermatologist's clinic
at no charge; (3) provision of design and construction of a lead lined treatment space at the co-
conspirator dermatologists's clinics at no charge; (4) provision of registration services for the
SRT-100 machine with appropriate State agencies and payment of registration fees at no charge;
(5) provision of a medical physicist to set up, calibrate and maintain such calibration for the
SkinCure placed, SRT-100 at no charge; (6) provision of free billing and collection services for
reimbursements for SRT treatment services, including, but not limited to, Federal and State
healthcare programs; and, (7) reliance upon SkinCure to adjust the co-conspirator dermatologist's
reimbursement share based on the volume and value of such reimbursements.  Co-conspirator
dermatologists also knew they had a  financial interest in SkinCure at the time they referred their
patients to SkinCure for superficial radiation therapy, making such referrals *Stark* violations.

186.    Such knowledge by these particular defendants, made their certifications in their
PPP Loan Applications that, "The Applicant is not engaged in any activity that is illegal under
federal, state or local law."–false statements. They were in violation of *Stark*, AKS and the False
Claims Act and they knew it. Under 13 C.F.R. § 120.110(h), they were ineligible to receive any

-122-

PPP Loan from SBA. They lied to SBA to get PPP Loans and lied again to SBA to obtain PPP

Loan forgiveness.

187.     These particular defendants were also in default of the terms of the PPP Loan

Note they signed to unlawfully obtain such loan, which included the following terms:

> "4.     DEFAULT:
>
> Borrower is in default under this Note if Borrower does not make a
> payment when due under this Note, or if Borrower or Operating Company:
>
> A.     Fails to do anything required by this Note and other Loan
> Documents;
>
> *                    *                    *
>
> D.     Does not disclose, or anyone acting on their behalf does not
> disclose, any material fact to Lender or SBA;
>
> E.     Makes, or anyone on their behalf makes, a materially false or
> misleading representation to Lender or SBA;
>
> *                    *                    *
>
> 9.     GENERAL PROVISIONS:
>
> A.     All individuals and entities signing this Note are jointly and
> severally liable."[161]

Defendants failed to disclose to the Lender or SBA that they had received bribes and kickbacks

from SkinCure, in violation of *Stark*, AKS and the False Claims Act. Such failures placed each

defendant receiving a PPP Plan in default on the Note.  Had the Lender or SBA known of each

defendant's default, their respective PPP Loans would have been called immediately and

defendant's required to pay the amount loaned back in its entirety.

---

[161]     See Exhibit C, PPP Loan Note, (CREGER00142-00147).          .

188.     The defendants who obtained PPP Loans also sought forgiveness for such loans.

To do so, they had to submit an appropriate form to SBA for evaluation and approval.[162] Both PPP

Loan Forgiveness Forms required defendants to each make the following representations and

certifications:

> "I understand that if the funds were knowingly used for unauthorized
> purposes, the federal government may pursue recovery of loan amounts
> and/or civil or criminal fraud charges."
>
> *                    *                    *
>
> The information provided in this application and the information provided
> in all supporting documents and forms is true and accurate in all material
> respects. I understand that knowingly making a false statement to obtain
> forgiveness of an SBA guaranteed loan is punishable under the law,
> including 18 U.S.C. 1001 and 3571 by imprisonment of not more than five
> years and/or a fine of up to $250,000; under 15 U.S.C. 645 by imprisonment
> of not more than two years and/or a fine of not more than $5,000; and, if submitted
> to a federally funded institution, under 18 U.S.C. 1014 by imprisonment of not
> more than thirty years and/or a fine of not more than $1,000,000.
>
> *                    *                    *
>
> SBA may direct a lender to disapprove the Borrower's loan forgiveness application
> if SBA determines that the Borrower was ineligible for the
> PPP loan.[163]

189.     SkinCure and each co-conspirator, dermatologist defendant that received a PPP

Loan, falsely certified that it was entitled to PPP Loan forgiveness. First, every penny of every

PPP Loan received was knowingly used for unauthorized purposes by such defendants because

not one of these defendants was eligible to receive a PPP Loan. Such defendants knew they were

---

[162]     See Exhibit D, PPP Loan Forgiveness Application Form 3508EZ (06/20), and
Loan Forgiveness Application Revised June 16, 2020, (CREGER00148-00152).

[163]     *Id.*

-124-

not eligible at the time they made application to receive PPP Loans. They also knew they were not eligible at the time they made application for forgiveness of their fraudulently obtained PPP Loans.

190.    Second, the information contained in each defendant's applications for PPP Loans and loan forgiveness was not "true and correct in all material respects," as set forth previously in detail in §§ 184-187 hereinabove. Third, if the SBA had known of such defendants false and misleading information contained in their respective applications for PPP Loans and loan forgiveness, SBA would have directed each such defendant's lenders to deny their PPP Loan applications, disapprove forgiveness and call for the immediately repayment of the full loan amounts of any PPP Loans that had been made to such defendants in addition to seeking other civil and criminal penalties.

B.    **Defendants' Ineligibility Due To Their Existing Violations And Conspiracy To Violate, State Laws When They Applied For PPP Loans And PPP Loan Forgiveness**

191.    When the dermatologist defendants named herein signed  the SRT Turnkey Implementation Program Contract, they combined and conspired with SkinCure to: (1) violate State, X-Ray Equipment, Registration laws and regulations and (2) violate SkinCure's obligation to pay Illinois sales tax on its $123,750,000 in purchases of about 250 Sensus, SRT-100-Vision, superficial radiation therapy machines. How did these State Law violations occur?

192.    SkinCure's SRT Turnkey Implementation Program, among other things, called for SkinCure to purchase and place in its co-conspirator dermatologist's clinic an SRT-100 machine to be used by the SkinCure employed radiation therapy technician to treat such dermatologist's

-125-

patient referrals.[164] The contract specifically stated that title and ownership of the SRT-100 machine would at all times remain with SkinCure, which had the right to remove the machine at anytime if it was not generating sufficient revenue.[165]

193.    When they entered into such Program, each co-conspirator dermatologist agreed that SkinCure would prepare X-Ray Equipment registration forms and pay registration fees to the various State agencies, to ensure that the SRT-100 machine placed by SkinCure in their clinics was properly and lawfully registered. SkinCure prepared and submitted to such State agencies false registration forms, which were false in two particulars.[166] First, SkinCure lied on the registration forms about its ownership of the SRT-100 machines, and instead falsely stated that the dermatologist or dermatology practice was the true owner. The best evidence of this violation is the Tennessee registration for the SRT-100 machine that SkinCure placed at The Skin Wellness Center in Knoxville. SkinCure prepared and submitted the registration, which falsely stated that The Skin Wellness Center owned the SRT-100 machine bearing Serial No.: 1812-2104.[167] Additionally, SkinCure falsely and misleadingly stated on such registration form that Meredith Overholt was the "Radiation Safety Officer or Person in charge of x-ray equipment." Truthfully, the SkinCure radiation therapy technician was the "Radiation Safety Officer or Person in charge of . . . [the SRT-100 machine]," which SkinCure placed at The Skin Wellness Center.

---

[164]    See Exhibit B, (CREGER00032-00090) and Exhibit E, (CREGER00155-00160).

[165]    See Exhibit E, Program Services Agreement, Principal Terms, ¶ 6,(CREGER00156) and Terms & Conditions, Section 1.2(a), (CREGER00159).                .

[166]    See Exhibit B, (CREGER00032, 00051, 00053. 00115-00124).

[167]    See Exhibit S, Tennessee Registration for SRT-100 machine bearing Serial No.: 1812-2104, (CREGER00253).

-126-

194.   SkinCure's misrepresentations and failure to disclose its ownership and that its employed radiation therapy technician was the "Radiation Safety Officer and Person in charge of the . . . [SRT-100 machine]," were material false statements designed to cover-up ownership of each machine SkinCure purchased and placed in a co-conspirator, dermatologist's clinic. Such material misrepresentations were essential for SkinCure to conspire with other defendants to fail to disclose its ownership of such SRT-100 machines and thus further its unlawful scheme to fail to pay lawful Illinois sales tax due on about $123,750,000 in SRT-100 machine purchases.

195.   Therefore, SkinCure and every co-conspirator dermatologist who applied for PPP Loans or PPP Loan forgiveness were in violation of Federal and State law at the time of such applications and thus ineligible for PPP Loans or loan forgiveness. Such defendants have failed to repay the United States the respective amounts of the PPP Loans they received.

### C.   Specific Examples Of Defendants, Fraudulently Receiving PPP Loans And Loan Forgiveness

196.   SkinCure's CEO, Kerwin Brandt, admitted to Relator on November 8, 2017, in Brentwood, Tennessee that SkinCure had SRT Turnkey Implementation Program Contracts in place Branson, Missouri and Stow, Ohio. Those contracts were with defendant, Branson Dermatology, a/k/a Shaffer Rainey Dermatology and Summit Dermatology and Aesthetic Surgery respectively. In March 2019, at the American Academy of Dermatology meeting in Washington, D. C. Brandt further admitted that SkinCure had its fraudulent contract with defendant, Tareen Dermatology, in Minneapolis, Minnesota. Before March 2020, SkinCure also had unlawful contracts with defendants, The Skin Wellness Center, Knoxville, Tennessee, Total Skin & Beauty Dermatology, Birmingham, Alabama and Piedmont Plastic Surgery & Dermatology, Charlotte,

-127-

North Carolina.

197.    Upon signing contracts with SkinCure, each of these defendants violated Federal and State Law, making them ineligible to receive PPP Loans. With full knowledge of their ineligibility to receive PPP Loans or loan forgiveness, these defendants and SkinCure falsely and fraudulently applied for PPP Loans and received loan forgiveness as follows:

|     | **Defendant** | **Loan Amount** | **Date Approved** | **Date Forgiven** |
| --- | --- | --- | --- | --- |
| (1) | Branson Derm. | $59,328 | 4/16/2020 | 10/28/2021 |
| (2) | Tareen Derm. | $457,400 | 4/6/2020 | 12/8/2020 |
| (3) | Skin Wellness | $638,000 | 4/4/2020 | 1/28/2021 |
| (4) | Total Skin | $854,000 | 4/8/2020 | 2/11/2021 |
|     | Total Skin | $928,607 | 2/19/2021 | 12/9/2021 |
| (5) | Piedmont | $3,742,482 | 4/13/2020 | 6/9/2021 |
| (6) | Lehigh Valley | $239,793 | 5/4/2020 | 4/22/2021 |
|     | Lehigh Valley | $228,840 | 2/25/2021 | 11/3/2021 |
| (7) | Oakland Hills | $141,807 | 5/1/2020 | 2/11/2021 |
| (8) | SkinCure | $2,417,500 | 4/14/2020 | 6/11/2021.[168] |

This is only a partial listing of the more than 59 defendants, which Relator has discovered through independent research, who are guilty of both Federal and State healthcare program fraud and PPP Loan fraud.[169]

---

[168]    See Exhibit AA, Select Documents With PPP Loan Approval And Forgiveness Dates, (CREGER00288-00300).

[169]    See Exhibit CC, List Of Fraudulent PPP Loans, (CREGER00305-410).

-128-

## IX. Damages To the Federal Government - Pro Form Damage Estimates 2016 To Present

198.    In a recent press release, SkinCure admitted that "as of July 2022," it had treated 42,000 patients since October 2016 with SRT-100, superficial radiation therapy. [170] Seventy percent of all non-melanoma skin cancers occur in patients who are 65 years of age or older ant thus Medicare beneficiaries. According to Sensus Healthcare, manufacturer of the SRT-100, each such patient presenting with non-melanoma skin cancer, presents with 1.25 lesions on average.[171] Medicare pays, on average, $7,352.13, per lesion treated with superficial radiation therapy.[172] Considering these SkinCure admissions, since October 2016, SkinCure and its co-conspirator dermatologists have  received reimbursements from Federal and State healthcare programs totaling at least $270,000,000.[173]

199.    Every penny of such reimbursements were procured by SkinCure's unlawful bribes and kickbacks paid to its co-conspirator dermatologists and their unlawful referrals of their patients to SkinCure for SRT-100 treatment.

200.    SkinCure and its co-conspirator dermatologist, defendants were in violation of *Stark*, AKS, the False Claims Act, State X- Ray Equipment Rules and Regulations and State of Illinois sales tax law at the time of their respective applications for PPP Loans and forgiveness. Such defendants' federal and state law violations made them ineligible for PPP Loans or

---

[170]    See Exhibit W, July 2022 SkinCure Press Release, (CREGER00264-00268).

[171]    See Exhibit M, (CREGER00231).

[172]    See Exhibit Y, SkinCure SRT-100 Reimbursement Table, (CREGER00284).

[173]    42,000 Patients x 0.70 x 1.25 Lesions/Patient x $7,352.13/Lesion = $270,190,778.

-129-

forgiveness. More than $30,000,000 in PPP Loans and forgiveness were unlawfully obtained by SkinCure and 58 of its co-conspirator dermatologists. Such defendants were each ineligible to receive a PPP Loan or loan forgiveness. Each defendant's representations of eligibility for PPP Loans and loan forgiveness were intentional, knowing false statements.

## X.    Conclusion

201.    Defendants knowingly submitted false and fraudulent invoices and claims to Federal and State healthcare programs for payment and unlawfully applied for PPP Loans and loan forgiveness that total more than $300,000,000. Under the False Claims Act the United States in entitled to damages, treble the fraud amount, ($900,000,000), together with separate and additional penalties on each of 42,000 claims submitted to Federal and State healthcare programs, which penalties could approach another One Billion ($1,000,000,000) Dollars. Defendants are guilty of breach of the public trust in the healthcare system, breach of the public fisc and massive fraud and conspiracy against the United States.[174]

202.    Defendants' fraud and conspiracy against the United States is accelerating exponentially from its inception in October 2016, by SkinCure's own admissions.[175] In September 2017, defendants' unlawful scheme had treated 1000 patients; by November 2018, 5000 patients; by July 2019, 10,000 patients; by January 2020, 15,000 patients; by January 2021, 25,000

---

[174]    Additionally, defendants have combined and conspired with SkinCure to defraud the State of Illinois out of at least $8,971,875 in sales taxes, at 7.25%, due on SkinCure's purchases of about 250 SRT-100 machines totaling about $123,750,000. See Exhibit O, (CREGER00240), SkinCure March 8, 2022, press release.

[175]    See Exhibit B, (CREGER00095-00096).

-130-

patients;[176] by July 2022, 42,000 patients.[177]

## **CLAIMS FOR RELIEF**

## **COUNT I**
## **VIOLATION OF FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(A)**
**Presentment Of False or Fraudulent Claims, Statements, or Records**

203.    Relator re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

204.    This is a civil action brought by Relator on behalf of the United States against Defendants under the Federal False Claims Act, 31 U.S.C. §§ 3729-3733.

205.    Under the False Claims Act, 31 U.S.C. § 3729(a)(1), as amended on May 20, 2009, Defendants have violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval.

206.    Defendants presented, or caused to be presented, false or fraudulent claims for payment or approval to CMS or its agents, or other Government Health Care Programs.

207.    Defendants knew, or were deliberately ignorant or reckless in not knowing, that these claims were false.

208.    Government Payors, unaware of these violations of the Federal FCA and the false or fraudulent nature of the claims presented or caused to be presented, and in reliance on the accuracy of these claims, paid for purported medical products and services performed for patients insured by

---

[176]    *Id.*

[177]    See Exhibit W, (CREGER00266).

-131-

federally funded health insurance programs, including Medicare, Medicaid, and CHAMPUS/TRICARE. Had the United States known that the bills presented by Defendants, or that Defendants caused to be presented, were false or fraudulent, payment would not have been made for such claims.

209. Defendants' unlawful conduct occurred from on or around October 10, 2016, until the present and is continuing, and has caused the United States to suffer damages.

210. Some Defendants, as previously alleged, since April 2020, presented false applications to the Small Business Administration, containing false certifications of eligibility, to unlawfully obtain Paycheck Protection Program loans and loan forgiveness under the CARES Act.

211. Accordingly, Defendants are liable for treble damages, civil penalties, and the cost of this action under 31 U.S.C. § 3729(a)(1) and (3), together with statutory attorneys fees, interest and prejudgment interest.

## COUNT II
## VIOLATION OF FEDERAL FALSE CLAIMS ACT, 31 U.S.C.§3729(a)(1)(B)
## Creation or Use of False Statements or Records Material To A False or Fraudulent Claim

212. Relator re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

213. This is a civil action brought by Relator on behalf of the United States against Defendants under the Federal False Claims Act, 31 U.S.C. §§ 3729-3733.

214. Under the False Claims Act, 31 U.S.C. § 3729(a)(1), as amended on May 20, 2009, Defendants have violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

-132-

215. Defendants made, used, or caused to be made or used false or fraudulent records or statements.

216. These false records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to CMS or its agents, or other Government Health Care Programs.

217. Some Defendants, as previously alleged, since April 2020, presented false applications to the Small Business Administration, containing false certifications of eligibility, to unlawfully obtain Paycheck Protection Program loans and loan forgiveness under the CARES Act.

218. Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.

219. Government Payors, unaware of these violations of the Federal FCA and the false or fraudulent nature of the records or statements made, used, or caused to be made or used, and in reliance on the accuracy of these records or statements or the false or fraudulent claims to which these records or statements were material: (1) paid for purported medical products or services performed for patients insured by federally funded health insurance programs, including Medicare, Medicaid, and CHAMPUS/TRICARE, (2) made Paycheck Protection Program loans and loan forgiveness to certain Defendants as previously alleged. Had the United States known that the bills presented by Defendants, or that Defendants caused to be presented, were false or fraudulent, payment would not have been made for such claims.

220. Defendants' unlawful, healthcare fraud, occurred from on or around October 10, 2016, until the present and is continuing, and has caused the United States to suffer damages. Defendants' Paycheck Protection Program loan and loan forgiveness fraud, occurred from on or around April 1, 2020, until the present and is continuing, and with such fraudulent conduct causing the United States

-133-

to suffer damages.

221.     Accordingly, Defendants are liable for treble damages, civil penalties, and the cost of this action under 31 U.S.C. § 3729(a)(1)(B), together with statutory attorneys fees, interest and prejudgment interest.

**COUNT III**
**VIOLATION OF THE FEDERAL FALSE CLAIMS ACT,**
**31 U.S.C. § 3729(a)(1)(G)**
**Knowingly Causing and Retaining Overpayments Received From the Government**

222.     Relator re-alleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

223.      This is a civil action brought by Relator on behalf of the United States against Defendants under the Federal False Claims Act, 31 U.S.C. §§ 3729-3733.

224.     Under the False Claims Act, 31 U.S.C. § 3729(a)(1), as amended on May 20, 2009, Defendants have violated 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the government.   The term "obligation" means:

> an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment. . . .

31 U.S.C. § 3729(b)(3).

225.     Further, in the health care context, such as Medicaid, the term "obligation" is further defined as "[a]ny overpayment retained by a person after the deadline for reporting and returning the

-134-

overpayment . . . is an obligation (as defined [in the Federal FCA]),” and an overpayment must be reported “[b]y the later of . . . 60 days after the date on which the overpayment was identified . . . or the date any corresponding cost report is due, if applicable.”  Patient Protection and Affordable Care Act, Pub. L. 111-148, § 6402(d)(2), (3), 124 Stat. 119, 755 (codified at 42 U.S.C. § 1128J(d)).

226.    Defendants made, used, or caused to be made or used false or fraudulent records or statements, as alleged above.

227.    These false records or statements were material to, or intended to conceal, avoid, or decrease, an obligation to pay or transmit money or property to CMS or its agents, or other Government Health Care Programs or to the Small Business Administration under the CARES Act, Paycheck Protection Program.

228.    Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.

229.    Defendants concealed or improperly avoided or decreased an obligation to pay or transmit money or property to CMS or its agents, or other Government Health Care Programs or to the Small Business Administration under the CARES Act, Paycheck Protection Program.

230.    Defendants knew, or were deliberately ignorant or reckless in not knowing, that its conduct concealed or improperly avoided or decreased an obligation to pay or transmit money or property to CMS or its agents, or other Government Health Care Programs or to the Small Business Administration under the CARES Act, Paycheck Protection Program.

231.    Through the acts described above, Defendants intentionally or knowingly failed to remit funds, or intentionally or knowingly caused its co-conspirator Defendants to fail to remit funds, improperly paid by Government Payors.  Defendants intentionally and improperly caused medical

-135-

providers to charge Government Payors for products and/or procedures that were tainted by violations of the *Stark* Law and Anti-Kickback Statute, and otherwise not properly reimbursable. Defendants intentionally and knowingly failed to remit loan proceeds, which they unlawfully received from the United States under the CARES Act, Paycheck Protection program.

232.    Defendants' knowing or intentional concealment or failure to report funds that were improperly received from Government Payors for services that were tainted by kickbacks and unlawful referrals and otherwise not properly reimbursable, constitute unlawful avoidances or decreases of obligations to pay money owed to the United States. And Defendants' knowing or intentional concealment or  failure to report loan proceeds and loan forgiveness, which they unlawfully received from the United States under the CARES Act, Paycheck Protection program, constitute additional unlawful avoidances or decreases of obligations to pay money owed to the United States.

233.    Defendants' unlawful conduct occurred from on or around October 10, 2016, until the present and is continuing, and has caused the United States to suffer damages.

234.    Accordingly, Defendants are liable for treble damages, civil penalties, and the cost of this action under 31 U.S.C. § 3729(a)(1)(G), together with statutory attorneys fees, interest and prejudgment interest.

### COUNT IV
### VIOLATION OF FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(G)
### Creating or Using False or Fraudulent Claims, Statements, and Records To
### Avoid Refunding Monies  To The Government

235.    Relator re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

-136-

236.    This is a civil action brought by Relator on behalf of the United States against Defendants under the Federal False Claims Act, 31 U.S.C. §§ 3729-3733.

237.    Under the False Claims Act, 31 U.S.C. § 3729(a)(1), as amended on May 20, 2009, Defendants have violated 31 U.S.C. § 3729(a)(1)(C)&(G) by conspiring to (1) knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval; (2) make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim; (3) make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay, transmit or refund money or property to the government.

238.    Defendants' conspiracy caused to be presented, false or fraudulent claims for payment or approval to CMS or its agents, or other Government Health Care Programs.

239.    Defendants knew, or were deliberately ignorant or reckless in not knowing, that their conspiracy to present false or fraudulent claims to CMS or its agents was unlawful.

240.    Government Payors, unaware of defendants' conspiracy or of these violations of the Federal FCA and the false or fraudulent nature of the claims presented or caused to be presented, and in reliance on the accuracy and purported truthfulness of these claims, paid for purported medical services performed for patients insured by federally funded health insurance programs, including Medicare, Medicaid, and CHAMPUS/TRICARE. Had the United States known that the bills presented by Defendants, or that Defendants caused to be presented through their conspiracy, were false or fraudulent, payment would not have been made for such claims.

241.    Defendants' unlawful, healthcare fraud and conspiracy occurred from on or around October 10, 2016, until the present and is continuing, with such fraudulent conduct causing the United

-137-

States to suffer damages. Defendants' Paycheck Protection Program loan and loan forgiveness fraud, occurred from on or around April 1, 2020, until the present and is continuing, with such fraudulent conduct causing the United States to suffer damages.

242.     Accordingly, Defendants are liable for treble damages, civil penalties, and the cost of this action under 31 U.S.C. § 3729(a)(1)(G).

**COUNT V**
**VIOLATION OF FEDERAL FALSE CLAIMS ACT, 31 U.S.C.§3729(a)(1)(B)**
**Submission of Express and Implied False Certifications With Presentments of**
**False Invoices to The Government For Payment**

243.     Relator repeats and re-alleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

244.     In pertinent part, the False Claims Act establishes liability for "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

245.     Compliance with Stark and Anti-Kickback Laws were explicit conditions of payment under Federal Healthcare Programs. For each of the years 2016 to the present, Defendants certified compliance with the Federal Stark and Anti-Kickback Laws on their annual cost reports submitted to Federal Healthcare Programs. The Defendants' certifications of compliance with Federal Stark and Anti-Kickback Laws were knowingly false. In reliance on the Defendants' express and implied certifications, the United States made payments to Defendants under Federal Healthcare Programs. If the United States had known that Defendants' certifications were false, Federal payments under the Federal Healthcare Programs would not have been made to Defendants for each of the years in question. Defendants' false records, false statements, and false certifications have caused the United

-138-

States to suffer damages. Defendants' unlawful conduct and conspiracy occurred from on or around October 10, 2016, until the present and is continuing, and have caused the United States to suffer damages.

246. Certain Defendants, as alleged hereinabove, made applications to the Small Business Administration for loans and loan forgiveness under the CARES Act, Paycheck Protection Program. Such applications required Defendants to certify that they were in compliance with all Federal and State laws to be eligible for such loans and for loan forgiveness. Such certifications by Defendants were material to their eligibility to receive PPP Loans and loan forgiveness. Certain Defendants falsely certified that they were in compliance with all Federal and State laws on their applications for PPP Loans and on their applications for loan forgiveness. At the time of such false certifications, these certain Defendants knew, should have known or recklessly disregarded that they were in material violations of both Federal and State laws and thereby ineligible to receive PPP Loans or loan forgiveness. Defendants' unlawful, PPP Loan fraud occurred from on or around April 1, 2020, until the present and is continuing, and has caused the United States to suffer damages.

247. Accordingly, Defendants are liable for treble damages, civil penalties, and the cost of this action under 31 U.S.C. § 3729(a)(1)(G).

**COUNT VI**
**VIOLATION OF FEDERAL FALSE CLAIMS ACT, 31 U.S.C.§3729(a)(1)(C)**
**Conspiring To Submit False Claims, or To Create or Use False Records or Statements**
**Material To a False Claim, or To Knowingly Retain Overpayments**
**From The United States, or Create and Use False Records To Avoid An**
**Obligation To Refund Monies To The United States or To Submit Express or Implied False**
**Certifications To The United States**

248. Relator re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

-139-

249. The False Claims Act establishes liability for "any person who . . . conspires to commit a violation of subparagraph (A), (B), (D), (E), (F) of (G)."[178]

250. Through the acts described above the defendants, and each of them, acting in concert with each other, conspired to submit false claims to the United States or to create or use false records or statements material to a false claim or to knowingly retain overpayments from the United States or create or use false records to avoid an obligation to refund monies to the United States or to submit express or implied false certifications to the United States.

251. The defendants covered up and hid their conspiracy from the United States and at no material time did the United States have knowledge of defendants' said unlawful conduct.

252. As a result, the United States was unaware of the false claims submitted and caused by the defendants and the United States paid and continues to pay claims that would not have been paid if the defendants' unlawful conduct was known to the United States.

253. Defendants' unlawful conduct and conspiracy occurred from on or around October 10, 2016, until the present and is continuing, and have caused the United States to suffer damages.

254. Accordingly, Defendants are liable for treble damages, civil penalties, and the cost of this action under 31 U.S.C. § 3729(a)(1)(C).

## COUNT VII
## Retaliation Against Relator in Violation of 31 U.S.C. § 3730(h)

255. Relator re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

256. In August 2019, during his employment interview, Relator began discussing his

---

[178] 31 U.S.C. § 3729(a)(1)(C).

opinion about the illegality of the SkinCure Turnkey Implementation Program with Pinnacle CEO, Chad Eckes, even before he was hired as Chief Growth Officer. Eckes told Relator that he was considering signing up for the SkinCure, SRT Turnkey Implementation Program. Relator replied and specifically told Eckes that if was hired as Chief Growth Officer, then Eckes would have an employee who was not a fan of the SkinCure Program because he did not think it was legal.

257.    Relator was hired by Eckes as Chief Growth Officer for Pinnacle and his first day on the job was September 3, 2019. Later in September 2019, Relator had another conversation with Eckes about the SkinCure program with Relator expressing skepticism about its legality. Relator told Eckes, "Let me handle SRT therapy at the practices and let's not do the SkinCure program." Eckes stated that he did not know if that was possible due to the extent of the on-going negotiations with SkinCure.

258.    Again in either late October or early November 2019, at about the time that the SkinCure owned, SRT-100-Vision machine was installed and became operational at Pinnacle's Murfreesboro Dermatology practice, Relator in a face-to-face meeting with Eckes in Nashville, expressed skepticism about the legality of the SkinCure program. Eckes remarked that the program was legal and Pinnacle was moving forward with it.

259.    During the late fall of 2019 and early winter of 2020 at Executive Leadership Team meetings, the topic of acquisitions of new dermatology practices was a constant theme. A recurring part of that theme was adding the SkinCure SRT Turnkey Implementation Program and the SkinCure SRT-100-Vision machine at any practice newly acquired by Pinnacle to enhance the practice's revenue stream.

260.    On about February 13, 2019, Relator had another telephone conversation with Eckes

-141-

when the topic of the SkinCure program came up. Relator on that occasion said to Eckes, "Are you sure that the SkinCure program is legitimate? Are you really sure?" Eckes told Relator, "I sure hope it is legal."

261.    Relator engaged in covered, protected conduct each of the three times, at least, that he warned Eckes that the SkinCure Turnkey Implementation Program was not legal. Eckes and Pinnacle were placed on notice by Relator with each warning, by reasonable inference, that Relator could be considering filing a False Claims Act case against Pinnacle.

262.    On March 13, 2020, Eckes called Relator and terminated his employment with Pinnacle. This firing and other retaliatory conduct against Relator were in violation of 31 U.S.C. § 3730(h) and were the proximate result of Relator's direct warnings to Eckes that the SkinCure Turnkey Implementation Program was illegal.

263.    As a direct and proximate result of this unlawful and discriminatory firing and other discriminatory conduct, Relator has suffered emotional pain and mental anguish, together with lost wages, lost bonuses lost benefits and special damages associated with his efforts to obtain alternative employment, in amounts to be proven at trial.

## COUNT VIII
## VIOLATION OF THE CALIFORNIA FALSE CLAIMS ACT

### CAL. GOV'T. CODE § 12650 *ET SEQ.*

264.    Relator re-alleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

265.    This count sets forth claims for treble damages and forfeitures under the California False Claims Act (the "California FCA").

-142-

266.    Defendants, violated the California FCA in the following ways:

a. Cal. Gov't. Code § 12651(a)(1): Defendants presented, or caused to be presented, false or fraudulent claims for payment or approval to the State or its agent; and Defendants knew, or were deliberately ignorant or reckless in not knowing, that these claims were false.

b. Cal. Gov't. Code § 12651(a)(2): Defendants made, used, or caused to be made or used false or fraudulent records or statements; these false records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to the State or its agents; Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.

c. Cal. Gov't. Code § 12651(a)(7): Defendants made, used, or caused to be made or used false or fraudulent records or statements, as alleged above; these false records or statements were material to, or intended to conceal, avoid, or decrease, an obligation to pay or transmit money or property to the State or its agents – including, but not limited to, an obligation to repay money or property defendants or their co-conspirator dermatologist had previously improperly received from the State; and Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false. Defendants concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or its agents; and Defendants knew, or were deliberately ignorant or reckless in not knowing, that their conduct concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the

-143-

State or its agents.

267.     The State of California, unaware of the fraudulent conduct and the falsity of the claims, approved, paid, and participated in payments made by the State, including the California Medicaid Program, or the State's agent for claims that otherwise would not have been allowed.

268.     Through the acts described above, Defendants intentionally or knowingly failed to remit funds, or intentionally or knowingly caused their co-conspirator's to fail to remit funds, improperly paid by Government Payors.  Defendants intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

269.     Defendants' knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

270.     Defendants' unlawful conduct occurred from on or around October 10, 2016, until the present and is on-going, has caused, and continues to cause, the State of California to suffer damages.

271.     Accordingly, Defendants are liable, jointly and severally, for treble damages, civil penalties, and the cost of this action under the California FCA, including Cal. Gov't. Code § 12651, together with Statutory attorneys fees, interest and prejudgment interest.

<u>**COUNT IX**</u>
<u>**VIOLATION OF THE CONNECTICUT FALSE CLAIMS ACT**</u>

-144-

**Conn. Gen. Stat. § 17b-301 et seq**.

272.     Relator re-alleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

273.     This count sets forth claims for treble damages and forfeitures under the Connecticut False Claims Act (the "Connecticut FCA").

274.     Defendants violated the Connecticut FCA in the following ways:

     a.     Conn. Gen. Stat. § 17b-301b(a)(1):  Defendants presented, or caused to be presented, false or fraudulent claims for payment or approval under a medical assistance program administered by the Department of Social Services, or its agent; and Defendants knew, or were deliberately ignorant or reckless in not knowing, that these claims were false.

     b.     Conn. Gen. Stat. § 17b-301b(a)(2):  Defendants made, used, or caused to be made or used false or fraudulent records or statements; these records or statements were material to, or intended to induce the payment of, false or fraudulent claims under a medical assistance program administered by the Department of Social Services, or its agent; Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.

     c.     Conn. Gen. Stat. § 17b-301b(a)(7):  Defendants made, used, or caused to be made or used false or fraudulent records or statements, as alleged above; these false records or statements were material to, or intended to

-145-

conceal, avoid, or decrease, an obligation to pay or transmit money or property to the State under a medical assistance program administered by the Department of Social Services, or its agent – including an obligation to repay money or property defendants or their co-conspirator dermatologists had previously improperly received under a medical assistance program administered by the Department of Social Services; and Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.

d. Conn. Gen. Stat. § 17b-301b(a)(8): Defendants concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State under a medical assistance program administered by the Department of Social Services, or its agent; and Defendants knew, or were deliberately ignorant or reckless in not knowing, that their conduct concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State under a medical assistance program administered by the Department of Social Services, or its agent.

275. The State of Connecticut, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid, and participated in payments made under a medical assistance program administered by the Department of Social Services or its agent for claims that otherwise would not have been allowed.

276. Through the acts described above, Defendants intentionally or knowingly failed to remit funds, or intentionally or knowingly caused their co-conspirators to fail to remit funds,

-146-

improperly paid under a medical assistance program administered by the Department of Social Services or its agent. Defendants intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

277. Defendants's knowing or intentional concealment and failure to report funds that were improperly received under a medical assistance program administered by the Department of Social Services for services that were not reasonable and medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

278. . Defendants' unlawful conduct occurred from on or around October 10, 2016, until the present and is on-going, has caused, and continues to cause, the State of Connecticut to suffer damages.

279. Accordingly, Defendants are liable jointly and severally for treble damages, civil penalties, and the cost of this action under Connecticut FCA, including Conn. Gen. Stat. §§ 17b-301b and 17b-301f, together with attorneys fees, interest and prejudgment interest.

## COUNT X
## VIOLATION OF THE FLORIDA FALSE CLAIMS ACT

### Fla. Stat. § 68.081 et seq.

280. Relator re-alleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

281. This count sets forth claims for treble damages and forfeitures under the Florida False Claims Act (the "Florida FCA").

282. Defendants violated the Florida FCA in the following ways:

-147-

a.  Fla. Stat. § 68.082(2)(a): Defendants presented, or caused to be presented, false or fraudulent claims for payment or approval to the State or its agent; and Defendants knew, or were deliberately ignorant or reckless in not knowing, that these claims were false.

b.  Fla. Stat. § 68.082(2)(b): Defendants made, used, or caused to be made or used false or fraudulent records or statements; these records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to the State or its agent; Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.

c.  Fla. Stat. § 68.082(2)(g): Defendants made, used, or caused to be made or used false or fraudulent records or statements, as alleged above; these false records or statements were material to, or intended to conceal, avoid, or decrease, an obligation to pay or transmit money or property to the State or its agents – including but not limited to, an obligation to repay money or property defendants or its co-conspirators had previously improperly received from the State; and Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.  Defendants concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or its agents; and  Defendants knew, or were deliberately ignorant or reckless in not knowing, that their conduct concealed or improperly avoided or decreased

-148-

an obligation to pay or transmit money or property to the State or its agents.

283.    The State of Florida, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid, and participated in payments made by the State, including the State of Florida Medicaid Program, or the State's agent for claims that otherwise would not have been allowed.

284.    Through the acts described above, Defendants intentionally or knowingly failed to remit funds, or intentionally or knowingly caused its Dermagraft clients to fail to remit funds, improperly paid by Government Payors.  Defendants intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

285.    Defendants's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

286.    Defendants's unlawful conduct occurred from on or around October 10, 2016, until the present and is continuing, and has caused, and continues to cause, the State of Florida to suffer damages.

287.    Accordingly, Defendants are liable for treble damages, civil penalties, and the cost of this action under the Florida FCA, including Fla. Stat. §§ 68.082(2), 68.085, and 68.086, together with attorney's fees, interest and prejudgment interest.

-149-

## COUNT XI

## VIOLATION OF THE GEORGIA TAXPAYER PROTECTION FALSE CLAIMS ACT
### Ga. Code Ann. § 23-3-121 et seq.

288.     Relator re-alleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

289.      This count sets forth claims for treble damages and forfeitures under the Georgia Taxpayer Protection False Claims Act (the "Georgia FCA") (prior to July 1, 2012, the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-186 et seq.).

290.     Defendants knowingly violated:

    a.      Ga. Code Ann. § 23-3-121(a)(1):  Defendants presented, or caused to be presented, false or fraudulent claims for payment or approval to the State or a local government, or their agent; and  Defendants knew, or were deliberately ignorant or reckless in not knowing, that these claims were false.

    b.      Ga. Code Ann. § 23-3-121(a)(2):  Defendants made, used, or caused to be made or used false or fraudulent records or statements; these records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to the State or a local government, or their agent; Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.

    c.      Ga. Code Ann. § 23-3-121(a)(7):  Defendants made, used, or caused to be made or used false or fraudulent records or statements, as alleged above; these false records or statements were material to, or intended to conceal,

-150-

avoid, or decrease, an obligation to pay or transmit money or property to the State or a local government, or their agent – including, but not limited to, an obligation to repay money or property defendants or their co-conspirators had previously improperly received from the State or a local government, or their agent; and Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false. Defendants concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or a local government, or their agent; and Defendants knew, or were deliberately ignorant or reckless in not knowing, that their conduct concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or a local government, or their agent.

291. The State of Georgia, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid, and participated in payments made by the State or a local government, including the State of Georgia Medicaid Program, or the State's agent for claims that otherwise would not have been allowed.

292. Through the acts described above, Defendants intentionally or knowingly failed to remit funds, or intentionally or knowingly caused their co-conspirators to fail to remit funds, improperly paid by Government Payors. Defendants intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

-151-

293.    Defendants's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

294.    Defendants's unlawful conduct occurred from on or around October 10, 2016, until the present, and is on-going and has caused, and continues to cause, the State of Georgia to suffer damages.

295.    Accordingly, Defendants are liable, jointly and severally, for treble damages, civil penalties, and the cost of this action under the Georgia FAC, including Ga. Code Ann. § 23-3-121, together with attorney's fees, interest and prejudgment interest.

**COUNT XII**
**VIOLATION OF THE ILLINOIS FALSE CLAIMS ACT**

**740 Ill. Comp. Stat. § 175/1 et seq**.

296.    Relator re-alleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

297.    This count sets forth claims for treble damages and forfeitures under the Illinois False Claims Act (the "Illinois FCA").

298.    Defendants violated the Illinois FCA in the following ways:

    a.    740 Ill. Comp. Stat. § 175/3(a)(1)(A):  Defendants presented, or caused to be presented, false or fraudulent claims for payment or approval to the State or its agent; and Defendants knew, or were deliberately ignorant or reckless in not knowing, that these claims were false.

-152-

b.      740 Ill. Comp. Stat. § 175/3(a)(1)(B):  Defendants made, used, or caused to be made or used false or fraudulent records or statements; these records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to the State or its agent; Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.

c.      740 Ill. Comp. Stat. § 175/3(a)(1)(G):  Defendants made, used, or caused to be made or used false or fraudulent records or statements, as alleged above; these false records or statements were material to, or intended to conceal, avoid, or decrease, an obligation to pay or transmit money or property to the State or its agents – including, but not limited to an obligation by SkinCure to pay 9% sales tax and annual use taxes on about 200, SRT-100-Vision machines, which its  purchased from the manufacturer, Sensus Healthcare, purchase price $495,000,  an obligation to repay money or property defendants or their co-conspirators had previously improperly received from the State; and Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.  Defendants concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or its agents; and  Defendants knew, or were deliberately ignorant or reckless in not knowing, that their conduct concealed or improperly avoided or decreased an obligation to pay or transmit money or property

-153-

to the State or its agents.

299.     The State of Illinois, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid and participated in payments made by the State, including the State of Illinois Medicaid Program, or the State's agent for claims that otherwise would not have been allowed.  The State of Illinois, at all material times was unaware of the purchase and true ownership by defendant, SkinCure, of about 200, SRT-100-Vision machines since October 10, 2016. Such purchases and ownership have generated sale taxes and annual use taxes together with penalties of at least $15,000,000, which sum trebled, SkinCure presently owes the State of Illinois.

300.     Through the acts described above, Defendants intentionally or knowingly failed to remit funds, or intentionally or knowingly caused its Dermagraft clients to fail to remit funds, improperly paid by Government Payors.  Defendants intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

301.     Defendants's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

302.     Defendants's unlawful conduct occurred from on or around October 10, 2016,, until the present and is on-going and  has caused, and continues to cause, the State of Illinois to suffer damages.

303.     Accordingly, Defendants is liable for treble damages, civil penalties, and the cost of

-154-

this action under the Illinois FCA, including 740 Ill. Comp. Stat. §§ 175/3 and 175/4, together with attorneys fee, interest and prejudgment interest.

## COUNT XIII
## VIOLATION OF THE INDIANA FALSE CLAIMS
## AND WHISTLEBLOWER PROTECTION ACT

### Ind. Code § 5-11-5.5-1 et seq.

304.    Relator re-alleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

305.    This count sets forth claims for treble damages and forfeitures under the Indiana False Claims and Whistleblower Protection Act (the "Indiana FCA").

306.    Defendants violated the Indiana FCA in the following ways:

a.    Ind. Code § 5-11-5.5-2(b)(1):  Defendants presented false claims to the State or its agent for payment or approval; Defendants knew, were deliberately ignorant or reckless in not knowing, or intended that these claims were false.

b.    Ind. Code § 5-11-5.5-2(b)(2):  Defendants made or used false records or statements; these false records or statements were made to obtain payment or approval of a false claim from the State or its agent; Defendants knew, were deliberately ignorant or reckless in not knowing, or intended that these records or statements were false; and Defendants intended they would be used to obtain payment or approval of a false claim from the State or its agent.

c.    Ind. Code § 5-11-5.5-2(b)(6):  Defendants made or used false records or

-155-

statements to avoid an obligation to pay or transmit property to the State or its agent; Defendants, were deliberately ignorant or reckless in not knowing, or intended that the records or statements were false; and Defendants knew and intended that these false records or statements would be made or used to avoid an obligation to pay or transmit property to the State or its agent.

307. The State of Indiana, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid, and participated in payments made by the State, including the State of Indiana Medicaid Program, or the State's agent for claims that otherwise would not have been allowed.

308. Through the acts described above, Defendants intentionally or knowingly failed to remit funds, or intentionally or knowingly caused their co-conspirators to fail to remit funds, improperly paid by Government Payors. Defendants intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

309. Defendants' knowing and intentional conduct constitutes an unlawful avoidance or decrease of an obligation to pay money owed to the State.

310. Defendants' unlawful conduct occurred from on or around October 10, 2016, until the present and is on-going, and has caused, and continues to cause, the State of Indiana to suffer damages.

311. Accordingly, Defendants are liable for treble damages, civil penalties, and the cost

-156-

of this action under the Indiana FCA, including Ind. Code §§ 5-11-5.5-2 and 5-11-5.5-6, together with attorney's fees, interest and prejudgment interest.

**COUNT XIV**
**VIOLATION OF THE LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW**

**La. Rev. Stat. § 46:438.1 et seq.**

312.     Relator re-alleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

313.     This count sets forth claims for treble damages and forfeitures under the Louisiana Medical Assistance Programs Integrity Law (the "Louisiana FCA").

314.     Defendants violated the Louisiana FCA in the following ways:

    a.     La. Rev. Stat. § 46:438.3(A):  Defendants presented, or caused to be presented, false or fraudulent claims for payment or approval to the State or its agent; and  Defendants knew, or were deliberately ignorant or reckless in not knowing, that these claims were false.

    b.     La. Rev. Stat. § 46:438.3(B):  Defendants made, used, or caused to be made or used false or fraudulent records or statements; these records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to the State or its agent; Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.

    c.     La. Rev. Stat. § 46:438.3(C):  Defendants made, used, or caused to be made or used false or fraudulent records or statements, as alleged above;

-157-

these false records or statements were material to, or intended to conceal, avoid, or decrease, an obligation to pay or transmit money or property to the medical assistance programs – including an obligation to repay money or property defendants or their co-conspirators had previously improperly received from the medical assistance programs; and Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false. Defendants concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the medical assistance programs; and Defendants knew, or were deliberately ignorant or reckless in not knowing, that their conduct concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the medical assistance programs.

315. Moreover, the Louisiana False Claims Act, La. Rev. Stat. § 46:438.2A, specifically provides that:

> No person shall solicit, receive, offer or pay any remuneration, including but not limited to kickbacks, bribes, rebates, or . . . payments, directly or indirectly, overtly or covertly, in cash or in kind, for the following:

(1) In return for referring an individual to a health care provider, … for the furnishing or arranging to furnish any good, supply, or service for which payment may be made, in whole or in part, under the medical assistance programs.

(2) In return for purchasing, leasing, or ordering, or for arranging for or recommending purchasing, leasing, or ordering, any good, supply, or service, or

-158-

facility for which payment may be made, in whole or in part, under the medical assistance programs.

      (3)    To a recipient of goods, services, or supplies, or his representative, for which payment may be made, in whole or in part, under the medical assistance programs.

316.    The State of Louisiana, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid, and participated in payments made by the State, including the State of Louisiana Medicaid Program, or the State's agent for claims that otherwise would not have been allowed.

317.    Through the acts described above, Defendants intentionally or knowingly failed to remit funds, or intentionally or knowingly caused their co-conspirators to fail to remit funds, improperly paid by Government Payors. Defendants intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

318.    Defendants' knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

319.    Defendants's unlawful conduct occurred from on or around October 10, 2016, until the present and is on-going and has caused, and continues to cause, the State of Louisiana to suffer

-159-

damages.

320.     Accordingly, Defendants are liable, jointly and severally, for treble damages, civil penalties, and the cost of this action under the Louisiana FCA, including La. Rev. Stat. § 46.438.6, together with attorneys fees, interest and prejudgment interest.

**COUNT XV**
**VIOLATION OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT**

**Mich. Comp. Laws § 400.601 et seq.**

321.      Relator re-alleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

322.     This count sets forth claims for treble damages and forfeitures under the Michigan Medicaid False Claim Act (the "Michigan FCA").

323.     Defendants violated the Michigan FCA in the following ways:

   a.     Mich. Comp. Laws § 400.607, § 7(1):  Defendants made, presented, or caused to be made or presented to an officer or employee of the State or its agent claims under the social welfare act; Defendants knew, or were deliberately ignorant or reckless in not knowing, that these claims were false.

   b.     Mich. Comp. Laws § 400.607, § 7(2):  Defendants made, presented, or caused to be made or presented claims under the social welfare act; Defendants knew, or were deliberately ignorant or reckless in not knowing, that the claims falsely represented that the goods or services for which the claims were made were not medically necessary in accordance with professionally accepted standards.

-160-

c.    Mich. Comp. Laws § 400.607, § 7(3):  Defendants made, used, or caused to be made or used false records or statements, as alleged above; these false statements were intended to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or its agents pertaining to claims under the social welfare act.

324.    The State of Michigan, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid, and participated in payments made by the State, including the State of Michigan Medicaid Program, or the State's agent for claims that otherwise would not have been allowed.

325.    Through the acts described above, Defendants intentionally or knowingly failed to remit funds, or intentionally or knowingly caused its co-conspirators to fail to remit funds, improperly paid by Government Payors.  Defendants intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

326.    Defendants's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

327.    Defendants' unlawful conduct occurred from on or around October 10, 2016, until the present and is on-going, and has caused, and continues to cause, the State of Michigan to suffer damages.

328.    Accordingly, Defendants are liable, jointly and severally, for damages, penalties, and

-161-

costs under the Michigan FCA, including Mich. Comp. Laws §§ 400.610a and 400.612, together with attorneys fees, interest and prejudgment interest.

**COUNT XVI**
**VIOLATION OF THE MINNESOTA FALSE CLAIMS ACT**

**Minn. Stat. § 15C.01 et seq.**

329.     Relator re-alleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

330.     This count sets forth claims for treble damages and forfeitures under the Minnesota False Claims Act (the "Minnesota FCA").

331.     Defendants violated the Minnesota FCA in the following ways:

    a.     Minn. Stat. § 15C.02(a)(1): Defendants presented, or caused to be presented, false or fraudulent claims for payment or approval to the State or its agent; and Defendants knew, or were deliberately ignorant or reckless in not knowing, that these claims were false.

    b.     Minn. Stat. § 15C.02(a)(2): Defendants made, used, or caused to be made or used false or fraudulent records or statements; these records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to the State or its agent; Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.

    c.     Minn. Stat. § 15C.02(a)(7): Defendants made, used, or caused to be made or used false or fraudulent records or statements, as alleged above; these false records or statements were material to, or intended to conceal, avoid,

-162-

or decrease, an obligation to pay or transmit money or property to the State or a political subdivision, or their agents – including an obligation to repay money or property defendants or their co-conspirators had previously improperly received from the State or a political subdivision, or their agents; and Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false. Defendants concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or a political subdivision, or their agents; and Defendants knew, or were deliberately ignorant or reckless in not knowing, that their conduct concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or a political subdivision, or their agents.

332.    The State of Minnesota, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid, and participated in payments made by the State, including the State of Minnesota Medicaid Program, or the State's agent for claims that otherwise would not have been allowed.

333.    Through the acts described above, Defendants intentionally or knowingly failed to remit funds, or intentionally or knowingly caused its Dermagraft clients to fail to remit funds, improperly paid by Government Payors. Defendants intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

-163-

334.     Defendants's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

335.     Defendants's unlawful conduct occurred from on or around October 16, 2016, until the present and is on-going, and has caused, and continues to cause, the State of Minnesota to suffer damages.

336.     Accordingly, Defendants are liable, jointly and severally, for treble damages, civil penalties, and the cost of this action under the Minnesota FCA, including Minn. Stat. §§ 15C.02 and 15C.12, together with attorneys fees, interest and prejudgment interest.

**COUNT XVII**
**VIOLATION OF THE NEW YORK FALSE CLAIMS ACT**

**N.Y. St. Fin. Law § 187 et seq.**

337.     Relator re-alleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

338.     This count sets forth claims for treble damages and forfeitures under the New York False Claims Act (the "New York FCA").

339.     Defendants violated the New York FCA in the following ways:

a.     N.Y. St. Fin. Law § 189(1)(a):  Defendants presented, or caused to be presented, false or fraudulent claims for payment or approval to the State or its agent; and Defendants knew, or were deliberately ignorant or reckless in not knowing, that these claims were false.

b.     N.Y. St. Fin. Law § 189(1)(b):  Defendants made, used, or caused to be

-164-

made or used false or fraudulent records or statements; these records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to the State or its agent; Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.

c.   N.Y. St. Fin. Law § 189(1)(f):  Defendants made, used, or caused to be made or used false or fraudulent records or statements, as alleged above; these false records or statements were material to, or intended to conceal, avoid, or decrease, an obligation to pay or transmit money or property to the State or a local government, or their agents – including an obligation to repay money or property defendants or their clients had previously improperly received from the State or a local government, or their agents; and Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.

d.   N.Y. St. Fin. Law § 189(1)(g):  Defendants concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or a local government, or their agents; and Defendants knew, or were deliberately ignorant or reckless in not knowing, that their conduct concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or a local government, or their agents.

340.   The State of New York, unaware of the fraudulent course of conduct and the falsity

-165-

of these claims, approved, paid and participated in payments made by the State or a local government, including the State of New York Medicaid Program, or their agent for claims that otherwise would not have been allowed.

341.    Through the acts described above, Defendants intentionally or knowingly failed to remit funds, or intentionally or knowingly caused their co-conspirators to fail to remit funds, improperly paid by Government Payors.  Defendants intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

342.    Defendants's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

343.    Defendants's unlawful conduct occurred from on or around October 10, 2016, until the present and is on-going, and has caused, and continues to cause, the State of New York to suffer damages.

344.    Accordingly, Defendants are liable for treble damages, civil penalties, and the cost of this action under the New York FCA, including N.Y. St. Fin. Law §§ 189 and 190, together with attorney's fees, interest and prejudgment interest.

## COUNT XVIII
## VIOLATION OF THE NORTH CAROLINA FALSE CLAIMS ACT

### N.C. Gen. Stat. § 1-605 et seq.

-166-

345.     Relator re-alleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

346.    his count sets forth claims for treble damages and forfeitures under the North Carolina False Claims Act (the "North Carolina FCA").

347.     Defendants violated the North Carolina FCA in the following ways:

a.     N.C. Gen. Stat. § 1-607(a)(1):  Defendants presented, or caused to be presented, false or fraudulent claims for payment or approval to the State or its agent; and  Defendants knew, or were deliberately ignorant or reckless in not knowing, that these claims were false.

b.     N.C. Gen. Stat. § 1-607(a)(2):  Defendants made, used, or caused to be made or used false or fraudulent records or statements; these records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to the State or its agent; Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.

c.     N.C. Gen. Stat. § 1-607(a)(7):  Defendants made, used, or caused to be made or used false or fraudulent records or statements, as alleged above; these false records or statements were material to, or intended to conceal, avoid, or decrease, an obligation to pay or transmit money or property to the State or its agents – including an obligation to repay money or property defendants or their co-conspirators had previously improperly received from the State; and Defendants knew, or were deliberately ignorant or

-167-

reckless in not knowing, that these records or statements were false. Defendants concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or its agents; and Defendants knew, or were deliberately ignorant or reckless in not knowing, that their conduct concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or its agents.

348.    The State of North Carolina, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid, and participated in payments made by the State, including the State of North Carolina Medicaid Program, or the State's agent for claims that otherwise would not have been allowed.

349.    Through the acts described above, Defendants intentionally or knowingly failed to remit funds, or intentionally or knowingly caused their co-conspirators to fail to remit funds, improperly paid by Government Payors.  Defendants intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

350.    Defendants's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

351.    Defendants' unlawful conduct occurred from on or around October 10, 2016, until the

-168-

present and is on-going, and has caused, and continues to cause, the State of North Carolina to suffer damages.

352.     Accordingly, Defendants is liable for treble damages, civil penalties, and the cost of this action under the North Carolina FCA, including N.C. Gen. Stat. §§ 1-607 and 1-610, togethere with attorneys fees, interest and prejudgment interest.

### COUNT XIX
### VIOLATION OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT

### Tenn. Code Ann. § 71-5-181 et seq.

353.     Relator re-alleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

354.     This count sets forth claims for treble damages and forfeitures under the Tennessee Medicaid False Claims Act (the "Tennessee FCA").

355.     Defendants violated the Tennessee FCA:

   a.     Tenn. Code Ann. § 71-5-182(a)(1)(A):  Defendants presented, or caused to be presented, false or fraudulent claims for payment or approval to the State or its agent under the Medicaid program; and  Defendants knew, or were deliberately ignorant or reckless in not knowing, that these claims were false.

   b.     Tenn. Code Ann. § 71-5-182(a)(1)(B):  Defendants made, used, or caused to be made or used false or fraudulent records or statements; these records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to the State or its agent under the medicaid

-169-

program; Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.

   c.   Tenn. Code Ann. § 71-5-182(a)(1)(D):  Defendants made, used, or caused to be made or used false or fraudulent records or statements, as alleged above; these false records or statements were material to, or intended to conceal, avoid, or decrease, an obligation to pay or transmit money or property to the State or its agent relative to the medicaid program – including an obligation to repay money or property defendants or their co-conspirators had previously improperly received from the State relative to the medicaid program; and   Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.   Defendants concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or its agent relative to the medicaid program; and Defendants knew, or were deliberately ignorant or reckless in not knowing, that their conduct concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or its agent relative to the medicaid program.

356.   The State of Tennessee, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid and participated in payments made by the State, including the State of Tennessee Medicaid Program, or the State's agent for claims that otherwise would not have been allowed.

-170-

357. Through the acts described above, Defendants intentionally or knowingly failed to remit funds, or intentionally or knowingly caused its clients to fail to remit funds, improperly paid by Government Payors. Defendants intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

358. Defendants's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

359. Defendants's unlawful conduct occurred from on or around October 10, 2016, until the present and is on-going, and has caused, and continues to cause, the State of Tennessee to suffer damages.

360. Accordingly, Defendants is liable for treble damages, civil penalties, and the cost of this action under the Tennessee FCA, including Tenn. Code Ann. §§ 71-5-182 and 71-5-183, together with attorney's fees, interest, and prejudgment interest.

## COUNT XX
## VIOLATION OF THE TEXAS MEDICAID FRAUD PREVENTION ACT
### Tex. Hum. Res. Code Ann. § 36.001 et seq.

361. Relator re-alleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

362. This count sets forth claims for treble damages and forfeitures under the Texas Medicaid Fraud Prevention Act (the "Texas FCA").

363. Defendants violated the Texas FCA:

-171-

a.      Tex. Hum. Res. Code Ann. § 36.002(1):  Defendants made or caused to be made false statements or misrepresentations that were material to permit people to receive benefits or payments under the Medicaid program that were not authorized or were greater than the benefits or payments that were authorized; and  Defendants knew, or were deliberately ignorant or reckless in not knowing, that the false statements or misrepresentations were material to permit people to receive benefits or payments under the Medicaid program that were not authorized or were greater than the benefits or payments that were authorized.

b.      Tex. Hum. Res. Code Ann. § 36.002(2):  Defendants concealed or failed to disclose information that permitted people to receive benefits or payments under the Medicaid program that were not authorized or that were greater than the benefits that were authorized; and Defendants knew, or were deliberately ignorant or reckless in not knowing, that the concealed information, or the information it failed to disclose, would permit people to receive benefits or payments under the Medicaid program that were not authorized or that were greater than the benefits that were authorized.

c.      Tex. Hum. Res. Code § 36.002(12):  Defendants made, used, or caused to be made or used false or fraudulent records or statements, as alleged above; these false records or statements were material to an obligation to pay or transmit money or property to the State or its agent under the Medicaid program – including an obligation to repay money or property the defendants

-172-

or their co-conspirators had previously improperly received from the State; and Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false. Defendants concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or its agent under the Medicaid program; and Defendants knew, or were deliberately ignorant or reckless in not knowing, that their conduct concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or its agent under the Medicaid program.

364.    The State of Texas, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid, and participated in payments made by the State, including the State of Texas Medicaid Program, or the State's agent for claims that otherwise would not have been allowed.

365.    Through the acts described above, Defendants intentionally or knowingly failed to remit funds, or intentionally or knowingly caused their co-conspirators to fail to remit funds, improperly paid by Government Payors. Defendants intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

366.    Defendants's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an

-173-

unlawful avoidance or decrease of an obligation to pay money owed to the State.

367.     Defendants's unlawful conduct occurred from on or around October 10, 2016, until the present and is on-going, and has caused, and is causing, the State of Texas to suffer damages.

368.     Accordingly, Defendants are liable for treble damages, civil penalties, and the cost of this action under the Texas FCA, including Hum. Res. Code § 36.007, together with attorney's fees, interest and prejudgment interest.

## PRAYERS FOR RELIEF

WHEREFORE, Relator, Creger, on behalf of the United States and the Plaintiff States, and on his own behalf, requests that this Court enter an order:

a.     That Defendants violated: the Federal and State False Claims Acts; the *Stark* Law; the Anti-Kickback Statute and the CARES Act, including its Paycheck Protection Program;

b.     That Defendants pay an amount equal to three times the amount of damages the United States and the Plaintiff States have sustained because of Defendants' actions, plus a civil penalty against Defendants of not less than $12,537 and not more than $25,076 for each of over 42,000 violations of the Federal and State False Claims Acts;

c.     That Defendants cease and desist from violating the Federal and State FCAs;

d.     That Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to the Federal and State False Claims Acts;

e.     That Relator be awarded the maximum amount allowed as a relator share pursuant to 31 U.S.C. § 3730(d) and comparable provisions of the State False Claims Acts; and

f.     That the United States, the Plaintiff States and Relator be granted all such other and further relief as the Court deems just and proper.

-174-

RELATOR DEMANDS TRIAL BY JURY ON ALL COUNTS.

Respectfully submitted,

RELATOR DANIEL W. CREGER


By: /s/ Trevor W. Howell
Trevor W. Howell, #9496
HOWELL LAW, PLLC
P. O. Box 158511
Nashville, TN 37215
(615) 406-1416
trevor@howelllawfirmllc.com


Ray M. Thompson (Trial Counsel)
Attorney at Law
P. O. Box 81177
Mobile, AL 36689-1177
(251) 432-0055
seapitch@bellsouth.net


Attorneys for Relator

STATE OF TENNESSEE    )
COUNTY OF DAVIDSON    )

VERIFICATION

Appeared before me, the undersigned Notary Public, Daniel W. Creger, who, after being placed under oath, did depose and say the following:

My name is Daniel W. Creger and I am over the age of twenty-one (21) years, of sound mind and not under the influence of any drugs or medications. I have reviewed the factual assertions and statements contained in the foregoing Verified Amended Complaint and each Exhibit attached thereto. The statements and information contained in the said Verified Amended Complaint and Exhibits are true and correct based upon either my firsthand knowledge or the contents of the said Exhibits. I make this Verified Amended Complaint voluntarily as my own free act and deed and further acknowledge that I have not been influenced or coerced to do so.

_____
Daniel W. Creger

Sworn to and subscribed before me
this __29__ day of August, 2022.

_____
Notary Public
My Commission Expires:

(SEAL)